# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF MARYLAND, and STATE OF NEW JERSEY, | Civil Action No. 18-cv-6427 |
| Plaintiffs, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | JURY REQUESTED |
| STEVEN T. MNUCHIN, in his official capacity as Secretary of the United States Department of Treasury; the UNITED STATES DEPARTMENT OF TREASURY; DAVID J. KAUTTER, in his official capacity as Acting Commissioner of the United States Internal Revenue Service; the UNITED STATES INTERNAL REVENUE SERVICE; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## INTRODUCTION

1.      The States of New York, Connecticut, Maryland, and New Jersey (the "Plaintiff States") bring this action seeking declaratory and injunctive relief to invalidate the new $10,000 cap on the federal tax deduction for state and local taxes ("SALT"). Congress has included a deduction for all or a significant portion of state and local taxes in every tax statute since the enactment of the first federal income tax in 1861. The new cap effectively eviscerates the SALT deduction, overturning more than 150 years of precedent by drastically curtailing the deduction's

1

scope. As the drafters of the Sixteenth Amendment[1] and every subsequent Congress have understood, the SALT deduction is essential to prevent the federal tax power from interfering with the States' sovereign authority to make their own choices about whether and how much to invest in their own residents, businesses, infrastructure, and more—authority that is guaranteed by the Tenth Amendment and foundational principles of federalism. The new cap disregards Congress's hitherto unbroken respect for the States' distinct and inviolable role in our federalist scheme. And, as many members of Congress transparently admitted, it deliberately seeks to compel certain States to reduce their public spending. This Court should invalidate this unconstitutional assault on the States' sovereign choices.

2.      As used in this complaint, "SALT deduction" refers to the federal individual income tax deduction for all or a substantial portion of state and local (i) real and personal property taxes, (ii) income taxes, and (iii) sales taxes. Until the 2017 federal tax overhaul, Congress consistently provided a deduction for all or a substantial portion of state and local taxes. In the most recent iteration of the deduction prior to the 2017 tax overhaul, federal tax law permitted federal taxpayers who itemized their tax deductions to deduct, subject to certain incidental limitations, all of their state and local real and personal property taxes, and either state and local income taxes or sales taxes.

3.      A SALT deduction has been a part of every federal income tax law since the first federal income tax was enacted in 1861. The deduction is necessary to ensure that the exercise of the federal government's tax power does not unduly interfere with the sovereign authority of the

---

[1] The Sixteenth Amendment to the United States Constitution was ratified in 1913 and provides: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

States to determine their own taxation and fiscal policies by crowding the States out of traditional revenue sources, like income, property, and sales taxes. The SALT deduction further ensures that States have the prerogative to determine the appropriate mix and level of public investments to make on behalf of their residents, as well as the authority to choose how to raise revenue to pay for those investments. The new cap on the SALT deduction will raise the federal tax liability of millions of taxpayers within the Plaintiff States. And by increasing the burden of those who pay substantial state and local taxes, the new cap on the SALT deduction will make it more difficult for the Plaintiff States to maintain their taxation and fiscal policies, hobbling their sovereign authority to make policy decisions without federal interference.

4.     The necessity of protecting the States' sovereign authority to determine their own taxation and fiscal policies was an explicit concern for the Founders at the time of the ratification of the Constitution. That necessity informed all decisions about imposing the first federal income tax during the Civil War, and it was confirmed in the subsequent enactment history of the Sixteenth Amendment.

5.     The longstanding statutory deduction is based on Congress's historic understanding that a deduction for all or a significant portion of state and local taxes is constitutionally required because it reflects structural principles of federalism embedded in the Constitution. The Founders were deeply concerned that the federal government would exercise its tax power to encroach upon the original and sovereign authority of the States to raise revenues through taxes. To avoid this possibility, the Founders reserved to the States concurrent authority to levy taxes. When the Constitution was ratified, it was widely understood that the federal government could not abrogate the States' sovereign tax authority, and that the federalism principles embedded in the Constitution would constrain the federal government's tax power.

3

6.      Since Congress enacted the first federal income tax in 1861, Congress has provided a deduction for all or a significant portion of SALT in every federal income tax law, respecting federalism constraints on its taxing power and the concurrent tax authority of the sovereign States. This uninterrupted practice provides strong evidence that the federal government lacks constitutional authority to drastically curtail the deduction.

7.      The ratification history of the Sixteenth Amendment provides further confirmation that Congress's unprecedented curtailment of the deduction cannot be reconciled with the limits on the federal government's tax powers under Article I, Section 8 and the Sixteenth Amendment to the United States Constitution. When the States agreed to ratify the Sixteenth Amendment, they did so on the understanding that the federal government's income tax power was and would remain subject to federalism constraints, and that the federal government was required to accommodate the sovereign tax power of the States when it imposed a federal income tax. Moreover, federal income tax measures considered immediately before and after ratification expressly included a SALT deduction. This history demonstrates that the States approved the federal government's authority to tax income subject to longstanding federalism principles, including the requirement that the federal government could not drastically curtail the scope of the SALT deduction.

8.      On December 22, 2017, following a rushed and highly partisan process, the federal government reversed over 150 years of precedent by enacting sweeping tax legislation that, among other things, eviscerated the deduction for state and local taxes. Effective 2018, individual and married taxpayers filing jointly may deduct only up to $10,000 for their combined state and local (i) real and personal property taxes, and (ii) income taxes or sales taxes. For married taxpayers filing separately, each taxpayer is limited to a $5,000 deduction. *See* An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent Resolution on the Budget for Fiscal

Year 2018 (the "2017 Tax Act" or "Act"), Pub. L. No. 115-97, § 11042, 131 Stat. 2054 (2017) (H.R. 1).

9.      The new cap on the SALT deduction is unprecedented, unlawful, and will cause significant and disproportionate injury to the Plaintiff States and their residents.

10.     The new cap will significantly increase the amount of taxes residents in Plaintiff States will pay to the federal government. For example, when considering the effect of the 2017 Tax Act with and without the new cap on the SALT deduction, the new cap will be responsible for New York taxpayers paying an additional $14.3 billion in federal taxes in tax year 2018, and an additional $121 billion between 2018 and 2025, the year when the new cap is set to expire. The other Plaintiff States will experience similar effects. This revenue is a primary means by which Congress is offsetting the cost of the tax cuts in the 2017 Tax Act.

11.     While taxpayers in the Plaintiff States will bear the cost of paying for the new tax cuts, they will receive the least benefit from the 2017 Tax Act. As a percentage of each State's population, more taxpayers in the Plaintiff States will experience a tax increase relative to taxpayers in other States because of the 2017 Tax Act. And relative to the amount of taxes the taxpayers in the Plaintiff States were paying to the federal government before the 2017 Tax Act, they will receive a disproportionately small share of the tax cuts. By unfairly benefiting taxpayers of other States at the expense of the taxpayers of Plaintiff States, the 2017 Tax Act injures the Plaintiff States' sovereign and quasi-sovereign interests.

12.     In addition to disproportionately harming the Plaintiff States relative to others, the new cap on the SALT deduction will cause significant and irreparable direct harm to the Plaintiff States and their taxpayers.

13.     Among other things, the new cap on the SALT deduction is likely to substantially decrease home values in the Plaintiff States, hurting both in-state homeowners and the Plaintiff States themselves. Under the law before the 2017 Tax Act, homeowners could deduct the full cost of property taxes on their federal income taxes. By capping the deduction, the 2017 Tax Act increases the cost of owning a home, which, in turn, depresses home values.

14.     Homes are the most valuable assets many homeowners possess. With depressed home prices, many homeowners will lose the equity on which they depend to finance retirement, school tuition, and other investments. Homeowners will also have less to spend on goods and services, which, in turn, will lead to decreased business sales, lower the Plaintiff States' revenue, and curtail their economic growth.

15.     By reducing the wealth of taxpayers in the Plaintiff States and undermining the States' revenue sources, the new cap on the SALT deduction will ultimately make it more difficult for the States to maintain their current taxation and fiscal policies, and deprive the Plaintiff States of the ability to raise revenue in the future. These effects will force the Plaintiff States to choose between their current level of public investments and higher tax rates. By interfering with the States' sovereign authority in this way, the new SALT deduction cap violates bedrock principles of federalism enshrined in the Tenth Amendment, and it exceeds the federal government's tax powers under Article I, Section 8 and the Sixteenth Amendment to the U.S. Constitution.

16.     This interference with the States' sovereign authority is particularly egregious because Congress enacted the cap on the SALT deduction with the purpose of coercing a handful of States to change their taxation and fiscal policies. During the debates on the 2017 Tax Act, executive officials and Republican legislators—the legislation received no Democratic votes in either house of Congress—issued press statement after press statement making clear their intention

to injure the Plaintiff States. For example, President Trump stated that the new cap on the SALT deduction was intended to force States like New York and the other Plaintiffs States to change their policies or they were "not going to benefit" from the 2017 Tax Act. In Secretary Mnuchin's words, the new cap on the SALT deduction was intended to "send a message" to the Plaintiff States that they need to alter the choices they have made about publicly investing in their States' residents and businesses. And as a Republican legislator acknowledged, the new cap on the SALT deduction was intended to "kick" Plaintiff States—an assault that proponents hoped would force the Plaintiff States to change their policy choices.

17.     Because Congress acted with the purpose and effect of forcing the Plaintiff States to change their taxation and fiscal policies, the new cap also violates principles of equal state sovereignty. The Constitution guarantees each State equal authority to control its sovereign affairs, including the ability to determine state taxation and fiscal policy. Without a compelling purpose, the federal government may not target a few States for unfavorable treatment to coerce those States into changing their sovereign policy choices.

18.     The 2017 Tax Act violates this constitutional guarantee. The Plaintiff States have exercised their sovereign authority to adopt taxation and fiscal policies that support vital public investments that benefit their residents. Because a bare congressional majority of one party disagrees with the Plaintiff States' policy choices, Congress enacted the new cap on the SALT deduction with the purpose and effect of coercing the Plaintiff States into reducing taxes and cutting the vital public investments and services those taxes support. The new cap thus constitutes a purposeful invasion of the sovereign authority of a handful of States to determine their own taxation and fiscal policies without a compelling justification.

19.     For all of these reasons, the Plaintiff States seek a declaration that the new cap on the SALT deduction violates the U.S. Constitution, and an injunction barring the new cap's enforcement.

## JURISDICTION AND VENUE

20.     The Court has jurisdiction over the action under the provisions of 28 U.S.C. §§ 1331, 1340, and 2201.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and § 1391(e)(1)(B).

## PARTIES

22.     The Plaintiff States are all sovereign States of the United States of America.

23.     Attorney General Barbara D. Underwood brings this action on behalf of the State of New York at the request of Governor Andrew M. Cuomo to protect the interests of New York and its residents. The Attorney General is the chief law officer of the State and is authorized to file civil suits directly involving the State's rights and interests. *See* N.Y. Executive Law § 63(1). Among other things, the Attorney General is empowered to protect New York's sovereign tax authority. *See* N.Y. State Const. art. XVI, § 1.

24.     Attorney General George Jepsen brings this action on behalf of the State of Connecticut at the request of Governor Dannel P. Malloy to protect the interests of Connecticut and its residents. *See* Conn. Gen. Stat. § 3-5. The Attorney General is Connecticut's chief legal officer with general supervision over all civil legal matters in which the State is an interested party. *Id.* § 3-125.

25.     Plaintiff the State of Maryland is represented by and through the Attorney General of Maryland, Brian Frosh, its chief legal officer, with general charge, supervision, and direction of

8

the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file this suit to challenge the actions by the federal government, which threaten the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); Joint Resolution 1, 2017 Md. Laws.

26.     Plaintiff the State of New Jersey is represented by and through the Attorney General Gurbir S. Grewal, the State's chief legal officer. Attorney General Grewal has the authority to file this suit to protect the sovereign interests of the State. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

27.     As explained below, the Plaintiff States and their residents will suffer legally cognizable harm because of the new cap on the SALT deduction, and an order invalidating the new cap would redress the Plaintiff States' injuries. Accordingly, the Plaintiff States have standing to bring this action.

28.     Congress has not provided an alternative procedure for the Plaintiff States to challenge the constitutionality of the new $10,000 cap on the SALT deduction.

29.     Defendant Steven Mnuchin is the Secretary of the U.S. Department of Treasury and is responsible for overseeing the Department of Treasury and the Internal Revenue Services (IRS). *See* 26 U.S.C. § 7801; 31 U.S.C. § 301. He is sued in his official capacity.

30.     Defendant the U.S. Department of Treasury is an executive department that oversees the IRS. *See* 26 U.S.C. § 7801.

31.     Defendant David J. Kautter is the Acting Commissioner of the IRS and is responsible for overseeing the IRS, including its implementation and enforcement of the 2017 Tax Act. *See* 26 U.S.C § 7803. He is sued in his official capacity.

9

32.     Defendant the IRS is a federal tax-collection agency that is responsible for the implementation and enforcement of the internal revenue laws, including the 2017 Tax Act. *See* 26 U.S.C § 7803.

33.     Defendant the United States of America includes all government agencies and departments responsible for the passage and implementation of the 2017 Tax Act.

## ALLEGATIONS

I.     **CONGRESS'S CONSTITUTIONAL POWER TO IMPOSE AN INCOME TAX IS LIMITED BY ITS OBLIGATION TO PROVIDE A DEDUCTION FOR ALL OR A SIGNIFICANT PORTION OF STATE AND LOCAL TAXES.**

34.     The Supreme Court has made clear that Congress's powers vis-à-vis the States must be construed in light of history. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 905-18 (1997). As the Court recently explained, the "lack of historical precedent" for a new assertion of congressional power is "[p]erhaps the most telling indication" of a "severe constitutional problem." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (quotation marks omitted). Measured by history, the new cap and its drastic curtailment of the SALT deduction is unprecedented.

35.     The power to tax was an original power of the sovereign States that has never been surrendered. When the States formed the union, they consented to give the federal government a concurrent power to tax, but only to the extent that federal power could not be exercised to abrogate the sovereign authority of the States to establish their own taxation and fiscal policies. At ratification, it was widely understood that the federalism principles enshrined in the Constitution would serve as a check on the federal government's tax power.

36.     Recognizing this structural limitation on its power to tax, the federal government has always respected the sovereign tax authority of the States by providing a deduction for all or a

substantial portion of state and local taxes as part of the federal income tax. Indeed, since the federal government first exercised its income tax power in 1861, Congress has included such a deduction in every federal income tax law. Relying on this constitutional guarantee and uninterrupted practice, the States have structured their own state tax regimes around the federal SALT deduction.

37.     The ratification history of the Sixteenth Amendment provides further confirmation that a deduction for all or a significant portion of state and local taxes is constitutionally required. When the States ratified the Sixteenth Amendment, they confirmed the historic limitations on the federal government's income tax power. At the time of the amendment's ratification, it was widely understood that, to the extent the federal government taxed income, it would provide a deduction for all or a significant portion of state and local taxes. The States—including the Plaintiff States— relied upon this understanding in making the decision to ratify the Sixteenth Amendment.

38.     The longstanding understanding that a deduction for all or a significant portion of state and local taxes is constitutionally required has remained the law until the recent tax overhaul, when Congress not only reversed over 150 years of precedent by imposing the new cap, but did so with the purpose of coercing the Plaintiff States into changing the choices they have made about publicly investing in their residents and businesses. Press statements from President Trump, Secretary Mnuchin, and Republican legislators make clear that the new cap on the SALT deduction was intended to "send a message" to the Plaintiff States that they must change their public policy choices or suffer. As explained below, these statements stand in stark contrast to the last 150 years of federal tax law, which has respected the States' sovereign authority.

### A. The Founders understood the federal government's tax power to be limited by the sovereign and co-equal tax sovereignty of the States.

39.    The power to tax and spend is a sovereign function of the States that predates the formation of the United States. *See, e.g.*, *Lane County v. Oregon*, 74 U.S. 71, 76 (1868). The States have always retained their sovereign right to determine their own taxation and fiscal policies, and that sovereign authority imposes a structural check on the tax power of the federal government. As explained below, the Founders designed the Constitution to ensure that the federal government could not exercise its tax power to abrogate the States' sovereign tax authority, or to use its own tax power to coerce the States into changing or abandoning their own taxation and fiscal policies.

40.    For much of the colonial period, taxes were levied primarily by colonial governments, which raised revenues from a diverse array of property and income taxes, among other sources.[2] When, in the late eighteenth century, the Crown attempted to increase its own taxes, the colonies waged a war to preserve their right to self-government, including the right to determine their own taxation and fiscal policies.[3]

41.    Following the failures of the Articles of Confederation, the Founders recognized the necessity of creating a national government with the power to tax, but they were also deeply concerned that giving the federal government an unlimited tax power would encroach on the

---

[2] The precursor to the modern income tax, known as the faculty tax, was levied by colonial governments as early as the 1630s. *See* Alvin Rabushka, *Taxation in Colonial America* 165, 170-78, 206-07 (2008); Edwin R.A. Seligman, *The Income Tax: A Study of the History, Theory, and Practice of Income Taxation at Home and Abroad* 367-68 (2d ed. 1914). Although the colonies paid some taxes to the British government, external taxes were relatively low until the decades before the Revolutionary War and consisted largely of import duties and royal quitrents—i.e., land taxes imposed in lieu of a service obligation—not income or property taxes. *See* Rabushka, *supra*, at 715, 866.

[3] *See, e.g.*, Rabushka, *supra* note 2, at 1, 144.

States' traditional revenue sources.[4] This concern pervaded the state debates about ratification. As a prominent contemporaneous legal scholar explained, "[w]hen the constitution of the United States was under the consideration of the state conventions, there was much concern expressed on the subject of the general power of taxation over all objects of taxation, vested in the national government."[5]

42.     Although the Founders were particularly concerned with the possibility of the federal government's direct interference with the States' tax powers, the ratification debates make clear that the Founders understood that creating a federal tax power could also interfere with state sovereignty.[6]

43.     To prevent such encroachment, the Founders adopted a dual federalist structure and reserved to the States a concurrent tax authority. As Alexander Hamilton explained during the ratification debates, "the individual States would, under the proposed Constitution, retain an *independent and uncontrollable authority* to raise revenue to any extent of which they may stand in need, *by every kind of taxation*, except duties on imports and exports."[7] Further protections were afforded to the States in the Guarantee Clause, which ensures, among other things, the power of the States "to set their legislative agendas" and to determine their own "form" and "method" of self-government. *New York v. United States*, 505 U.S. 144, 185 (1992).[8]

---

[4] *See, e.g.*, Sarah F. Liebschutz & Irene Lurie, *The Deductibility of State and Local Taxes*, 16 Publius 51, 52 (1986).

[5] 1 James Kent, *Commentaries on American Law* 367 (O. Halsted ed., 1826).

[6] *See, e.g.*, *The Federalist* No. 33 (Hamilton) (Congress.gov) (arguing that the federal government could not use its tax power to abrogate a land tax imposed by a State).

[7] *Id.* (emphasis added).

[8] *See* U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on

44.     In 1791, the Founders solidified these protections when they ratified the Tenth Amendment, confirming that because the power to tax was reserved to the States, the federal government could not exercise its own tax power in such a way as to encroach upon the States' sovereign tax authority.[9] By reserving to the states a concurrent power to tax, and thereby imposing structural limits on the federal government's tax power, the Founders ensured that the federal government could not use its new tax power to undermine the sovereign authority of the States to determine how to make public investments and how to tax their residents to support those investments. The right of the States to determine their own taxation and fiscal policies is thus enshrined in the federalist structure of the Constitution, as well as the Guarantee Clause and the Tenth Amendment.

**B.  Pre-Sixteenth Amendment practice confirms Congress's consistent understanding and practice that its income tax power cannot be exercised without providing a deduction for all or a significant portion of state and local taxes.**

45.     While the Founders were principally concerned with direct federal interference with state tax authority (such as a federal statute abrogating a state tax), the actions of the early Congresses reflected a broader understanding of the need to refrain from exercising the federal tax power in the domains in which the States had traditionally exercised their tax authority. In the decades following the adoption of the Constitution, most taxes were levied by the States, not the

---

Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.").

[9] *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); *see also, e.g.*, *Thomson v. Pacific R.R. Co.*, 76 U.S. 579, 591 (1869) (explaining that "the power to tax all property, business, and persons" was a power "original in the States" and that was never "surrendered" to the federal government); N.Y. State Const. art. XVI, § 1 ("The power of taxation shall never be surrendered, suspended or contracted away, except as to securities issued for public purposes pursuant to law.").

federal government. To the extent the federal government imposed its own taxes, it respected the federalism principles enshrined in the Constitution by levying customs duties and excise taxes, rather than taxing revenue sources traditionally taxed by the States, such as property and income.[10] When the federal government did attempt to tax incomes—a tax power traditionally exercised by the States—it accommodated the sovereign authority of the States by providing a deduction for all or a significant portion of state and local taxes. These accommodations reflected Congress's consistent understanding that the revenue sources traditionally taxed by the States should be largely free from the interference that would result from concurrent federal taxation.

46.     Congress first considered imposing an income tax during the War of 1812. At that time, lawmakers reaffirmed the views expressed by the Founders about the dangers of the federal government imposing a tax that would interfere with the States' ability to generate revenue from traditional sources. To guard against such interference, an initial proposal for a federal income tax exempted entirely state and local taxes from federal taxation, providing that the federal income tax would extend "only to such capital or employments *as are not taxed by any existing laws*."[11] Although never adopted, this early proposal makes clear that early Congresses understood that the application of federal taxes to sources already taxed by the States would interfere with the States' own tax authority, and that, in the context of the income tax, the federal government was *required* to accommodate the States by exempting from taxation the income that taxpayers pay towards state and local taxes.

---

[10] *See* Roy G. Blakey & Gladys C. Blakey, *The Federal Income Tax* 2 (1940); *see also* Seligman, *supra* note 2, at 389, 397-406 (describing the history of the income tax as adopted by the States until the Civil War).

[11] 28 Annals of Cong. 1079 (Jan. 18, 1815) (emphasis added); *see also* U.S. Treasury, State of the Treasury, No. 438, 13th Cong., 3d Sess., in 2 *American State Papers, Finance* 885, 887 (1815) (proposing consideration of an income tax to fund the War of 1812).

47.     Congress adhered to this understanding when it eventually adopted the first federal income tax in 1861.[12] Despite the nation's desperate need for revenue during the Civil War, the first federal income tax provided a deduction for "all national, state, or local taxes assessed upon the property, from which the income is derived."[13] As legislators stressed, the deduction was necessary to ensure that the federal tax did not burden the States' own ability to raise tax revenue—a power that had been reserved to the States under the federalism guarantees of the Constitution. For example, House Ways and Means Committee member Justin Smith Morrill explained: "It is a question of vital importance to [the States] that the General Government should not absorb all their taxable resources—that the accustomed objects of State taxation should, in some degree at least, go untouched. The orbit of the United States and the States must be different and not conflicting."[14] Committee Chairman Thaddeus Stevens made similar comments, explaining that Congress was primarily concerned with avoiding "double taxation," and that it was a paramount goal of the drafters to "exclud[e] from this tax the articles and subjects of gain and profit which are taxed in another form."[15] Although the Civil War income tax was modified several times, the deduction for SALT was inviolable and remained in effect until the federal income tax was repealed in 1872.[16]

---

[12] *See generally* Blakey & Blakey, *supra* note 10, at 4 (discussing the 1861 income tax).

[13] Act of Aug. 5, 1861, ch. 45, § 49, 12 Stat. 292, 309.

[14] Cong. Globe, 37th Cong., 2d Sess. 1194 (1862).

[15] Cong. Globe, 37th Cong., 2d Sess. 1577 (1862).

[16] *See* Act of July 1, 1862, ch. 119, § 91, 12 Stat. 432, 473-74; Act of June 30, 1864, ch. 173, § 117, 13 Stat. 223, 281; Act of March 3, 1865, ch. 78, 13 Stat. 469, 479; Act of March 2, 1867, ch. 169, § 13, 14 Stat. 471, 478; Act of July 14, 1870, ch. 255, § 9, 16 Stat. 256, 258. *See generally* Seligman, *supra* note 2, at 435-68 (discussing the Civil War income tax).

48.     The Civil War income tax—and its deduction for state and local taxes—provided "an important precedent" for subsequent federal income-tax regimes.[17] When the federal income tax was briefly revived between 1894 and 1895, legislators modeled the tax on the Civil War precedent,[18] providing a broad deduction for "all national, State, county, school, and municipal taxes, not including those assessed against local benefits, paid within the year."[19] At the time, there was virtually no debate about the SALT deduction; its inclusion was a foregone conclusion. As even an opponent of the bill acknowledged, there was no question that individuals would be "allowed to deduct their taxes."[20]

49.     The 1894 federal income tax was ultimately short-lived. In 1895, the Supreme Court held the tax unconstitutional because it was a direct tax that had not been apportioned. *See Pollock v. Farmer's Loan & Trust Co.*, 158 U.S. 601 (1895); *see also* U.S. Const. art. I, § 2. Nonetheless, the 1894 income tax, like its Civil War predecessor, reflected Congress's longstanding constitutional understanding of the type of SALT deduction it was required to provide to avoid interfering with the States' ability to raise tax revenue from the same sources. And as the Supreme Court has recognized, this kind of uninterrupted historical understanding is important evidence of the constitutional limitations on Congress's power. *See, e.g., Free Enterprise Fund*, 561 U.S. at 505.

---

[17] Blakey & Blakey, *supra* note 10, at 5.

[18] *See* Seligman, *supra* note 2, at 508.

[19] Act of August 27, 1894, ch. 349, § 28, 28 Stat. 509, 553.

[20] 26 Cong. Rec. 6,888 (1894) (statement of U.S. Senator David B. Hill); *see also* Seligman, *supra* note 2, at 505 (describing Senator Hill's opposition to the income tax on States' rights grounds).

**C.  When the States ratified the Sixteenth Amendment, they affirmed the structural limits on the federal government's tax power and the constitutional necessity of a deduction for all or a significant portion of state and local taxes.**

50.     In the years following *Pollock*, the federal government's power to impose an income tax was unsettled. A number of proposals to restore a federal income tax—all of which included a deduction for all or a significant portion of state and local taxes[21]—were introduced in Congress, but none passed until after the ratification of the Sixteenth Amendment.[22] As explained below, the ratification process of the amendment and the legislative enactments immediately following ratification make clear that both Congress and the States understood the federal government's income tax powers to be constrained by federalism, and that the federal government cannot drastically curtail the SALT deduction without running afoul of that constraint.

---

[21] *See, e.g.*, H.R. 5, 62d Cong. § 2 (1911) (proposing an income tax that included a deduction for "all national, State, county, school, and municipal taxes, not including those assessed against local benefits"); H.R. 110, 61st Cong. § 2 (1909) (same); H.R. 1473, 61st Cong. § 2 (1909) (same); H.R. 2110, 61st Cong. § 2 (1909) (same); H.R. 21216, 60th Cong. § 2 (1908) (same); H.R. 10548, 60th Cong. § 2 (1907) (same); H.R. 345, 60th Cong. § 2 (1907) (same).

In 1909, Congress considered a proposed income tax sponsored by Senator Joseph Bailey as an amendment to the Payne-Aldrich Tariff Act. The proposal, which was modeled on the 1894 income tax, included a deduction for SALT. *See* 44 Cong. Rec. 2444 (May 27, 1909) ("Provided, however, that it be proper to deduct from such gains, profits, and income . . . all national, state, county, town, district, and municipal taxes, not including those assessed against local benefits . . . ."). Although not adopted, the proposal sparked Congress's consideration of the Sixteenth Amendment. Both the constitutional amendment and the tariff bill, *sans* income tax, passed in Congress in the summer of 1909. *See* S.J. Res. 40, 61st Cong., 36 Stat. 184 (1909) (Sixteenth Amendment); Payne-Aldrich Tariff Act, ch. 6., 36 Stat. 11 (1909); *see also Taft Tax Message Fails to Unite Party*, N.Y. Times, June 17, 1909, at 4 (describing a message from President Taft to Congress recommending that Congress pass the tariff bill without an income tax but consider a separate amendment to the Constitution authorizing an income tax).

[22] The Sixteenth Amendment provides that "Congress shall have the power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

51.     After Congress voted to adopt the Sixteenth Amendment in the summer of 1909, a four-year-long ratification process began in the States.  Across the country, state legislators raised concerns about the federalism implications of the proposed amendment, fearing that it would expand the federal government's power at the expense of the States. Indeed, the States' rights argument "was the most frequently voiced reason for opposing the amendment."[23] As explained below, the assurances made by the supporters of the Sixteenth Amendment to overcome these federalism concerns provide critical evidence about the Amendment's original meaning and confirm the constitutional limitations that the 2017 Tax Act transgresses by capping the SALT deduction.

52.     A number of States engaged in extended debates concerning the Sixteenth Amendment's impact on state taxation powers. New York played a leading role in these debates.[24] In January 1910, then-Governor (and later Chief Justice of the U.S. Supreme Court) Charles Evans Hughes delivered a widely circulated message (the "Hughes Message") to the New York Legislature opposing ratification on federalism grounds.[25] Although Hughes's primary concern was whether the amendment would enable the taxation of income derived from state and municipal securities, he raised broader concerns about its implications for federalism and the balance of power between the federal government and the States. Hughes feared that the proposed amendment "would be an impairment of the essential rights of the State," including the States' ability to

---

[23] John D. Buenker, *The Ratification of the Federal Income Tax Amendment*, 1 Cato J. 183, 204 (1981).

[24] *See* John D. Buenker, *The Income Tax and the Progressive Era* 239, 250 (1985).

[25] *See id.* at 255.

generate revenue from traditional sources.[26] As Hughes warned, "we may desire that the Federal Government may be equipped with all necessary National powers in order that it may perform its National function," but "we must be equally solicitous to secure the essential bases of State Government."[27]

53.     Governor Hughes's concerns gained traction throughout the United States. The Governor of Connecticut, Frank B. Weeks, based his opposition to the amendment on the sentiments in the Hughes Message, and Massachusetts's legislative committee on federal relations cited Hughes's argument as the reason for its report opposing the amendment. State legislators in Louisiana, South Carolina, and Utah also heavily cited the Hughes Message in their opposition to the amendment.[28]

54.     Many other States articulated similar concerns. Georgia initially voted against the amendment, with legislators warning that "it was a grave thing for States to confer such power on the Federal Government," and that "it would probably be better for Georgia to adopt an income tax law for herself and reject the proposition for a National income tax."[29] After the Virginia legislature rejected the amendment, one newspaper summarized the sentiments of many of the state legislators: "It will be a long time before Virginia will set her sister States the example of surrendering unnecessarily to the central government any important right now reserved to the States."[30]

---

[26] *Hughes is Against Income Amendment*, N.Y. Times, Jan. 6, 1910, at 2 (reproducing Hughes's message to the legislature).

[27] *Id.*

[28] *See* Buenker, *supra* note 24, at 264-65.

[29] *Georgia Avoids Income Tax*, N.Y. Times, Aug. 6, 1909, at 1.

[30] *Decisive Blow at the Income Tax Amendment*, Daily Press (Newport News, V.A.), Mar. 10, 1910, at 4; *see also Views of the Virginia Editors*, Times Dispatch (Richmond, V.A.), Feb. 16,

55.     The various objections to the Sixteenth Amendment demonstrate that the States understood that the primary power the amendment solidified was the concurrent power of Congress to tax incomes. And the objections highlight that the main concern shared by the States was that such concurrent authority would impinge on the States' tax base and undermine a traditional source of tax sovereignty.

56.     These vigorous objections to the Sixteenth Amendment posed a serious obstacle to ratification, which required the assent of thirty-six States. In order to overcome these concerns, the champions of the Sixteenth Amendment provided repeated and vigorous assurances that the federal government's income tax power under Article I had been subject to meaningful federalism constraints, and that the same constraints would apply equally to the Sixteenth Amendment's authority to tax income. For example, U.S. Senator William Borah argued in widely publicized statements that the federal tax power, while broad, was limited by the tax sovereignty of the States, and that the federal government could not exercise its powers under the Sixteenth Amendment to encroach on the States' traditional tax authority. Borah stressed that the Sixteenth Amendment must be construed in light of the Founders' understanding of the federal tax power, as well as the Founders' desire to preserve the independent and inviolable tax sovereignty of the States, free from federal intrusion.[31] As Borah explained, "[t]he taxing power of the United States *is subject to an*

---

1913, at 4 ("The ratification of the sixteenth amendment to the Federal Constitution seems to have been a voluntary surrender upon the part of the States—to the national government, and appears upon its face to relinquish an inherent State right—that of levying a tax upon incomes.").

[31] *See* 45 Cong. Rec. 1696-98 (Feb. 10, 1910).

*implied restraint arising from the existence of the powers in the State* which are obviously intended to be beyond the control of the General Government."[32]

57.     Another U.S. Senator, and a former Secretary of State and Secretary of War, Elihu Root, echoed Borah's arguments in a widely publicized letter sent to the New York legislature responding to the Hughes Message.[33] Like Borah, Root argued that the proposed amendment must "be interpreted in the light of history."[34] In light of the longstanding constitutional understanding, "[t]he taxing power of the Federal Government does not . . . extend to the means or agencies through or by the employment of which the States perform their essential functions."[35] Root further argued that there was a "uniform, long-established, and indisputable rule" of construction that would apply to the Sixteenth Amendment and prohibit the federal taxing power from encroaching on "the powers or instrumentalities of the State."[36]

58.     U.S. Senator Joseph Bailey, another prominent defender of the amendment, toured the United States and spoke before a number of state legislatures in defense of the amendment.[37]

---

[32] *Id.* at 1696 (emphasis added) (internal citation omitted). Borah reiterated these sentiments in a June 1910 article, arguing that "notwithstanding the unlimited nature of the taxing power of Congress when *standing alone*, it must be construed in the light of the fact that we have a dual Government[,]" and that "[t]he decision was based upon the law of self-preservation—the whole scope and plan of Government as outlined in the Constitution being that there were two separate and distinct sovereignties unembarrassed by each other." William E. Borah, *Income-Tax Amendment*, 191 N. Am. Rev. 755, 758 (1910).

[33] *See Root for Adoption of Tax Amendment*, N.Y. Times, Mar. 1, 1910, at 4 (reproducing letter from Root to New York State Senator Frederick Davenport).

[34] *Id.*

[35] *Id*.

[36] *Id*.

[37] Just before Congress proposed the constitutional amendment to the States in July 1909, Senator Bailey was the lead author of legislation to establish an income tax with a deduction for SALT. *See* 44 Cong. Rec. 2444 (May 27, 1909) (text of amendment submitted by Senator Bailey);

Bailey "ridicul[ed] the idea that its passage would alter the positions of the Federal government and the States, or impair the integrity of States' rights."[38] He assured opponents: "It is not true that such an amendment would abridge the rights of the State. No change but one is proposed, and that is that the income tax should be levied upon wealth rather than population. . . . Everything the State can do or tax now it can do after this amendment is adopted."[39]

59.     The assurances provided by Senators Borah, Root, Bailey, and others were important in persuading New York and other States to ratify the Sixteenth Amendment. Based on these assurances, the States understood that the new authority they were conferring on the federal government would not empower the federal government to encroach on the States' sovereign tax power, including their ability to impose their own state tax regimes free from federal interference.

60.     These public declarations about the meaning of the Sixteenth Amendment also provide insight into how Congress's income tax power under the Sixteenth Amendment should be construed. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 163-66 (1992).

61.     The drafters and defenders of the Sixteenth Amendment intended for the federal government's income tax powers to be constrained by the need to accommodate the States' sovereign tax authority.

---

*see also supra* note 21 (describing how Congress opted to propose a constitutional amendment to the States instead of immediately adopting individual income tax legislation).

[38] *Bailey Pleads for Income Tax*, Times Dispatch (Richmond, V.A.), Mar. 2, 1910, at 1.

[39] *Bailey Speaks at Columbia*, Watchman and Southron (Sumter, S.C.), Feb. 19, 1910, at 6.

The constitutional arguments made by the drafters and defenders of the Sixteenth Amendment were grounded in existing Supreme Court precedent and the thinking of contemporary legal scholars on the federalism constraints imposed on the federal tax power. *See, e.g.*, *Veazie Bank v. Fenno*, 75 U.S. 533, 541 (1869); *Lane County v. Oregon*, 74 U.S. 71, 77-78 (1868); Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 61-62 (3d ed. 1898); J.I. Clark Hare, 1 *American Constitutional Law* 265-66 (1889).

62.     When Congress first exercised its income tax power after the amendment's ratification in 1913, Congress respected the federalism constraints promised by the amendment's champions. Similar to prior federal income tax statutes, the first post-amendment federal income tax law—the Revenue Act of 1913—included a deduction for "all national, State, county, school, and municipal taxes paid within the year."[40]

63.     Under Supreme Court precedent, "[e]arly congressional enactments" of this nature "provide contemporaneous and weighty evidence of the Constitution's meaning." *Printz*, 521 U.S. at 905 (alteration and quotation marks omitted). As relevant here, the 1913 Revenue Act's SALT deduction establishes that Congress understood that its newly minted power to impose a federal tax on incomes was subject to the same federalism limitations that had applied to every federal tax statute since the Founding.[41]

64.     H. Parker Willis, an economist who advised the House Banking and Currency Committee on the 1913 Revenue Act, wrote that federalism concerns guided the drafting of the Act. As Willis explained, Congress "desired that the question of interference with state taxes should very carefully be safeguarded."[42] In the context of SALT, Willis explained that the deduction was included to ensure the federal government did not interfere with the States' existing tax powers. Because several States already had income tax regimes, "it was believed[] the field

---

[40] *See* Revenue Act of 1913, ch. 16, § II(B), 38 Stat. 114, 167.

[41] *See Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 174 (1926) (explaining that "[i]t was not the purpose or effect" of the Sixteenth Amendment "to bring any new subject within the taxing power").

[42] H. Parker Willis, *The Tariff of 1913: III*, 22 J. Pol. Econ. 218, 224, 227 (1914).

ought to be shared with the states."[43] Ultimately, this was accomplished by providing for "the general deduction of state and municipal taxes in computing income."[44]

65.     As the Supreme Court has recognized, this early post-amendment history "provide[s] contemporaneous and weighty evidence of the Constitution's meaning." *Printz*, 521 U.S. at 905 (quotation marks omitted). And, here, it provides clear evidence that Congress's income tax power under the Sixteenth Amendment is limited by the requirement that it must provide a deduction for all or a significant portion of SALT.

**D. Congress has provided a deduction for all or a significant portion of all state and local taxes in every federal income tax law since the adoption of the Sixteenth Amendment.**

66.     Since the enactment of the 1913 Revenue Act, Congress has adhered to the same constitutional understanding: that to exercise its income tax power, the federal government must accommodate the States' sovereign tax authority by providing a deduction for all or a significant portion of state and local taxes. Although Congress has imposed some incidental limitations on the deduction in the past, the core of the deduction for state and local property and income taxes has remained intact, across 51 different Congresses and 56 different tax acts.[45]

---

[43] *Id.* at 227.

[44] *Id.*

[45] *See* Revenue Act of 1916, ch. 463, § 5(a), 39 Stat. 756, 759 (allowing deduction for "[t]axes paid within the year imposed . . . under the authority of any State, county, school district, or municipality, or other taxing subdivision of any State, not including those assessed against local benefits"); Revenue Act of 1917, ch. 63, § 1201, 40 Stat. 300, 330 (no material changes to SALT deduction); Revenue Act of 1918, ch. 18, § 214(a)(3), 40 Stat. 1057, 1067 (no material changes to SALT deduction); Revenue Act of 1921, ch. 136, § 214(a)(3), 42 Stat. 227, 239 (preserving SALT deduction, but simplifying the statutory language); Revenue Act of 1924, ch. 234, § 214(a)(3), 43 Stat. 253, 270 (no material changes to SALT deduction); Revenue Act of 1926, ch. 27, § 214(a)(3), 44 Stat. 9, 26 (same); Revenue Act of 1928, ch. 852, § 23, 45 Stat. 791, 799 (same); Revenue Act of 1932, ch. 209, § 23, 47 Stat. 169, 179-80 (same); National Industrial Recovery Act of 1933, ch. 90, 48 Stat. 195 (same); Revenue Act of 1934, ch. 277, § 23, 48 Stat. 680, 688 (preserving SALT

deduction, but disallowing deduction of estate and gift taxes); Revenue Act of 1935, ch. 829, 49 Stat. 1014 (no material changes to SALT deduction); Revenue Act of 1936, ch. 690, § 23, 49 Stat. 1648, 1658-59 (preserving SALT deduction and reintroducing deduction for estate and gift taxes); Revenue Act of 1937, ch. 815, § 1, 50 Stat. 813, 816  (no material changes to SALT deduction); Revenue Act of 1938, ch. 289, § 23, 52 Stat. 447, 460-61 (same); Internal Revenue Code of 1939, ch. 2, § 23, 53 Stat. 1, 12 (preserving SALT deduction in Internal Revenue Code); Revenue Act of 1939, ch. 247, 53 Stat. 862 (1939) (no material changes to SALT deduction); Revenue Act of 1940, ch. 419, 54 Stat. 516 (same); Revenue Act of 1941, ch. 412, § 202, 55 Stat. 687, 700 (same); Revenue Act of 1942, ch. 619, 56 Stat. 798 (same); Revenue Act of 1943, ch. 63, 58 Stat. 21 (same); Revenue Act of 1945, ch. 453, 59 Stat. 556 (same); Revenue Act of 1948, ch. 168, 62 Stat. 110 (same); Revenue Act of 1950, ch. 904, 64 Stat. 906 (same); Revenue Act of 1951, ch. 521, 65 Stat. 452 (1951); Internal Revenue Code of 1954, ch. 736, § 164(a), 68A Stat. 3, 47 (reorganizing Internal Revenue Code and preserving SALT deduction); Technical Amendments Act of 1958, Pub. L. No. 85-866, 72 Stat. 1606 (preserving SALT deduction without change); Revenue Act of 1964, Pub. L. No. 88-272, § 207, 78 Stat. 19, 40-42 (restructuring statute but preserving SALT deduction and allowing a SALT deduction for gasoline taxes); Act of Oct. 27, 1972, Pub. L. No. 92-580, 86 Stat. 1276 (1972) (preserving SALT deduction but capping deduction for gasoline taxes for residents of American Samoa); Tax Reform Act of 1976, Pub. L. No. 94-455, § 1951(3), 90 Stat. 1520, 1837 (preserving SALT deduction without change); Revenue Act of 1978, Pub. L. No. 95-600, § 111, 92 Stat. 2763, 2777 (preserving deduction but repealing deduction for a narrow category of taxes); Crude Oil Windfall Profit Tax Act of 1980, Pub. L. No. 96-223, § 101(b), 94 Stat. 229, 250 (preserving SALT deduction without change); Act of Jan. 14, 1983, Pub. L. No. 97-473, § 202, 96 Stat. 2605, 2609 (preserving SALT deduction and adding technical language about the treatment of Indian and tribal governments); Social Security Amendments of 1983, Pub. L. No. 98-21, § 124, 97 Stat. 65, 90-91 (no material change to SALT deduction); Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 474(r), 98 Stat. 494, 844 (preserving the SALT deduction but making technical amendments to the statute); Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, § 516, 100 Stat. 1613, 1771 (no material changes to SALT deduction); Tax Reform Act of 1986, Pub. L. No. 99-514, §§ 134, 1432, 100 Stat. 2085, 2116, 2729 (same); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1941(b)(2)(A), 102 Stat. 1107, 1323 (same); Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 1018(u)(11), 102 Stat. 3342, 3590 (same); Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11111(a),104 Stat. 1388, 1388-410 (same); Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (same); Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1704(t)(79), 110 Stat. 1755, 1891 (same); Taxpayer Relief Act of 1997, Pub. L. No. 105-34, 111 Stat. 788 (same); Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, 115 Stat. 38 (same); Jobs and Growth Tax Relief Reconciliation Act of 2003, Pub. L. No. 108-27, 117 Stat. 752 (same); Working Families Tax Relief Act of 2004, Pub. L. No. 108-311, 118 Stat. 1166 (same); American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 501(a), 118 Stat. 1418, 1520 (permitting deduction of state and local sales taxes); Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, § 403(r)(1), 119 Stat. 2577, 2628 (no material changes to SALT deduction); Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. No. 109-222, 120 Stat. 345 (2006) (same); Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, § 103(a), 120 Stat. 2922, 2934 (extending deduction of state and local sales taxes); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 201(a), 122 Stat. 3765,

67.     Congress has not only preserved the deduction over time, but it has repeatedly recognized the deduction's importance as a federalism safeguard. When considering reforms to the tax code in 1963, a House Report stated that it was necessary to retain the SALT deduction to preserve federalism when "the State and local governments on one hand and the Federal Government on the other hand tap this same revenue source."[46] The report concluded that maintaining the deduction prevented federal interference in state and local tax policy, ensuring that States could freely structure their tax systems without undue influence from the federal government.[47]

68.     Proposals to repeal the SALT deduction have been repeatedly defeated, due in large part to constitutional concerns. During the 1980s, for example, a proposal to eliminate the SALT deduction was defeated after a number of constitutional scholars and elected officials argued that repealing the SALT deduction was unconstitutional. For example, U.S. Senator Daniel Patrick Moynihan explained to Congress that repealing the SALT deduction would violate deeply embedded federalism principles and disrupt the "constitutional balance in some fundamental

---

3864 (extending deduction of state and local sales taxes); American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1008, 123 Stat. 115, 317 (permitting deduction for state or local taxes imposed on the purchase of certain motor vehicles); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 9015(b)(2)(A), 124 Stat. 119, 871 (2010) (no material changes to SALT deduction); Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111-312, § 722(a), 124 Stat. 3296, 3316 (extending deduction of state and local sales taxes); American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 205(a), 126 Stat. 2313, 2323 (2013) (same); Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, §§ 105(a), 209(c), 221(a)(12)(D), (26), (95)(B)(ii), 128 Stat. 4010, 4013, 4028, 4038, 4040 & 4051 (extending deduction of state and local sales taxes, eliminating deduction for motor vehicle taxes, and other amendments to 26 U.S.C. § 164 not materially changing SALT deduction); Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 106(a), 129 Stat. 2242, 3046 (2015) (repealing expiration date for deduction of state and local sales taxes).

[46] H.R. Rep. No. 88-749, at 48 (1963).

[47] *See id.* at 48-50.

way."[48] The Governor of New York, Mario M. Cuomo, testified before Congress that the SALT deduction is a "fundamental constitutional concept," and that repealing the deduction would violate the "essential predicate" of the compact between the States and federal government.[49] Governor Cuomo went on to explain that federalism principles would be violated even if the States benefited from other provisions of the proposed tax reform: "[n]o matter how good a deal you make," repealing the SALT deduction would "change the nature of this Republic."[50] And U.S. Senator Dave Durenberger, the Chair of the Senate Subcommittee on Intergovernmental Relations, argued that the SALT deduction was critical to federalism because it "prevent[ed] the national government from capturing all of the tax base," "preserve[d] some portion of the base for state and local revenue sharing," and "cushion[ed] the harmful tax competition among states by reducing the effect of fiscal disparities among them."[51]

69.    In response to these and other concerns, Congress rejected efforts to repeal the SALT deduction for income and property taxes in the 1986 tax reform.[52] And up until the most

---

[48] *Tax Reform Proposals—XIX: Hearing Before the S. Finance Comm.*, 99th Cong. 70 (1985); *see also* Daniel Patrick Moynihan, *Constitutional Dimensions of State and Local Tax Deductibility*, 16 Publius 71 (1986) (arguing that a repeal of the SALT deduction would be unconstitutional on federalism grounds).

[49] *The Impact of Repeal of the Deductions for State and Local Taxes: Hearings Before the Subcomm. on Monetary and Fiscal Policy of the Joint Economic Committee*, 99th Cong. 87 (1985).

[50] *Id.*

Others echoed Governor Cuomo's historical and constitutional argument. *See, e.g.*, *Tax Reform Proposals—XIX*, *supra* note 48, at 14 (statement of Jacob Javits, former U.S. Senator from New York) ("When the income tax was passed, the understanding was that the Federal Government had to get its revenue there, leaving the property tax to the States and localities. And if you deny the deductibility, you destroy this balance at one fell swoop."); *id.* at 35 (testimony of Ed Herschler, Governor of Wyoming) ("The proposed elimination of deductibility threatens to weaken our federation of states, which is the foundation of our nation.").

[51] *See id.* at 7.

[52] *See* Liebschutz & Lurie, *supra* note 4, at 64-70.

28

recent tax overhaul—through over 60 different tax laws over 150 years—Congress has never significantly curtailed the scope of the SALT deduction. *See* 26 U.S.C. § 164 (2012) (SALT deduction in effect prior to the 2017 Tax Act).

70.     Congress's consistent respect for the States' sovereign authority to determine their own taxation and fiscal policies stands in stark contrast to the passage of the 2017 Tax Act, and the repeated statements by the President, the Treasury Secretary, and numerous legislators that the new cap on the SALT deduction was intended "kick" and coerce the Plaintiff States into changing their public spending policies.

### E. The Plaintiff States have come to rely on the existence of a deduction for all or nearly all state and local taxes.

71.     Based on the historical longevity of the SALT deduction, the States have developed substantial reliance interests with respect to the deduction, further solidifying the provision of a deduction for all or a significant portion of state and local taxes as a constitutional requirement. *Cf. National Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 580-85 (2012) (weighing States' reliance interests when evaluating an assertion of federal power).

72.     At the time the Sixteenth Amendment was ratified in 1913, only a handful of States had their own income tax regimes.[53] As noted above, Congress included the SALT deduction in the 1913 Revenue Act in part to avoid interfering with these States' tax laws.

---

[53] Many colonies imposed faculty taxes, which were a precursor to the modern income tax, and over a dozen States experimented with their own income tax regimes during the nineteenth century. At the time the Sixteenth Amendment was ratified, however, many of these regimes had been allowed to lapse. *See* Seligman, *supra* note 2, at 367-428. Wisconsin is widely considered to have adopted the first modern state income tax regime in 1911. *See* Ajay K. Mehrotra, *Forging Fiscal Reform: Constitutional Change, Public Policy, and the Creation of Administrative Capacity in Wisconsin, 1880–1920*, 20 J. of Policy Hist. 94, 94-95 (2008).

73.     In the subsequent century, scores of other States adopted their own income tax regimes, relying on the existence of a deduction for all or a significant portion of SALT. As previous Congresses have recognized, the SALT deduction removes what would otherwise be a substantial barrier to States adopting their own income tax laws. Eliminating or drastically curtailing the deduction now makes those state taxes more expensive because taxpayers will face concurrent taxes on the same income, making it more difficult for States to levy their own taxes and generate revenue.[54]

74.     In total, some forty-one States now levy broad-based taxes on individual income.[55] Among these States, there is tremendous diversity in the state income tax regimes. For example, eight States impose a single tax rate on all income, while the remainder vary tax rates by income bracket.[56] Among the latter group, top marginal rates vary from 3.07% in Pennsylvania to 13.3% in California.[57] This diversity in tax policy is "[o]ne of federalism's chief virtues"—the promotion of "States as laboratories." *Gonzales v. Raich*, 545 U.S. 1, 42 (2005) (O'Connor, J., dissenting).

75.     The revenues the States generate from state income taxes are vital. For example, New York's income tax alone generates approximately 30% of the State's annual receipts and

---

[54] *See, e.g.*, H.R. Rep. No. 88-749, at 48-49 (1963) (explaining that the SALT deduction is a necessary "accommodation" to ensure that the States and federal government can "tap this same revenue source" and to avoid interference with the States' tax policy choices).

[55] *See* Tax Policy Center, *How Do State and Local Individual Income Taxes Work*, *at* http://www.taxpolicycenter.org/briefing-book/how-do-state-and-local-individual-income-taxes-work (last visited July 16, 2018) [https://perma.cc/SJ25-PCPZ].

[56] *See id.*

[57] *See id.*

more than 60% of total tax collections.[58] For fiscal year 2017, the state income tax generated approximately $47.6 billion.[59]

76.     The Plaintiff States use this tax revenue to offer essential services and to make vital public investments. For example, in the 2017 state fiscal year (FY), New York alone spent $26.6 billion on direct funding and grants to schools; $26.1 billion for hospitals and other health services; $2.9 billion to build and maintain roads and bridges; and $4.2 billion to support police and public safety services. For the 2015-2016 school year, the last year for which data is available, real property taxes funded approximately 49% of statewide primary education.[60]

77.     Many of the programs funded by the States—and state taxes—provide public benefits that extend well beyond the Plaintiff States' borders. For example, in FY 2017, New York spent $58 million to protect airports, ports, and public waterways; $335 million to maintain its state parks; over $700 million to support energy conservation; and $4.9 billion to support higher education.

## II.    THE NEW CAP ON THE SALT DEDUCTION WILL SIGNIFICANTLY AND DISPROPORTIONATELY HARM THE PLAINTIFF STATES AND THEIR RESIDENTS, IN VIOLATION OF THE U.S. CONSTITUTION.

78.     Prior to the 2017 Tax Act, federal law permitted individuals who itemized their individual income tax deductions to deduct, with only incidental limitations, all of their: (1) state

---

[58] *See id*.

[59] *See* New York State Dep't of Tax and Finance, *Fiscal Year Tax Collections: 2016-2017*, *at* https://www.tax.ny.gov/research/collections/ fy_collections_stat_report/2016_2017_ annual_statistical_report_of_ny_state_tax_collections.htm (last visited July 16, 2018) [https://perma.cc/YUH9-7T4J].

[60] *See* Annual Financial Report (Form ST-3) for All New York State Public Schools, *at* https://stateaid.nysed.gov/st3/st3data.htm (last visited July 16, 2018).

and local real estate taxes, (2) state and local personal property taxes, and (3) either state and local income taxes or state and local sales taxes. *See* 26 U.S.C. § 164(a)-(b) (2012).

79.     The 2017 Tax Act eviscerates the SALT deduction for individual taxpayers.[61] Under the 2017 Tax Act, individuals may deduct only up to $10,000 total in (i) state and local real and personal property taxes, and (ii) either state and local income taxes or state and local sales taxes. Married taxpayers filing separately may deduct up to $5,000 each.[62] *See* Pub. L. No. 115-97, § 11042. Like many of the provisions of the 2017 Tax Act, the new cap on the SALT deduction is effective beginning in tax year 2018, and it will expire after 2025 without further action by Congress. *See id.*

80.     Although the federal government has previously enacted incidental limitations on the SALT deduction, the new $10,000 cap on the SALT deduction is unprecedented in several respects. First, while Congress has previously imposed limitations on the types of state and local taxes subject to the deduction, Congress has never before limited the deduction of property and income taxes—taxes that are at the core of the States' revenue-raising efforts.

81.     Second, the new cap is the first *direct* limitation on the deduction for state and local income and property taxes. Congress has previously placed general limits on the amount of itemized deductions taxpayers could take based on taxpayers' overall income. But these measures were often intended to maintain the progressive nature of the income tax and to raise revenue, rather than to curtail deductions for taxpayers of all incomes, with the goal of injuring a handful

---

[61] The $10,000 cap does not apply to taxes that are "paid or accrued in carrying on a trade or business." Pub. L. No. 115-97, § 11042.

[62] *See* H.R. Rep. No. 115-466, at 679 (2017) (Conf. Rep.) (characterizing the $10,000 cap as an "exception" to the general rule that "State and local income, war profits, and excess profits taxes are not allowable as a deduction").

of States.[63] Moreover, those past limitations were not direct caps on the amount of the SALT deduction a taxpayer could take.

82.     Third, the $10,000 limit on the new cap is particularly low, and it is far exceeded by the amount that many taxpayers in the Plaintiff States pay in SALT. For example, in 2015, the most recent year for which tax data is available, the average SALT deduction claimed by the 3.3 million New York taxpayers who itemized their deductions on their federal tax returns was $21,943. Exhibit ("Ex.") 1 (Decl. of Lynn Holand) at 3-4.

83.     The cap is not only unprecedented, but it will cause significant injuries to the Plaintiff States and their sovereign and quasi-sovereign interests—precisely the kind of injuries and interference the Framers of the Tenth and Sixteenth Amendments intended to preclude.

84.     From a comparative perspective, the new cap on the SALT deduction disproportionately benefits taxpayers of other States at the expense of the Plaintiff States' taxpayers. This unequal treatment not only harms millions of taxpayers, but it also hurts the Plaintiff States themselves.

85.     The cap also hurts the Plaintiff States in absolute terms. Among other things, the new cap on the SALT deduction is likely to depress home values and increase the cost of state taxes. This, in turn, would undermine businesses in the Plaintiff States, increase unemployment, and curtail the Plaintiff States' income and economic growth.

---

[63] For example, the so-called "Pease provision" reduced the amount of itemized deductions a taxpayer could take if the taxpayer's income exceeded a certain threshold. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11103, 104 Stat. 1388, 1388-406 (codified at 26 U.S.C. § 68(a) (2012)). *See also* Cong. Research Serv., *The PEP and Pease Provisions of the Federal Individual Income Tax* 4 (2006), *at* https://www.everycrsreport.com/reports/RS22464.html (explaining that the Pease provision was implemented to raise revenue and designed "so that the resultant tax increases were borne by taxpayers at the upper end of the income spectrum").

86.     By decreasing state tax revenue and making state taxes more expensive, the new cap on the SALT deduction will ultimately force the Plaintiff States to choose between maintaining or cutting their public investments and level of services, and the taxes supporting them.  As such, the new cap on the SALT deduction directly and unfairly interferes with the Plaintiff States' sovereignty, by depriving them of their authority to determine their own taxation and fiscal policies without federal interference.

87.     This is by design. Congress enacted the new cap with the purpose of coercing the Plaintiff States to change their policies. Congress was fully aware that the new cap on the SALT deduction would disproportionately harm the Plaintiff States, and it enacted the cap with the expectation that the harmful effects would compel the Plaintiff States to change their policies. Indeed, prior to the enactment of the 2017 Tax Act, President Trump, Secretary Mnuchin, and numerous Republican legislators repeatedly identified the Plaintiff States by name and suggested that the new cap on the SALT deduction was intended to "kick" them and "send a message" that they needed to alter their taxation and fiscal policies or they were "not going to benefit" from the 2017 Tax Act.

88.      By invading the sovereign policy authority of the Plaintiff States in this way, Congress has violated the Tenth Amendment and exceeded the federal government's tax power under Article I, Section 8 and the Sixteenth Amendment to the United States Constitution. It has also violated the constitutional guarantee of equal state sovereignty.

**A. The new cap on the SALT deduction disproportionately benefits other States at the expense of the Plaintiff States and their taxpayers.**

89.     From a comparative perspective, the new cap on the SALT deduction harms the Plaintiff States on a variety of different metrics, all of which leave the Plaintiff States and their taxpayers comparatively worse off.

34

90.     First, higher percentages of taxpayers in the Plaintiff States will experience a tax increase because of the 2017 Tax Act as compared to taxpayers in most other States. These taxpayers will experience a net increase in taxes notwithstanding the Act's general decrease in tax rates, because the Plaintiff States have higher percentages of taxpayers who have historically taken advantage of the SALT deduction and other deductions that were drastically curtailed by the Act, such as the mortgage interest deduction. While 13% of New York taxpayers, 12% of Maryland taxpayers, and 11% of New Jersey taxpayers will experience a net increase in federal taxes because of the 2017 Tax Act, only 5% and 2% of taxpayers in Florida and North Dakota, respectively, will see their net federal taxes increase. This tax increase is primarily driven by the cap on the SALT deduction. *See* Ex. 2 (Decl. of Scott Palladino) at 6-7.

91.     Second, the 2017 Tax Act increases the portion of the federal government's income tax revenues paid by taxpayers of the Plaintiff States, even though those taxpayers already pay an outsize portion of federal income taxes.[64] For example, in 2019, New Yorkers will make up approximately 6.3% of all U.S. taxpayers. Even without the 2017 Tax Act, New Yorkers would have paid approximately 9% of all federal income taxes. But because of the 2017 Tax Act, New Yorker taxpayers will now pay approximately 9.8% of all federal income taxes.[65] The States of Connecticut, Maryland, and New Jersey will also see their share of federal personal income taxes

---

[64] *See* Institute on Taxation and Economic Policy, *Final GOP-Trump Bill Still Forces California and New York to Shoulder a Larger Share of Federal Taxes Under Final GOP-Trump Tax Bill; Texas, Florida, and Other States Will Pay Less* (Dec. 17, 2017), *at* https://itep.org/final-gop-trump-bill-still-forces-california-and-new-york-to-shoulder-a-larger-share-of-federal-taxes-texas-florida-and-other-states-will-pay-less/ (last visited July 16, 2018) [https://perma.cc/WY3J-ZZD5].

[65] *See id.*

significantly increase.[66] By contrast, the 2017 Tax Act will reduce the total federal income taxes paid by most other States.[67] For example, Florida makes up approximately 7% of all U.S. taxpayers, and under the law in effect before the 2017 Tax Act, its taxpayers would have paid approximately 7.2% of federal income taxes. Under the 2017 Tax Act, the share of federal income taxes paid by Florida taxpayers will decline to approximately 7%.[68] Texas gets an even better deal. Texas will account for approximately 8.2% of the nation's taxpayers in 2019, but, under the prior law, its residents would have paid just approximately 7.6% of federal income taxes. Under the 2017 Tax Act, that number drops to approximately 7.1%.[69]

92.     Third, taxpayers in the Plaintiff States get a disproportionately smaller share of the tax cuts overall relative to taxpayers in other States. Under prior law, taxpayers in each State contributed some percentage of all taxes paid to the federal government. For example, under the law in effect prior to the 2017 Tax Act, taxpayers in New York paid 7.3% of all federal taxes.[70] The 2017 Tax Act is a large expenditure of which taxpayers in each State get a percentage. If the 2017 Tax Act treated the States fairly, the expenditure provided to taxpayers in each State—i.e., each State's "share of the tax cut"—would closely reflect the contribution of each State's taxpayers under prior law. In fact, the Plaintiff States receive a much smaller expenditure—or share of the tax cut—relative to their taxpayers' baseline contributions. For example, New York taxpayers' share of the tax cut (or their share of the expenditure) was only 5.1%, even though they paid 7.3%

---

[66] *See id.*

[67] *See id.*

[68] *See id.*

[69] *See id.*

[70] The 7.3% represents the percentage of all federal taxes paid by New Yorkers, as distinct from the 9%, referenced in paragraph 91, *supra*, which refers to the percentage of all federal *income* taxes paid by New Yorkers.

of all federal income taxes under the prior law. In other words, New York taxpayers only received 70.1% of the State's baseline contribution of federal taxes—i.e., 5.1% of the tax cut divided by 7.3% of all federal tax payments—the lowest such percentage of any State. Similarly, New Jersey only received 79.4% of its baseline share. By contrast, Alaska received 137%, Texas received 127%, and Florida received 122%. Ex. 2 at 9-11.

93.     Thus, even though some taxpayers in the Plaintiff States will experience a tax cut because of the 2017 Tax Act, overall, taxpayers in the Plaintiff States get a disproportionately small share of the recent tax cuts relative to taxpayers in most other States.

94.     Ultimately, the 2017 Tax Act's inequitable treatment of taxpayers in the Plaintiff States not only hurts those taxpayers, but it hurts the States themselves. Even if some residents in the Plaintiff States benefit from the 2017 Tax Act, the Plaintiff States are still worse off in relative terms because the Act benefits other States to a much greater extent.

**B.  While residents of the Plaintiff States receive the least benefit from the 2017 Tax Act, they pay for the vast majority of the tax cuts.**

95.     Not only do taxpayers in the Plaintiff States receive the smallest benefit from the 2017 Tax Act, but they also bear the burden of paying for the tax cuts in the Act. In other words, taxpayers in other States get the biggest benefit from the Act at the expense of the Plaintiff States' taxpayers.

96.     Taxpayers in the Plaintiff States will pay a substantial portion of the increase in federal taxes generated by the new cap on the SALT deduction. For example, New York taxpayers will pay an additional $14.3 billion in federal income taxes in tax year 2018 because of the new cap on the SALT deduction, relative to what they would have paid if the 2017 Tax Act had been enacted without the new cap. The New York State Department of Taxation and Finance estimates that, between 2018 and 2025, New Yorkers will pay an additional $121 billion in federal taxes

because of the cap on the SALT deduction, notwithstanding any other provisions of the bill. And although many New Yorkers will see their federal tax liability decline because of the 2017 Tax Act's reduction in tax rates and other changes, more than one million New Yorkers will experience a net tax increase in 2018, primarily due to the new cap on the SALT deduction. Ex. 2 at 4-6. The other Plaintiff States will see similar effects. Ex. 3 (Decl. of Ernest Adamo) at 2-3; Ex. 4 (Decl. of Andrew M. Schaufele) at 2; Ex. 5 (Decl. of Martin Poethke) at 2-5.

97.     The federal Joint Committee on Taxation (JCT) estimates that the 2017 Tax Act will increase the federal deficit by $1.4 trillion dollars.[71] Most provisions of the bill, including the changes to the individual tax rates, will increase the federal deficit. To ensure the 2017 Tax Act would not further enlarge the deficit, Congress needed to include certain revenue-generating items. Changes to itemized deductions—including the deduction for SALT—are the single largest revenue-generating mechanism in the Act.[72] Collectively, the most significant changes to itemized deductions in the 2017 Tax Act—including but not limited to the SALT deduction—will generate some $668.4 billion in federal tax revenue over eight years.[73] New York alone will pay for about one-fifth of that figure. And collectively, the Plaintiff States will pay for a substantial portion of the revenue generated by the 2017 Tax Act.

---

[71] *See* Joint Committee on Taxation, U.S. Congress, *Estimated Budget Effects of the Conference Agreement for H.R. 1,* the *"Tax Cuts and Jobs Act": Fiscal Years 2018-2027*, at 8 (Dec. 18, 2017), *at* https://www.jct.gov/publications.html?func=startdown&id=5053 (last visited July 16, 2018).

[72] According to the JCT, the repeal of personal exemptions will generate $1.2 trillion over ten years, but that figure is offset by $573 billion in outlays that will be required because of the expanded child tax credit. *See id.* at 1.

[73] *See id.* at 2.

C. **The new cap on the SALT deduction will depress the real estate market in the Plaintiff States, further harming the States' residents and economies.**

98.     The new cap on the SALT deduction not only harms the Plaintiff States in comparative terms, but it will also have direct, negative effects on the Plaintiff States and their residents by depressing real estate values, depriving homeowners of essential savings and income, and costing the Plaintiff States hundreds of millions of dollars in revenue, among other things.

99.     Under the law before the 2017 Tax Act, homeowners could fully deduct the cost of property taxes assessed on their homes. By capping the deductibility of property taxes, those taxes are no longer fully deductible, which makes homeownership more expensive and decreases the value of real estate. The New York State Division of the Budget projects that, in aggregate, the new cap on the SALT deduction will result in a loss of home equity value of approximately $63.1 billion statewide in 2016 dollars.[74] Although the 2017 Tax Act contains a number of other provisions that are likely to depress home prices in New York, the new cap on the SALT deduction is likely to be the largest contributor to the decline in residential real estate prices. *See* Ex. 1 at 4-5.

100.     Declining home values will mean that New Yorkers realize a smaller return when they sell their homes. Even those residents who do not sell their homes will be harmed. For many homeowners, homes are their most important asset. With declining home values, homeowners lose income on which they depend to fund retirement, school tuition, and other investments. Homeowners will also have less income available to spend on goods and services. Based on standard input-output modeling techniques, the New York State Division of the Budget estimates

---

[74] The 2017 Tax Act overall will depress home equity values in New York by $100.8 billion, with the new cap on the SALT deduction being the primary driver of decreased values. *See* Ex. 1 at 3-4.

household spending will decline by approximately $1.26 billion to $3.15 billion because of the new cap on the SALT deduction. *See* Ex. 1 at 5-6.

101.    The decline in home equity value and lower household spending will cause direct injuries to the State. For example, the decline in household spending will mean the State collects less in sales taxes, because residents will have less income to spend on goods and services. The State will also collect less in real estate transfer taxes, because depressed home prices will cause homeowners to delay the sales of their homes. *See* Ex. 1 at 6.

102.    The decline in household spending will also result in lower sales for businesses in the State. The decline in household spending, coupled with lower business sales, will ultimately hurt the growth of the State's economy. Based on input-output modeling, the New York State Division of the Budget estimates that New York is likely to lose between 12,500 and 31,300 jobs due to the new cap on the SALT deduction and its corresponding effects on real estate prices, household spending, and business sales, among other things. *See* Ex. 1 at 5-6.

103.    Other States are likely to experience similar harms. For example, the New Jersey Office of Revenue and Economic Analysis estimates that home values in New Jersey are likely to decline by an average of 8.5% because of the 2017 Tax Act. This decline will reduce the amount that the State collects in Realty Transfer Fees—a state tax imposed when a home transfers ownership. *See* N.J. Admin Code 46:15-5 *et seq*. Because of the decline in home values, New Jersey will also collect less in real property taxes. New Jersey's Division of Revenue estimates that, between fiscal years 2019 and 2023, the State will lose $325.9 million in revenue because of the 2017 Tax Act. *See* Ex. 5 at 6-8.

104.    Based on models presented to it by the State's outside advisors, Maryland's Bureau of Revenue estimates that the 2017 Tax Act will cause housing prices to grow at a decreased rate,

depriving the state of $13.2 to $25.2 million in real estate tax revenue. Based on the same models, the Bureau of Revenue Estimates further estimates that the State will lose approximately $7.5 million in 2019 in revenue from the State's transfer tax on real estate transactions. *See* Ex. 4 at 3-4.

105.    These harms are magnified by the fact that many of the Plaintiff States' residents purchased their homes years or even decades ago in reliance on the SALT deduction. The 2017 Tax Act's cap on that deduction will thus impose an immediate and unforeseen additional cost on such residents. This cost will fall particularly hard on residents whose incomes and assets cannot accommodate the additional federal tax liability created by the 2017 Tax Act's severe limitation on the SALT deduction.

### D.  Congress purposefully capped the SALT deduction to force the Plaintiff States to alter their taxation and fiscal policies.

106.    The financial harms that the Plaintiff States and their residents will suffer because of the new cap on the SALT deduction are not merely an incidental effect of the 2017 Tax Act. When Congress enacted the cap, President Trump, Secretary Mnuchin, and numerous Republican legislators made clear their intention was to injure the Plaintiff States and thereby coerce them into changing their tax policies and cutting the vital public investments that tax revenues support, including, for example, safety, schools, infrastructure, and transportation.

107.    Shortly before the enactment of the 2017 Tax Act, Republican sponsors' true purpose in imposing the new cap on the SALT deduction became apparent: to coerce a handful of States with relatively high taxpayer-funded public investments—States that are primarily Democratic leaning—to change their tax policies. As one conservative commentator explained, "[t]he fact that these tax increases will fall most heavily on 'blue' parts of the country is obviously

not an accident."[75] An economist who advised President Trump's campaign was more explicit about the purpose of changing the SALT deduction: "'It's death to Democrats.'"[76]

108.    Republican legislators and executive-branch officials made clear that one purpose of capping the SALT deduction was to coerce States that have made the sovereign policy choice to invest in services and infrastructure to lower their taxes and thereby cut the services that those taxes support. For example, Secretary Mnuchin declared that altering the SALT deduction was intended to "*send[] a message* to the state governments that, perhaps, they should try to get their budgets in line" and reduce state taxes.[77] While acknowledging that reducing the SALT deduction would hurt the States that have most relied on taxpayer revenue to make important public expenditures, Mnuchin argued that such pressure was necessary: "We can't have the federal government continue to subsidize the states."[78]

109.    When asked about the impact of a SALT limitation on States such as New York and New Jersey, President Trump declared that the new cap was designed to force those States to choose between changing their tax policies or foregoing the tax benefits in the 2017 Tax Act:

---

[75] Ramesh Ponnuru, *Red States, Blue States, and Taxes*, Nat'l Rev., Nov. 8, 2017, *at* http://www.nationalreview.com/corner/453535/red-states-blue-states-and-taxes (last visited July 16, 2018) [https://perma.cc/5TMP-UWNW].

[76] Sahil Kapur, *'Death to Democrats': How the GOP Tax Bill Whacks Liberal Tenets*, Bloomberg, Dec. 5, 2017, *at* https://www.bloomberg.com/news/articles/2017-12-05/-death-to-democrats-how-the-gop-tax-bill-whacks-liberal-tenets (last visited July 16, 2018) [https://perma.cc./H3DM-DC45].

[77] *Mnuchin Fires Warning Shot to High-Tax States: Get Control of Your Budgets*, Fox Business, Nov. 9, 2017 (emphasis added), *at* http://www.foxbusiness.com/politics/2017/11/09/mnuchin-fires-warning-shot-to-high-tax-states-get-control-your-budgets.html (last visited July 16, 2018).

[78] *Mnuchin Backs Key Provision in Trump Tax Plan That Would Hit Democrats Hardest*, (Oct. 12, 2017), *at* https://www.cnbc.com/2017/10/12/mnuchin-backs-key-provision-in-trump-tax-plan-that-would-hit-democrats-hardest.html (last visited July 16, 2018).

"[Y]ou have some really well run states that have very little borrowing. . . . And it's unfair that a state that is well-run is really subsidizing states that have been horribly mismanaged. I won't use names but we understand the names. . . . And so what we are doing is, we're showing that. . . . *[I]t's finally time to say, hey, make sure that your politicians do a good job of running your state. Otherwise, you are not going to benefit.*"[79]

110.    Republican legislators echoed Mnuchin's and Trump's views. For example, Senator Rob Portman, a Republican from Ohio, acknowledged that reducing the SALT deduction would "kick" States with higher levels of public spending, and he hoped that such pressure would coerce them into lowering state tax rates.[80] House Majority Leader Kevin McCarthy expressly called on the States to cut their taxes, arguing that the federal government is lowering taxes, and "'[w]e challenge our governors as well to do the same.'"[81] Specifically mentioning New York, California, and New Jersey, Senator Ted Cruz commented that "'[o]ne hopefully positive result of this legislation will be that state and local officials will be less eager to jack up taxes . . . .'"[82]

111.    Republican legislators openly acknowledged that the 2017 Tax Act would disproportionately hurt the Plaintiff States. For example, Republican House Member Duncan

---

[79] Transcript: President Trump Vows Largest Tax Cut in History, Hannity (Oct. 11, 2017) (emphasis added), *at* http://www.foxnews.com/transcript/2017/10/11/president-trump-vows-largest-tax-cut-in-history-this-country.html (last visited July 16, 2018).

[80] Transcript: Moore Back on Campaign Trail, CNN Transcripts (Nov. 28, 2017), *at* http://transcripts.cnn.com/TRANSCRIPTS/1711/28/cnr.02.html (last visited July 16, 2018).

[81] *GOP Leaders to Governors: Lower State Taxes*, Wall Street Journal, Oct. 31, 2017, *at* https://www.wsj.com/livecoverage/tax-bill-2017/card/1509468748 (last visited July 16, 2018).

[82] Kapur, *supra* note 76.

Hunter stated: "'California, New Jersey, New York, and other states that have horrible governments, yes. It's not as good for those states.'"[83]

112.    And House Speaker Paul Ryan explained that he supported cutting the SALT deduction because Republicans disagree with the Plaintiff States' tax policy choices. Ryan argued that the deduction was "'propping up profligate, big government states.'"[84] And he made clear that his view rested on a disagreement with the policy choices of the Plaintiff States, in part, because those States have chosen to invest more in public services.[85]

113.    Contrary to these assertions, the Plaintiff States are, in general, net contributors to the federal government. For example, for federal fiscal year 2016, New York sent $40.9 billion more in tax payments to Washington than it received in federal spending. For every federal tax dollar generated in New York, the federal government returned 84 cents to the State. That return

---

[83] Joshua Stewart, *Rep. Duncan Hunter said GOP tax bill could cost Californians more than others, but he still supports it*, San Diego Union Tribune, Oct. 30, 2017, *at* http://www.sandiegouniontribune.com/news/politics/sd-me-hunter-taxes-20171030-story.html (last visited July 16, 2018) [https://perma.cc/Z4ET-T3B6].

[84] Lindsey McPherson, *Brady and Ryan Mulling Big Gamble on Key Tax Deduction*, Oct. 16, 2017, *at* https://www.rollcall.com/news/politics/brady-ryan-mulling-big-gamble-key-tax-deduction (last visited July 16, 2018) [https://perma.cc./3SEN-83Z6].

[85] *See* Mike DeBonis, *To Make Their Tax Plan Work, Republicans Eye a Favorite Blue-State Break*, Wash. Post, Sept. 16, 2017, *at* https://www.washingtonpost.com/powerpost/to-make-their-tax-plan-work-republicans-eye-a-favorite-blue-state-break/2017/09/16/c726d506-9a26-11e7-b569-3360011663b4_story.html?utm_term=.6d39d5644265 (last visited July 16, 2018) [https://perma.cc/4KBT-7JFQ].

was substantially less than the $1.18 average return for every tax dollar nationwide.[86] New Jersey and Connecticut also pay more in federal taxes than their residents receive in federal spending.[87]

114.     The Plaintiff States were not only targeted for unequal treatment, but they were also deprived of a fair opportunity to participate in the lawmaking process to protect their interests. Congress passed the 2017 Tax Act in a highly rushed and partisan process that left little chance for legislators from the Plaintiff States to successfully oppose the bill. Because of the extraordinarily rushed schedule—the bill was passed in less than two months—there was minimal time for debate, and there were any number of last-minute changes.[88] The bill received no Democratic votes, and Republicans from the Plaintiff States who voted against the bill faced retaliation from their Republican colleagues.[89]

115.     The Act passed just fifty days after the bill was first proposed in the House. The legislative process was so rushed that the 2017 Tax Act is riddled with errors and typos that generated numerous unintended loopholes, which have turned implementation of the bill into a

---

[86] *See* New York Office of the Comptroller, *New York's Balance of Payments in the Federal Budget, Federal Fiscal Year 2016*, at 3 (2017), *at* https://www.osc.state.ny.us/reports/budget/2017/federal-budget-fiscal-year-2016.pdf (last visited July 16, 2018).

[87] *See id.*

[88] *See* Amy B. Wang, *Democrats Fume Over 'Absurd' GOP Tax Bill Full of Last-Minute Handwritten Edits*, Washington Post, Dec. 2, 2017, *at* https://www.washingtonpost.com/news/politics/wp/2017/12/02/democrats-fume-over-absurd-gop-tax-bill-full-of-last-minute-handwritten-edits/?noredirect=on&utm_term=.6450fe45c2f7 (last visited July 16, 2018).

[89] *See* Matthew Rozsa, *Why Paul Ryan Snubbed a Republican Congressman's Fundraiser*, Salon (Dec. 29, 2017), https://www.salon.com/2017/12/29/why-paul-ryan-snubbed-a-republican-congressmans-fundraiser/ (last visited July 16, 2018) [https://perma.cc/Q3EA-Y6ZX]; *No Signs of Punishment for 'No' Votes on Tax Overhaul—Yet*, Roll Call (Dec. 20, 2017), https://www.rollcall.com/news/politics/gop-retaliation-tax-overhaul (last visited July 16, 2018) [https://perma.cc/42W4-GFD5].

quagmire. Congressional Republicans are already discussing the need for new legislation to correct their errors in the 2017 Tax Act.[90]

116.    By imposing such inequality on the States, and targeting the Plaintiff States in particular for unfavorable treatment, Congress violated the basic promise of the Constitution: the States have equal sovereignty under the law.

**E. The new cap on the SALT deduction deprives the States of their sovereign authority to determine their own taxation and fiscal policies.**

117.    The Constitution imposes structural constraints on the federal government's ability to use its tax power to interfere with the sovereign authority of the States to determine their own taxation and fiscal policies. See *supra* at ¶¶ 34-69.[91]

118.    By drastically capping the SALT deduction at only $10,000, Congress has exceeded those constraints.

119.    By design, the new cap on the SALT deduction will make it more difficult for the Plaintiff States to generate revenue, both politically and economically. As a result, the Plaintiff States now face the difficult choice of cutting vital public investments or maintaining the necessary means to generate revenue to finance those investments. By constraining the prerogative of the

---

[90] *See, e.g.*, Eileen A.J. Connelly, *GOP's Tax Reform Law Is Full of Typos, Errors: Experts*, N.Y. Post, Feb. 24, 2018, *at* https://nypost.com/2018/02/24/gops-tax-reform-law-is-full-of-typos-errors-experts/ (last visited June 12, 2018) [https://perma.cc/LM9Z-728R]; Zoë Henry, *How 40 Ambiguities (and Outright Errors) in the New Tax Law Could Cost You Big Money*, Inc. (Mar. 13, 2018), https://www.inc.com/zoe-henry/gop-tax-bill-errors-could-impact-your-bottom-line.html (last visited June 12, 2018); Brian Faler, *'This Is Not Normal': Glitches Mar New Tax Law*, Politico, Feb. 24, 2018, *at* https://www.politico.com/story/2018/02/24/tax-law-glitches-gop-423434 (last visited June 12, 2018) [https://perma.cc/6T5H-9MNR].

[91] *See also Veazie Bank v. Fenno*, 75 U.S. 533, 541 (1869) (explaining that there are "certain virtual limitations, arising from the principles of the Constitution itself" on the taxing power, and that "[i]t would undoubtedly be an abuse of the power if so exercised as to impair the separate existence and independent self-government of the States"); *Lane County v. State of Oregon*, 74 U.S. 71, 77 (1868) ("There is nothing in the Constitution which contemplates or authorizes any direct abridgment of [the State's tax power] by national legislation.").

Plaintiff States to make these decisions without federal interference, the new cap on the SALT deduction impermissibly impinges on the States' sovereignty in violation of the Tenth and Sixteenth Amendments to the U.S. Constitution.

120. While the Supreme Court has long recognized Congress's power to incentivize States to adopt federal policy priorities through its Spending Power, *see South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987), the 2017 Tax Act is not an exercise of such power, and the coercion here is unprecedented and unlawful. While Congress's tax power is broad, it cannot be used to accomplish unconstitutional ends. *See United States v. Butler*, 297 U.S. 1, 74-75 (1936). As relevant here, it cannot be used to purposefully treat a handful of States unfavorably with the goal of coercing those States into choosing between significant financial harm and abandoning their sovereign authority to determine their own taxation and fiscal policies in favor of federal policy priorities.

121. In the months since the enactment of the 2017 Tax Act, the Plaintiff States have taken, or are considering taking, legislative and other action to combat the most harmful effects of the new cap on the SALT deduction and to restore their sovereign authority over their own taxation and fiscal policies.

122. In response to these efforts, the federal government has signaled that it intends to take additional action, again targeting the Plaintiff States, to further prevent them from exercising their sovereign authority. On May 23, 2018, for example, the IRS released a notice that it intends to issue guidance in direct response to "state efforts to circumvent the new statutory limitation on state and local tax deductions."[92] These further efforts make clear that the federal government is

---

[92] Internal Revenue Service, *Guidance on Certain Payments Made in Exchange for State and Local Tax Credits*, Notice 2018-54 (May 23, 2018), *at* https://www.irs.gov/pub/irs-drop/n-18-54.pdf; *see also* Alan Rappeport & Jim Tankersley, *I.R.S. Warns States Not to Circumvent State*

not only targeting the Plaintiff States for adverse treatment, but that it intentionally seeks to interfere with the States' sovereign policy authority over taxation and fiscal policy.

123.    The new cap on the SALT deduction must be invalidated.

## FIRST CAUSE OF ACTION
### (Violations of the Tenth Amendment to the United States Constitution)

124.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

125.    The Tenth Amendment prohibits the federal government from invading the sovereign tax authority of the States.

126.    The Tenth Amendment also requires the federal government to respect the equal sovereignty of the sovereign States.

127.    The cap on the SALT deduction has both the purpose and effect of interfering with the Plaintiff States' sovereign authority to determine their own fiscal policies.

128.    Without adequate justification, the cap on the SALT deduction also impermissibly targets for unfavorable treatment those States that have exercised their sovereign authority to adopt relatively high taxpayer-funded public investments.

129.    The cap on the SALT deduction thereby violates the Tenth Amendment and the constitutional guarantees of federalism.

130.    Enforcement of the new cap on the SALT deduction would cause significant and irreparable harm to the Plaintiff States and their residents.

---

*and Local Tax Cap*, N.Y. Times, May 23, 2018, https:// nytimes.com/2018/05/23/us/politics/irs-state-and-local-tax-deductions.html (last visited July 16, 2018).

## SECOND CAUSE OF ACTION
### (Violations of the Sixteenth Amendment to the United States Constitution)

131. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

132. The federal government's taxation powers are not unlimited. Under the Sixteenth Amendment of the United States Constitution, the federal government may not exercise its power to tax individual incomes without providing a deduction for all or a significant portion of state and local taxes.

133. In imposing a $10,000 cap on the deductibility of state and local taxes, Congress has exceeded its powers under the Sixteenth Amendment.

134. The cap on the SALT deduction causes substantial and ongoing harm to the Plaintiff States.

## THIRD CAUSE OF ACTION
### (Violations of Article I, Section 8 of the United States Constitution)

135. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

136. Pursuant to Article I, Section 8 of the United States Constitution, Congress has the "Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

137. Congress may not use its tax and spending powers to "exert a 'power akin to undue influence'" over the States or coerce the States into adopting policies preferred by the federal government. *NFIB*, 567 U.S. at 578 (op. of Roberts, C.J.) (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)).

138.    The cap on the SALT deduction will have both the purpose and effect of interfering with the Plaintiff States' sovereign authority to determine their own taxation and fiscal policies by coercing the Plaintiff States into lowering their taxes and cutting the services those taxes support.

139.    The cap on the SALT deduction thereby exceeds Congress's powers under Article I, Section 8 of the United States Constitution and violates the constitutional guarantees of federalism.

140.    The cap on the SALT deduction causes substantial and ongoing harm to the Plaintiff States.

### PRAYER FOR RELIEF

141.    Wherefore, the Plaintiff States Pray that the Court:

    a.    Declare that the provision of the 2017 Tax Act imposing a $10,000 cap on the SALT deduction, Pub. L. No. 115-97, § 11042, is unauthorized by and contrary to the Constitution of the United States;

    b.    Enjoin Defendants from enforcing the new cap on the SALT deduction;

    c.    Award such additional relief as the interests of justice may require.

Dated: July 17, 2018 STATE OF NEW YORK

BARBARA D. UNDERWOOD
*Attorney General*

By:   */s/ Caroline A. Olsen*
Caroline A. Olsen
*Assistant Solicitor General*
caroline.olsen@ag.ny.gov
Steven C. Wu
*Deputy Solicitor General*
steven.wu@ag.ny.gov
Justin Wagner
*Assistant Attorney General*
justin.wagner@ag.ny.gov
Owen T. Conroy
*Assistant Attorney General*
owen.conroy@ag.ny.gov
Eric R. Haren
*Special Counsel*
eric.haren@ag.ny.gov
New York Office of the Attorney General
28 Liberty Street, 23rd Floor
New York, New York 10005
212-416-6184 (tel.)
212-416-8962 (fax)

*Attorney for Plaintiff*
*State of New York*

(*Counsel list continues on next page.*)

STATE OF CONNECTICUT

    GEORGE JEPSEN
    *Attorney General*

By:  _/s/ Mark F. Kohler_____
    Mark F. Kohler*
     *Assistant Attorney General*
     mark.kohler@ct.gov
    Michael K. Skold*
     *Assistant Attorney General*
     michael.skold@ct.gov
    Connecticut Office of the Attorney General
    55 Elm Street, P.O. Box 120
    Hartford, Connecticut 06141
    860-808-5020 (tel.)
    860-808-5347 (fax)

    *Attorney for Plaintiff*
    *State of Connecticut*

STATE OF MARYLAND

    BRIAN E. FROSH
    *Attorney General*

By:  _/s/ Sarah W. Rice_____
    Sarah W. Rice*
     *Assistant Attorney General*
     SRice@oag.state.md.us
    Maryland Office of the Attorney General
     Civil Division
    200 St. Paul Place, 20th Floor
    Baltimore, Maryland 21202
    410-576-7847 (tel.)
    410-576-6955 (fax)

    *Attorney for Plaintiff*
    *State of Maryland*

STATE OF NEW JERSEY

    GURBIR S. GREWAL
    *Attorney General*

By:  _/s/ Jeremy M. Feigenbaum_____
    Jeremy M. Feigenbaum*
     *Assistant Attorney General*
     jeremy.feigenbaum@njoag.gov
    New Jersey Office of the Attorney General
    Richard J. Hughes Justice Complex
    25 Market Street, 8th Floor, West Wing
    Trenton, New Jersey 08625
    609-292-4925 (tel.)
    609-777-4015 (fax)

    *Attorney for Plaintiff*
    *State of New Jersey*

---

*Admission pro hac vice pending*