UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, STATE OF
CONNECTICUT, STATE OF MARYLAND, and
STATE OF NEW JERSEY,

                Plaintiffs,

      v.

STEVEN T. MNUCHIN, in his official capacity as
Secretary of the United States Department of
Treasury; the UNITED STATES DEPARTMENT OF
TREASURY; CHARLES P. RETTIG, in his official
capacity as Commissioner of the United States
Internal Revenue Service; the UNITED STATES
INTERNAL REVENUE SERVICE; and the UNITED
STATES OF AMERICA,

                Defendants.

18 Civ. 6427 (JPO)

# MEMORANDUM OF LAW IN SUPPORT OF
# THE GOVERNMENT'S MOTION TO DISMISS

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

EDWARD J. MURPHY
JORDAN A. KONIG
Trial Attorneys
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 307-6064/305-7917
Fax: (202) 514-5238
Email: Edward.J.Murphy@usdoj.gov
      Jordan.A.Konig@usdoj.gov

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

JEAN-DAVID BARNEA
REBECCA S. TINIO
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2679/2774
Fax: (212) 637-2686
E-mail: Jean-David.Barnea@usdoj.gov
      Rebecca.Tinio@usdoj.gov

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................4

ARGUMENT ........................................................................................................................8

I.      The Court Should Dismiss the States' Complaint Under Rule 12(b)(1) ............................8

      A.     Standard for Rule 12(b)(1)....................................................................................9

      B.     The States Lack Standing......................................................................................9

      C.     The Anti-Injunction Act Bars the States' Complaint...........................................14

      D.     The States' Complaint Is Non-Justiciable............................................................17

II     The Court Should Dismiss the States' Complaint Under Rule 12(b)(6) .........................18

      A.     Standard for Rule 12(b)(6)..................................................................................19

      B.     The Complaint Fails to State a Violation of the Sixteenth Amendment...............19

           1.     The Sixteenth Amendment Does Not Limit Congress's Authority to Tax Incomes and Set or Limit Deductions ............................................20

           2.     Nothing in the Sixteenth Amendment's Ratification History Limits Congress's Plenary Power to Set or Limit Tax Deductions ....................21

           3.     Nothing in the History of Federal Income Taxation Suggests That a SALT Deduction Is Constitutionally Required .............................25

      C.     The Complaint Fails to State a Violation of the Tenth Amendment ....................29

      D.     The Complaint Fails to State a Violation of Article I, Section 8..........................33

CONCLUSION....................................................................................................................39

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006)......................................................................... 9

*Alpenglow Botanicals, LLC v. United States*,
    894 F.3d 1187 (10th Cir. 2018) ............................................................... 20

*Am. Bicycle Ass'n v. United States (In re Am.Bicycle Ass'n)*,
    895 F.2d 1277 (9th Cir. 1990) ................................................................. 16

*Arizona Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011)................................................................................. 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................. 19

*Baker v. Carr*,
    369 U.S. 186 (1962)................................................................................. 18

*Batagiannis v. W. Lafayette Cmty. Sch. Corp.*,
    454 F.3d 738 (7th Cir. 2006) ................................................................... 35

*Batalla Vidal v. Duke*,
    295 F. Supp. 3d 127 (E.D.N.Y. 2017) ..................................................... 13

*Baur v. Veneman*,
    352 F.3d 625 (2d Cir. 2003)..................................................................... 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................. 19

*Bob Jones Univ. v. Simon*,
    416 U.S. 725 (1974)................................................................................. 15

*Bowers v. Kerbaugh-Empire Co.*,
    271 U.S. 170 (1926)........................................................................... 21, 30

*Campbell v. United States*,
    No. 00 Civ. 4746, 2001 WL 1262934 (S.D.N.Y. Oct. 22, 2001) .............. 27, 34

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)........................................................................... 10, 14

ii

*Coker v. Comm'r,*
    480 F.2d 146 (2d Cir. 1973) ........................................................................ 20

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax &*
    *Trade Bureau*, 843 F.3d 810 (9th Cir. 2016) ...................................... 15, 16, 17

*Dep't of Revenue v. Davis,*
    553 U.S. 328 (2008) ..................................................................................... 25

*Enochs v. Williams Packing & Navigation Co.,*
    370 U.S. 1 (1962) .................................................................................... 14, 15

*Fernandez v. Wiener,*
    326 U.S. 340 (1945) ..................................................................................... 34

*Florida v. Mellon,*
    273 U.S. 12 (1927) ................................................................................ *passim*

*Garcia v. San Antonio Metropolitan Transit Authority,*
    469 U.S. 528 (1985) .......................................................................... 17, 30, 31

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928) ..................................................................................... 34

*Judicial Watch, Inc. v. Rossotti,*
    317 F.3d 401 (4th Cir. 2003) ....................................................................... 16

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................. 9, 10

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) ..................................................................................... 10

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ................................................................................ 11, 12

*MMA Consultants 1, Inc. v. Republic of Peru,*
    245 F. Supp. 3d 486 (S.D.N.Y. 2017) .......................................................... 19

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) ........................................................................... 30, 32

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ............................................................................... *passim*

*Nat'l Taxpayers Union, Inc. v. United States*,
     68 F.3d 1428 (D.C. Cir. 1987) ...................................................................... 15

*New York v. United States*,
     505 U.S. 144 (1992) .................................................................................... 31

*Okin v. Comm'r*,
     808 F.2d 1338 (9th Cir. 1987) (per curiam) ........................................... 27, 28

*Pennsylvania v. New Jersey*,
     426 U.S. 660 (1976) .................................................................................... 10

*Phillips v. Comm'r*,
     283 U.S. 589 (1931) .................................................................................... 34

*Poe v. Seaborn*,
     282 U.S. 101 (1930) .................................................................................... 34

*Pollock v. Farmers' Loan & Trust Co.*,
     158 U.S. 601 (1895) ............................................................................... 21, 23

*Renne v. Geary*,
     501 U.S. 312 (1991) ...................................................................................... 9

*RYO Machine, LLC v. U.S. Dep't of Treasury*,
     696 F.3d 467 (6th Cir. 2012) ...................................................................... 16

*Sonzinsky v. United States*,
     300 U.S. 506 (1937) .................................................................................... 35

*South Carolina v. Baker*,
     485 U.S. 505 (1988) .............................................................................. *passim*

*South Carolina v. Regan*,
     465 U.S. 367 (1984) ......................................................................... 14, 15, 16

*Summers v. Earth Island Inst.*,
     555 U.S. 488 (2009) .................................................................................... 13

*Texas v. United States*,
     300 F. Supp. 3d 810 (N.D. Tex. 2018) .................................................. 14, 17

*United States ex rel. Joseph v. Cannon*,
     642 F.2d 1373 (D.C. Cir. 1981) .................................................................. 18

*United States v. Johnson*,
    40 F.3d 436 (D.C. Cir. 1994) ........................................................................ 35

*United States v. Moore*,
    54 F.3d 92 (2d Cir. 1995) ....................................................................... 35, 36

*United States v. Morgan*,
    313 U.S. 409 (1941) ...................................................................................... 35

*United States v. Ptasynski*,
    462 U.S. 74 (1983) ........................................................................................ 34

*United Steelworkers v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980) ................................................................... 35

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) ...................................................................................... 17

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................................... 35

*Virginia ex rel. Cuccinelli v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ........................................................................ 12

*Virginia Office for Prot. & Advocacy v. Stewart*,
    563 U.S. 247 (2011) ...................................................................................... 26

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................................ 9

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ...................................................................................... 13

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) ...................................................................................... 18

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. X ............................................................................................ 29

U.S. Const. amend. XVI ....................................................................................... 20

U.S. Const. art. I, § 8 ............................................................................................ 33

U.S. Const. art. I, § 9, cl. 4 .................................................................................. 20

26 U.S.C. § 56(b)(1)(A)(ii) ........................................................................... 6, 27

26 U.S.C. § 68 ............................................................................................... 6, 27

26 U.S.C. § 163(h)(3) ........................................................................................ 28

26 U.S.C. § 164(a)(1)-(3) .................................................................................... 4

26 U.S.C. § 164(b)(6) .......................................................................................... 4

26 U.S.C. 213(a) ................................................................................................ 28

26 U.S.C. § 221(b)(1) ........................................................................................ 28

26 U.S.C. § 221(b)(2) ........................................................................................ 28

26 U.S.C. § 7421(a) ........................................................................................... 14

An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent
    Resolution on the Budget for Fiscal Year 2018,
    Pub. L. No. 115-97, 131 Stat. 2054 (2017) ............................................. 1, 6, 7

Individual Income Tax Act of 1994,
    Pub. L. No. 78-315, § 9, 58 Stat. 231, 236 (1944) ........................................ 5

Omnibus Budget Reconciliation Act,
    Pub. L. No. 101-508, § 11103(a), 104 Stat. 1388, 1388-406 (1990) ................ 6

Revenue Act of 1913,
    63 Cong. ch. 16, 38 Stat. 114, 167 (1913) ................................................... 5

Revenue Act of 1964,
    Pub. L. No. 88-272, § 207, 78 Stat. 19, 40 (1964) ........................................ 5

Revenue Act of 1978,
    Pub. L. No. 95-600, § 111, 92 Stat. 2763 (1978) .......................................... 5

Tax Reform Act of 1986,
    Pub. L. No. 99-514, § 701, 100 Stat. 2085, 2320 (1986) ............................... 6

## RULES AND REGULATIONS

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 9

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 19

Fed. R. Civ. P. 25(d) ........................................................................................... 1

Internal Revenue Service, *Proposed Rules: Contributions in Exchange for State or Local Tax Credits*, 83 Fed. Reg. 43,563 (Aug. 27, 2018) ................................. 38

**LEGISLATIVE MATERIALS**

45 Cong. Rec. 1696-98 (Feb. 10, 1910) .......................................................... 23

Cong. Budget Office, *The Deductibility of State and Local Taxes* (Feb. 2008), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/ 02-20-state_local_tax.pdf .......................................................................... 5, 6, 7

Cong. Research Service, *The 2017 Tax Revision (P.L. 115-97): Comparison to 2017 Tax Law* (Feb. 6, 2018), https://fas.org/sgp/crs/misc/R45092.pdf ............ 7

Joint Committee on Taxation. *Estimated Budget Effects of the Conference Agreement for H.R. 1, the "Tax Cuts and Jobs Act"* (Dec. 18, 2017), https://www.jct.gov/publications.html?func=startdown&id=5053 .................. 7

S. Comm. on the Judiciary, Subcomm. on the Constitution, 99th Cong., *Amendments to the Constitution: A Brief Legislative History* (Comm. Print 1985), https://www.senate.gov/artandhistory/history/resources/pdf/SPrt99-87.pdf ................... 22

*Tax Reform Proposals—XIX: Hearing Before the S. Finance Comm.*, 99th Cong. (1985) ........................................................................................ 31

**SECONDARY SOURCES**

*A Decisive Blow at the Income Tax Amendment*, Daily Press (Newport News, Va.) (Mar. 10, 1910), at 4, https://chroniclingamerica.loc.gov/lccn/sn83045830/1910-03-10/ed-1/seq-4.pdf .......... 22

*Bailey Pleads for Income Tax*, Times Dispatch (Richmond, Va.), Mar. 2, 1910, at 1, https://chroniclingamerica.loc.gov/lccn/sn85038615/1910-03-02/ed-1/seq-1 ................ 23

John D. Buenker, *Income Tax and the Progressive Era* (1985) .................................... 22

John D. Buenker, *The Ratification of the Federal Income Tax Amendment*, 1 Cato J. 183 (1981), http://alt.coxnewsweb.com/statesman/politifact/121610_buenker.pdf ......... 22

*Georgia Avoids Income Tax*, N.Y. Times, Aug. 6, 1999, at 1, https://www.nytimes.com/1909/08/06/archives/georgia-avoids-income-tax-senate- by-vote-of-37-to-2-refuses-to.html .................................................................... 22

Edward T. Howe & Donald J. Reeb, *The Historical Evolution of State and Local Tax Systems*, 78 Soc. Sci. Q. 109, 114 (1997) ................................................................................ 25

*Hughes Is Against Income Amendment*, N.Y. Times, Jan. 6, 1910, at 2, https://www.nytimes.com/1910/01/06/archives/hughes-is-against-income-amendment -tells-legislature-it-gives.html ............................................................................ 23

Institute on Taxation and Economic Policy, *The Final Trump-GOP Tax Bill: National & 50-State Analysis* (Dec. 2017), https://itep.org/wp-content/uploads/Trump-GOP-Final- Bill-Report.pdf ..................................................................................... 8, 11, 35

Interview with President Donald J. Trump, Fox News (Oct. 11, 2017), https://video.foxnews.com/v/5606452902001/?#sp=show-clips ...................................... 37

*Mnuchin Fires Warning Shot to High-Tax States*, FOXBusiness (Nov. 9, 2017), https://www.econclubny.org/recent-speakers/-/blogs/steven-mnuchin ........................... 37

*Root for Adoption of Tax Amendment*, N.Y. Times, Mar. 1, 1910, at 4, www.nytimes.com/1910/03/01/archives/root-for-adoption-of-tax-amendment-no- danger-to-state-bonds-in.html ............................................................................ 23

Tax Policy Ctr., *Briefing Book*, https://www.taxpolicycenter.org/sites/default/files/briefing- book/tpc-briefing-book_0.pdf ..................................................................... 5, 6, 7

Transcript, *Moore Back on Campaign Trail*, CNN (Nov. 28, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1711/28/cnr.02.html ................................... 36

## PRELIMINARY STATEMENT

Defendants Steven T. Mnuchin, in his official capacity as the Secretary of the Treasury; the United States Department of the Treasury; Charles P. Rettig,[1] in his official capacity as Commissioner of Internal Revenue; the Internal Revenue Service ("IRS"); and the United States of America (collectively, the "United States" or the "Government"), by their attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the complaint filed by the States of New York, Connecticut, Maryland, and New Jersey (together, the "States"). The States challenge the constitutionality of a provision of a 2017 tax reform statute capping the deduction that taxpayers may take on their federal tax returns for state and local tax payments ("SALT"). *See* An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent Resolution on the Budget for Fiscal Year 2018, Pub. L. No. 115-97, § 11042, 131 Stat. 2054, 2085 (2017) (the "2017 Tax Act" or the "Act"). As explained below, their complaint should be dismissed.

The States' complaint posits a radical theory—namely, that the Sixteenth Amendment, rather than expanding Congress's taxing power, severely cabined that power, granting states the right to limit federal taxation. Accepting these arguments would require the Court to hold as follows:

- First, that the text of the Sixteenth Amendment, without actually saying so, requires "a deduction for all or a significant portion of state and local taxes." Compl. ¶ 5. Or a deduction for a "substantial portion" of those taxes. *Id.* ¶ 36. Or a deduction that is

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Charles P. Rettig, the Commissioner of Internal Revenue, is automatically substituted as a defendant for David J. Kautter, the former Acting Commissioner of Internal Revenue.

sufficient to "accommodate the States' sovereign tax authority."  *Id.* ¶ 61.  Or perhaps it prohibits nothing more than an "incidental limitation[]" on the deduction, *id.* ¶ 66, or "particularly low" limits on the deduction, *id.* ¶ 82.  It is not clear which of these varying formulations the States believe the Sixteenth Amendment silently enshrined, but they leave this Court to define the contours of this essentially standardless inquiry.

- Second, that the Sixteenth Amendment allows states to increase their tax rates without limit, and the federal government must provide an unlimited corresponding deduction. Taken to its logical conclusion, this means that states' policy choices could override the federal income tax power that was granted by Article I, Section 8 of the Constitution and expanded by the Sixteenth Amendment.  In other words, the States would have the Court hold that a constitutional amendment that was meant to expand Congress's power to tax individuals actually granted states a (textually unstated) power to nullify federal taxation.

- Third, that generalized state sovereignty principles override Congress's constitutional taxation power.  The complaint suggests that such principles prohibit *any* federal legislation that might make it more difficult for a state to "set [its] legislative agenda[]." *Id.* ¶ 43.   Again, taken to their logical conclusion, these undefined principles could be used to invalidate all manner of federal statutes, taxes, mandates, and programs that increase costs on states or their residents or interfere with state legislative agendas.

- Fourth, that the spheres of operation of federal and state taxation must be "different and not conflicting."  *Id.* ¶ 47.  Once again, taken to its logical conclusion, this principle would mean that any state could displace federal taxation by taxing the same income, good, or service.  This would call into question any number of federal tax provisions.

The States can point to no constitutional text supporting these theories, so they instead write a revisionist history about the purpose of the Sixteenth Amendment.  But this does not change the text of the Constitution or its meaning.  The Supreme Court has repeatedly recognized that Congress has broad authority to enact taxes and set deductions.  Moreover, Congress has repeatedly used this authority, over decades, to enact, alter, narrow, and limit the SALT deduction.  None of those policy choices has ever been invalidated as contrary to the Sixteenth Amendment, and this case presents no reason to adopt such a textually and historically unmoored theory.

At bottom, the States identify no constitutional provision supporting their theories. Article I, Section 8 confers broad taxing authority on Congress, subject only to a rule of uniformity, according to which taxes must be applied to all states equally.  The Sixteenth Amendment further extends the congressional taxing power by stating that federal income taxes need not be "apportioned" according to each state's population.  That was its purpose, and that was why it was ratified.  And the Tenth Amendment simply reserves to the states the right to impose their own state taxes within constitutional limits.  There is simply no legal basis for the States' complaint.

The Court need not reach the merits of their claims, however, because there are threshold jurisdictional issues barring this suit.  The States have failed to establish standing to sue in their own right.  The injuries they claim to suffer as a result of the SALT deduction cap are, at best, derivative and speculative.  The directly injured persons, if any, are those taxpayers who are being denied a tax exemption to which they are allegedly constitutionally entitled.  Many of these affected taxpayers, however, will benefit from other provisions in the law.  And the majority of taxpayers in the States will not be affected by the cap at all, because they will take

the (now increased) standard deduction in lieu of itemized deductions such as the SALT

deduction.  Any effect of the Act's provisions on certain of the States' residents will only

secondarily affect the States themselves, if at all, and the purported harm that the States assert

they will experience ("pressure" to enact new laws or policies) is entirely speculative.  Therefore,

the States' asserted injury is insufficient to establish standing.

The complaint also runs afoul of the Anti-Injunction Act ("AIA"), which broadly

prohibits suits seeking injunctions against the application of federal tax laws.  Any reliance on

the narrow judicially created exception to the AIA is misplaced, as this exception is limited to

circumstances where the directly affected party has no incentive to sue and the tax law may then

go unreviewed.  Here, the affected taxpayers have every incentive to sue, if, as the States

contend, the SALT deduction cap exceeded Congress's authority.  And, the States' assertion that

the Constitution impliedly requires an undefined but "significant" SALT deduction amounts to

an argument about policy choices and value determinations properly committed for resolution to

the political branches, rendering the complaint non-justiciable under the political question

doctrine.

## BACKGROUND

Section 164 of the Internal Revenue Code permits taxpayers to deduct "[s]tate and local,

and foreign, real property taxes," "[s]tate and local personal property taxes," and "[s]tate and

local, and foreign, income, war profits, and excess profits taxes."  26 U.S.C. § 164(a)(1)-(3) (the

"SALT deduction").  The 2017 Tax Act limited this deduction for tax years 2018 through 2025,

by stating that the total amount of a taxpayer's SALT deduction "shall not exceed $10,000

($5,000 in the case of a married individual filing a separate return)."  *Id.* § 164(b)(6).

Over the years, Congress has many times changed or limited the application or effect of the SALT deduction, sometimes significantly.  The original deduction for taxes paid was very broad, allowing taxpayers to deduct "all national, State, county, school, and municipal taxes paid within the year, not including those assessed against local benefits."  *See* Revenue Act of 1913, 63 Cong. ch. 16, 38 Stat. 114, 167 (1913); Cong. Budget Office, *The Deductibility of State and Local Taxes* at 4 (Feb. 2008), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/02-20-state_local_tax.pdf ("2008 CBO Report").  Legislation enacted over the last several decades has generally, if not invariably, limited the SALT deduction both directly and indirectly.  *See* 2008 CBO Report at 4-5.  Starting in 1944, the "standard deduction"—which individual taxpayers can take instead of itemizing deductions, including the SALT deduction—effectively eliminated the SALT deduction for the substantial majority of taxpayers who are not high earners and whose itemized deductions would not exceed the amount of the standard deduction.  *See* Individual Income Tax Act of 1944, Pub. L. No. 78-315, § 9, 58 Stat. 231, 236 (1944); 2008 CBO Report at 4.  For example, only about 10 percent of taxpayers with annual incomes below $50,000 claimed the SALT deduction in tax year 2014.  *See* Tax Policy Ctr., *Briefing Book* at 482, https://www.taxpolicycenter.org/sites/default/files/briefing-book/tpc-briefing-book_0.pdf ("Tax Policy Ctr. Briefing").

For those taxpayers who itemize and claim the SALT deduction, other enactments curtailed the types of state and local taxes that could be deducted.  *See, e.g.*, *id.*; 2008 CBO Report at 4-5.  Notably, the Revenue Act of 1964, Pub. L. No. 88-272, § 207, 78 Stat. 19, 40 (1964), limited the taxes eligible to be deducted to particular enumerated taxes, in contrast to the original SALT deduction, pursuant to which all state and local taxes could be deducted unless specifically excluded.  *See* 2008 CBO Report at 4.  And the Revenue Act of 1978, Pub. L. No.

5

95-600, § 111, 92 Stat. 2763, 2777 (1978), excluded state and local gasoline and motor fuel taxes from the deduction.  *See* 2008 CBO Report at 4.

In 1986, Congress enacted the Alternative Minimum Tax ("AMT"), which significantly limited many taxpayers' ability to benefit from the SALT deduction.  *See* Tax Reform Act of 1986, Pub. L. No. 99-514, § 701, 100 Stat. 2085, 2320 (1986).  In calculating their AMT, taxpayers cannot deduct any amounts paid in state and local taxes, which essentially eliminates the SALT deduction for taxpayers subject to this tax.  *See* 26 U.S.C. § 56(b)(1)(A)(ii); Tax Policy Ctr. Briefing at 484.  High-income taxpayers who live in states that levy high state taxes have generally been much more likely to be subject to the AMT than those living in states with lower state taxes.  *See* Tax Policy Ctr. Briefing at 132.  The Tax Reform Act of 1986 also eliminated the deduction for state and local sales taxes (although the 2004 American Jobs Creation Act partially reinstated the deduction).  *See* 2008 CBO Report at 4.  In 1990, the Omnibus Budget Reconciliation Act, Pub. L. No. 101-508, § 11103(a), 104 Stat. 1388, 1388-406 (1990), added the so-called Pease limitation, which further limited the SALT deduction by reducing the value of most itemized deductions (including for state and local taxes) for taxpayers whose incomes exceed certain thresholds.  *See* 26 U.S.C. § 68.

The SALT deduction cap is the sole provision of the 2017 Tax Act that the States challenge in this suit.  The Act made many other changes to the Internal Revenue Code, however, that affect individual taxpayers' overall tax liability.  For example, the Act lowered the tax rates for five of the seven individual income tax brackets, nearly doubled the standard deduction for most taxpayers, and added a deduction for qualified pass-through business income. *See* Pub. L. No. 115-97, §§ 11001, 11011, 11021.  The Act also created a new "family credit" for taxpayers with dependents who are not eligible for the existing child credit and reduced the

income threshold for taxpayers claiming a deduction for medical expenses.  *Id.* §§ 11022, 11027.

Significantly, the Act substantially limited the application of the AMT to individual taxpayers,

by increasing exemption amounts and the thresholds at which the exemptions phase out.  *Id.*

§ 12003.

 While the SALT deduction cap is only one of many changes made in the 2017 Tax Act

that together affect individual taxpayers' tax liabilities, the cap is an important part of the Act.

As the States acknowledge, the SALT deduction cap "is a primary means by which Congress is

offsetting the cost" of other provisions in the 2017 Tax Act.  Compl. ¶ 10; *id.* ¶ 97 ("Changes to

itemized deductions—including the deduction for SALT—are the single largest revenue-

generating mechanism in the Act" and "will generate some $668.4 billion in federal revenue over

eight years."); *see also* Cong. Research Serv., *The 2017 Tax Revision (P.L. 115-97): Comparison

to 2017 Tax Law* at 3 (Feb. 6, 2018), https://fas.org/sgp/crs/misc/R45092.pdf (discussing

estimated costs of the Act); Joint Comm. on Taxation, *Estimated Budget Effects of the

Conference Agreement for H.R. 1, the "Tax Cuts and Jobs Act"* at 2 (Dec. 18, 2017), https://

www.jct.gov/publications.html?func=startdown&id=5053 (Item D.1, estimating the amount of

revenue expected to be generated by the repeal of certain deductions, principally the SALT

deduction).

 Any SALT deduction decreases the amount of federal taxes collected, and can be viewed

as "an indirect federal subsidy to the state and local governments that levy deductible taxes—

because it decreases the net cost to taxpayers of paying those taxes."  2008 CBO Report at ix; *see*

Tax Policy Ctr. Briefing at 485.  Indeed, the SALT deduction has historically been "one of the

largest federal tax expenditures, with an estimated revenue cost of $96 billion in 2017."  Tax

Policy Ctr. Briefing at 482.  Moreover, even taking into account the consequences of the SALT

deduction cap, a report by the Institute on Taxation and Economic Policy projects that the overall effect of the 2017 Tax Act will be that the residents of a majority of states (including the four plaintiff States) will pay less in total federal taxes.  *See* Inst. on Taxation and Econ. Policy, *The Final Trump-GOP Tax Bill: National & 50-State Analysis*, tbls. 2, 3 (Dec. 2017), https:// itep.org/wp-content/uploads/Trump-GOP-Final-Bill-Report.pdf ("ITEP Report").  Many taxpayers in these states who previously benefitted most from the SALT deduction are projected to have consistently lower tax bills due to the combined effect of the Act's many provisions.  *Id.* The ITEP Report estimates, for example, that New York residents will pay a total of $15.8 billion less in federal taxes in 2019. These studies and others show that the SALT deduction cap must be considered in concert with the many other provisions of the 2017 Tax Act in order to fully understand the effects of the Act on individual taxpayers' liabilities and the overall tax profiles of each state's residents.

## ARGUMENT

## I.   The Court Should Dismiss the States' Complaint Under Rule 12(b)(1)

As a preliminary matter, the Court lacks jurisdiction over this case because the States lack standing to bring this action, and the AIA also bars it.  Taxpayers who wish to challenge a tax statute such as the SALT deduction cap have a well-established means to do so: pay their taxes and sue for a refund.  This minimizes interference with the tax collection process and ensures that concrete disputes between taxpayers and the federal government are resolved efficiently.  The States seek to circumvent that process, by bringing a pre-enforcement challenge to a tax provision in which they have no substantial interest other than a policy disagreement with Congress.  First, the States lack standing because they have failed to allege a sufficient injury-in-fact to themselves (as opposed to their residents) resulting from the SALT deduction

cap.  They speculate that they will be pressured to mitigate the effect of the cap by enacting some

new state law or policy, but this alleged injury is insufficiently concrete to satisfy the standing

requirement.  *See* Point I.B.  And second, the States' claims are foreclosed by the AIA, which

specifically forbids lawsuits seeking to enjoin the collection of federal taxes (as opposed to direct

challenges by a taxpayer to a tax assessment).  *See* Point I.C.  Finally, the States' complaint is

non-justiciable, because it raises disputes of tax policy committed to the political branches.  *See*

Point I.D.

### A.     Standard for Rule 12(b)(1)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff

bears the burden of pleading allegations sufficient to establish the Court's jurisdiction.  *See*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Courts should "presume that [they]

lack jurisdiction unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501

U.S. 312, 316 (1991) (quotation marks omitted).  In deciding a Rule 12(b)(1) motion, the Court

may refer to evidence outside the pleadings.  *Alliance for Envtl. Renewal, Inc. v. Pyramid*

*Crossgates Co.*, 436 F.3d 82, 88 n.8 (2d Cir. 2006).

### B.     The States Lack Standing

A plaintiff must have "a personal stake in the outcome of the controversy [so] as to

warrant his invocation of federal-court jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

At its "irreducible constitutional minimum," the standing doctrine requires a plaintiff, as the

party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and

particularized injury-in-fact, either actual or imminent; (2) a causal connection between the

injury and defendant's challenged conduct, such that the injury is "fairly traceable to the

challenged action of the defendant"; and (3) a likelihood that the injury suffered will be

"redressed by a favorable decision."  *Lujan*, 504 U.S. at 560-61 (quotation marks and alterations

omitted).  The standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, but "a plaintiff cannot rely solely on conclusory allegations of injury," *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003).

The States have not met their burden here, because none of the purported harms alleged in the complaint are concrete, particularized, or imminent enough to confer standing.  The States allege in broad terms that the SALT deduction cap unconstitutionally interferes with their "sovereign choices" by "disregard[ing] Congress's hitherto unbroken respect for the[ir] distinct and inviolable role in our federalist scheme" and "seek[ing] to compel certain States to reduce their public spending."  Compl. ¶ 1.  They further claim that "[t]he new cap will significantly increase the amount of taxes [their] residents. . . will pay to the federal government," *id.* ¶ 10, and depress home prices, causing homeowners to "have less to spend on goods and services, which, in turn, will lead to decreased business sales, lower the[ir] . . . revenue, and curtail their economic growth."  *Id.* ¶¶ 13-14.  Therefore, according to the complaint, the States will find it more difficult "to maintain their current taxation and fiscal policies, . . . [which] will force the[m] to choose between their current level of public investments and higher tax rates."  *Id.* ¶ 15.

These claimed injuries do not establish standing.  To begin with, states may sue the federal government only to vindicate their sovereign or quasi-sovereign interests, not to litigate the personal claims of their taxpayers.  *See, e.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981) (a state cannot interject itself into a controversy "as a nominal party in order to forward the claims of individual citizens"); *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (it has

"become settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens"); *see also Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("While the state, under some circumstances, may sue in [a *parens patriae*] capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government.").  Therefore, the States may not predicate standing on their residents' alleged increased federal tax liability[2] or decreased home values.

The only arguably "sovereign" interest the States assert is their claim that because of the alleged effects of the SALT deduction cap on their residents, they will feel compelled to adopt changes to their own tax rates or public spending policies.  *E.g.*, Compl. ¶¶ 14-15.  Such an indirect and contingent interest does not confer standing.  Indeed, the States' argument is foreclosed by the Supreme Court's decision in *Massachusetts v. Mellon*, 262 U.S. 447 (1923).  In that case, the Commonwealth challenged a federal statute distributing maternal and infant health funds only to those states that set up agencies to administer them (and revoked such funds from states that fell out of compliance with the law).  *See id.* at 479.  Although Massachusetts was not required to accept the federal funds in the first place, it argued that "the burden of the appropriations provided by this act . . . falls unequally upon the several states," because not all states would set up the required agencies, and that its "rights and powers as a sovereign state and the rights of its citizens have been invaded and usurped by these expenditures."  *Id*.  The Court

---

[2] As for whether the SALT deduction cap will increase individual taxpayers' tax liabilities, *see, e.g.*, Compl. ¶ 10, even if that were relevant given Congress's clear power to set taxation levels, it is unclear whether the complaint accounts for the effects of other provisions in the 2017 Tax Act that offset or reduce any increase in tax liability due to the cap for many taxpayers.  *See supra* at 5 (discussing other provisions such as the near-doubling of the standard deduction and the significant trimming back of the AMT); ITEP Report tbls. 2, 3.

rejected these arguments, concluding that none of the alleged violations of Massachusetts'

sovereign authority presented an injury in fact, and inquiring:

> [W]hat burden is imposed upon the states, unequally or otherwise?  Certainly
> there is none, unless it be the burden of taxation . . . .  Nor does the statute require
> the states to do or to yield anything.  If Congress enacted it with the ulterior
> purpose of tempting them to yield, that purpose may be effectively frustrated by
> the simple expedient of not yielding.

*Id.* at 482.

The States have not alleged that they are required to enact any particular law or policy

because of the SALT deduction cap, or that the cap directly preempts or interferes with any

existing state law.  They merely contend that because the cap may affect some of their residents,

they may feel pressure to change their own laws or policies in some unspecified way.  This

contention does not suffice to confer standing.  In *Florida v. Mellon*, 273 U.S. 12 (1927), the

Supreme Court considered a similar claim that a change to federal tax law would "constitute an

invasion of the sovereign rights of [a] state and a direct effort on the part of Congress to coerce"

it into changing its own tax laws.  *Id.* at 16 (considering claim that imposition of federal estate

tax with offsetting credit for amount of state estate taxes paid impermissibly pressured states to

enact their own estate taxes).  The Court held that the allegation did not present a "tenable"

ground "to invoke the jurisdiction" of the Court.  *Id.*  Because Congress possesses the power to

enact tax laws that are supreme over state law, there was "no ground for judicial relief" even if

the federal laws "interfere[ ] with the exercise by the state of its full powers of taxation," and

therefore the state had not "suffered a wrong furnishing ground for judicial redress."  *Id.* at 17.

Here, too, the States argue that changes to federal tax law will pressure them to change

their own laws.  But that is insufficient to establish standing.  *See Virginia ex rel. Cuccinelli v.

Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("[O]nly when a federal law interferes with a state's

exercise of its sovereign power to create *and enforce* a legal code does it inflict on the state the requisite injury-in-fact." (citation and quotation marks omitted)).[3]

The complaint also does not sufficiently allege that the SALT deduction cap will cause the States to suffer "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (considering the alleged loss of severance tax revenues linked to coal extraction and sale). Harm based on a predicted decline in general tax revenues does not constitute a sufficient injury-in-fact; states may not establish standing based on a "claim . . . that actions taken by [the federal government] ha[ve] injured a State's economy and thereby caused a decline in general tax revenues." *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 161 (E.D.N.Y. 2017); *see also Florida v. Mellon*, 273 U.S. at 17-18 (rejecting Florida's claim of direct injury predicated on anticipated loss of tax revenue attributable to residents leaving the state due to the new federal inheritance tax).

In any event, even if pressure to change state law could be a sufficient sovereign interest in some cases, the alleged injury-in-fact in this case would still be too speculative to maintain a claim. The injury or threat of injury may not be "merely conjectural or hypothetical or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quotation marks

---

[3] The Supreme Court has entertained state challenges to federal tax statutes, but those cases involved far more direct constraints on sovereign interests. *See, e.g.*, *South Carolina v. Baker*, 485 U.S. 505, 511 (1988) (considering challenge to change to federal tax law that the Court assumed had "directly regulated States by prohibiting outright" their sale of a certain type of bonds); *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (considering challenge to federal law where plaintiff states essentially had no choice but to change their state laws in order to avoid major loss of federal funding). Of course, when a court does not address the issue of standing but proceeds to the merits, the decision "does not stand for the proposition that no defect [in jurisdiction] existed." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

omitted).  Instead, an alleged future injury must be "*certainly* impending."  *Clapper*, 568 U.S. at

409 (citation and quotation marks omitted, emphasis in the original).

The States' claims here, stemming from their concerns about the effect of the SALT

deduction cap, are far too speculative and indirect to establish standing.  Even if some residents

of the States will pay more in taxes or, more tenuously, suffer a decrease in their home values as

a result of the cap, the argument that the States would therefore feel compelled to change their

tax laws or spending priorities is speculative and conclusory.  Moreover, the States apparently do

not account for the likely countervailing effects of other provisions of the 2017 Tax Act, which

will cause many of their residents to pay less in taxes than before.  The States' allegations thus

fail to satisfy the Article III requirement of a "*certainly* impending" injury that does not rely on a

"highly attenuated chain of possibilities."  *Clapper*, 568 U.S. at 410.

## C.     The Anti-Injunction Act Bars the States' Complaint

Even if the States had standing to sue, their complaint is barred by the AIA.  This statute

provides that "no suit for the purpose of restraining the assessment or collection of any tax shall

be maintained in any court by any person, whether or not such person is the person against whom

such tax was assessed."  26 U.S.C. § 7421(a).  "The manifest purpose of [the AIA] is to permit

the United States to assess and collect taxes alleged to be due without judicial intervention, and

to require that the legal right to the disputed sums be determined in a suit for refund."  *Enochs v.*

*Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962).  If the AIA applies, federal courts

lack jurisdiction.  *See id.* at 5.

Here, the States seek to restrain "the assessment or collection of [a] tax."  *See, e.g.*,

Compl. ¶ 141(b) (seeking to "[e]njoin [the Government] from enforcing the new cap on the

SALT deduction").  And states are among the "persons" to which the AIA applies.  *E.g.*, *Texas v.*

*United States*, 300 F. Supp. 3d 810, 835 (N.D. Tex. 2018); *South Carolina v. Regan*, 465 U.S.

367, 373-81 (1984). Because the States' complaint falls squarely within the AIA's prohibition, it should be dismissed. *See Bob Jones Univ. v. Simon*, 416 U.S. 725, 738-39, 749 (1974).

The States may, however, attempt to invoke a judicially created exception to the AIA. *See* Compl. ¶ 28. In *South Carolina v. Regan*, the Supreme Court considered a constitutional challenge to a statute that eliminated a federal tax exemption for interest on unregistered "bearer" bonds, restricting the exemption to bonds whose ownership was registered. 465 U.S. at 371. In attacking the statute, South Carolina asserted a sovereign interest in issuing bonds in the form of its choice. *Id.* at 371-72. The Court held that the AIA did not bar South Carolina's suit (though it ultimately rejected the state's claim on the merits, *see infra* Part II.B.3) because application of the AIA would have risked precluding all judicial review of the statute. *See id.* at 373.

Had the AIA applied, South Carolina would have had to "issu[e] bearer bonds and urg[e] a purchaser of those bonds to bring a suit contesting the legality" of the statute. *Id.* at 380. Because taxpayers had little incentive to purchase tax-disadvantaged unregistered bearer bonds in order to challenge the tax law, South Carolina's constitutional objection to the law might never have been reviewed by a court. *See id.* at 380-81. Under those narrow circumstances, the Court concluded that Congress did not intend the AIA to bar the suit.

The *Regan* exception does not apply here. As an initial matter, the States' derivative and speculative injuries do not constitute an "irreparable injury" sufficient to justify injunctive relief. *See Williams Packing*, 370 U.S. at 6. Without such a showing, the Court need not even consider whether their claims fall within the *Regan* doctrine. Moreover, given the States' lack of independent standing, their claims necessarily fall outside *Regan*. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1436 (D.C. Cir. 1987). In any event, the *Regan* exception is narrow. *See Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax*

*& Trade Bureau*, 843 F.3d 810, 815 (9th Cir. 2016); *RYO Machine, LLC v. U.S. Dep't of Treasury*, 696 F.3d 467, 472 (6th Cir. 2012); *Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 408 n.3 (4th Cir. 2003). The AIA's plain language and legislative purpose require strict construction of any judicially created exceptions. *See Am. Bicycle Ass'n v. United States* (*In re Am. Bicycle Ass'n*), 895 F.2d 1277, 1281 (9th Cir. 1990).

This case is also significantly different from *Regan* because the violation of a supposedly sovereign interest asserted by the States here is an alleged secondary consequence of the increase in some of their residents' federal taxes. If the SALT deduction cap raises federal taxes for certain taxpayers in the States, the complaint speculates, those taxpayers may press for lower state taxes to compensate. Some taxpayers—unlike the States—have a direct economic interest in challenging the Act. The States need not struggle to "convince a taxpayer to raise [their] claims" and cannot show such a challenge is a possibility so remote that the Act would likely remain unreviewed. *Cf. Regan,* 465 U.S. at 380-81. As the Ninth Circuit ruled in similar circumstances:

> [*Regan*'s] narrow exception is inapplicable here. Most critically, in *Regan*, the state's interest in issuing bonds in the form it chose existed separately from the bondholders' interest in avoiding taxation. A bondholder could avoid taxation simply by purchasing registered bonds, and thus would have little incentive to pay the tax, file a refund suit, and raise the state's constitutional claims. Therefore, the state would be required to depend on the mere *possibility* of persuading a third party bondholder to assert its claims. Here, in contrast, the Yakama Nation's asserted injury flows from the taxation of its members, and thus is wholly derivative of any injury suffered by [the members].

*Yakama Indian Nation*, 843 F.3d at 815 (citations, quotation marks, and brackets omitted, and emphasis in original).

Here, as in *Yakama Indian Nation*, the places of the state and the individual taxpayers are reversed compared to *Regan*: it is the individual taxpayers who are directly affected by the tax law, while the States' asserted sovereign interests are at best secondary or derivative of the law's

impact on their taxpayers.  The Ninth Circuit held in that case that the plaintiff Indian tribe did

not overcome the AIA because its "asserted injury flows from the taxation of its members, and

thus is wholly derivative of any injury suffered by" those members, who have their own "interest

in preventing taxation" and could vindicate whatever interest the tribe had by suing on their own

behalf.  *Id.*; *cf. Texas*, 300 F. Supp. 3d at 836 (finding *Regan* exception satisfied where only

private parties with no incentive to sue had statutory authority to challenge regulation).

Similarly, the States' desire that their residents receive an unlimited SALT deduction is

duplicative of those residents' own interests in minimizing their taxes.  The AIA therefore bars

this suit.

### D.   The States' Complaint Is Non-Justiciable

Finally, the States' complaint is non-justiciable, because they fail to identify any

judicially manageable standards to guide the Court's analysis of their claims.  As discussed

further below, the States concede that Congress may constitutionally limit or cap the SALT

deduction to some extent.  *See* Point II.B.3.  However, they offer no clear, neutral standards or

critieria for deciding when a given SALT deduction limit or cap passes constitutional muster.

The States' claims, despite their constitutional garb, amount to an argument about policy choices

and value determinations constitutionally committed for resolution to the political branches.

In asking this Court to conclude that the 2017 Tax Act is unconstitutional because it does

not include a sufficiently "significant" SALT deduction, while identifying no criteria to use in

assessing this claim, the States urge the type of standardless inquiry that the Supreme Court

rejected as unworkable in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528,

546-49 (1985).  Courts may not be called upon to resolve policy disputes, and judicial

intervention in such circumstances raises significant separation-of-powers concerns.  *See, e.g.*,

*Vieth v. Jubelirer*, 541 U.S. 267, 305-06 (2004); *id.* at 307-08 (Kennedy, J., concurring);

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (courts may not decide

disputes where they "lack . . . judicially discoverable and manageable standards" for doing so);

*United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1379 (D.C. Cir. 1981) (finding a

complete absence of "judicially discoverable and manageable standards" for resolving the

question of whether Senators may use paid staff for campaign activities); *Baker v. Carr*, 369

U.S. 186, 217 (1962).[4]   Accordingly, the complaint is non-justiciable under the political question

doctrine.

## II.   The Court Should Dismiss the States' Complaint Under Rule 12(b)(6)

Even assuming jurisdiction, the States' complaint should be dismissed for failure to state

a valid claim.  The Supreme Court has long recognized Congress's broad authority to tax income

and decide whether certain costs can be deducted from taxable income.  Congress has repeatedly

used this authority, over the decades, to directly and indirectly narrow the SALT deduction.

None of those provisions has ever been invalidated, and the States offer no plausible ground to

invalidate the limit at issue here.  There is no basis in the Constitution or Supreme Court doctrine

to announce such a novel rule.

The States contend that Congress's imposition of the SALT deduction cap violates three

constitutional provisions, but these arguments are all plainly incorrect as a matter of law.  First,

there is no basis for the States' argument that, in the process of ratifying the Sixteenth

Amendment, an implicit limitation on the federal taxing authority was imposed specifically

---

[4] *See also Zivotofsky*, 566 U.S. at 209-10 (Sotomayor, J., concurring) ("[I]f the parties' textual, structural, and historical evidence is inapposite or wholly unilluminating, rendering judicial decision no more than guesswork, a case relying on the ordinary kinds of arguments offered to courts might well still present justiciability concerns."). Here, the States' "textual, structural, and historical evidence is inapposite or wholly unilluminating," leaving the Court to assess the States' claims with no standards or criteria, and rendering its analysis "no more than guesswork."

requiring an unlimited SALT deduction.  *See* Point II.B.  Second, the Tenth Amendment does

not mandate such a limitation; although Congress may not unlawfully commandeer states into

executing federal policy, the Tenth Amendment does not limit the federal taxing power.  *See*

Point II.C.  And third, the SALT deduction cap does not contravene Article I, Section 8 of the

Constitution, which sets Congress's broad taxing authority subject only to a rule of facial

uniformity—not uniformity of effect.  *See* Point II.D.

### A.       Standard for Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "plausibility" standard "asks

for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009).  In considering a Rule 12(b)(6) motion, "a district court may consider the

facts alleged in the complaint, documents attached to the complaint as exhibits, . . . documents

incorporated by reference in the complaint," "document[s] 'integral' to the complaint," and

"matters of which judicial notice may be taken." *MMA Consultants 1, Inc. v. Republic of Peru*,

245 F. Supp. 3d 486, 498 (S.D.N.Y. 2017) (citations omitted).

### B.       The Complaint Fails to State a Violation of the Sixteenth Amendment

The SALT deduction cap does not violate the Sixteenth Amendment.  The States'

argument that the Amendment contains some unwritten right to an unlimited SALT deduction

has no basis in its text, is premised on a misunderstanding of its purpose and effect, misconstrues

its ratification history, and incorrectly suggests that the history of the deduction before and after

the Amendment's ratification implies a constitutional limit on Congress's taxing authority.

### 1. The Sixteenth Amendment Does Not Limit Congress's Authority to Tax Incomes and Set or Limit Deductions

The Sixteenth Amendment allows Congress to "lay and collect Taxes on incomes, from whatever source derived, without apportionment among the several States." U.S. Const. amend. XVI. The States do not claim that anything in the text of this provision requires a SALT deduction or limits Congress's authority to allow or deny such a deduction. The States also fail to identify any court that has found that the Sixteenth Amendment mandates particular tax deductions. *Cf., e.g.*, *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1202 (10th Cir. 2018) ("Congress's choice to limit or deny deductions for [business] expenses . . . does not violate the Sixteenth Amendment."); *Coker v. Comm'r*, 480 F.2d 146, 147 (2d Cir.) ("The fact is that Congress has directed that [certain] expenses not be deductible. Appellant's argument that allowance of the deduction he claims is compelled by the Sixteenth Amendment does not merit discussion."), *rev'd in part on other grounds on reh'g*, 487 F.2d 593 (2d Cir. 1973).

The States misconceive the role of the Sixteenth Amendment with respect to Congress's taxing authority. The complaint suggests that the Amendment was an affirmative constitutional grant of power to Congress to tax income that was, the States claim, limited by an unwritten contemporaneous understanding as to the appropriate limits on such taxation, *see infra* Point II.B.2. *See, e.g.*, Compl. ¶¶ 56, 59-60 (discussing "the Sixteenth Amendment's authority to tax income"). But this is incorrect; the Sixteenth Amendment lifted a prior limitation on Congress's existing taxing power. At the time the Sixteenth Amendment was ratified in 1913, Congress's taxing authority was subject to the preexisting limitation that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." U.S. Const. art. I, § 9, cl. 4. "This requirement means that any 'direct Tax' must be apportioned so that each State pays in proportion to its population." *Nat'l Fed'n of Indep. Bus. v.*

*Sebelius* ("*NFIB*"), 567 U.S. 519, 570 (2012).  The Supreme Court had concluded that individual

income taxes are "direct taxes," as are certain other taxes on personal property.  *See id.* at 571

(citing *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 618 (1895)).

  The Sixteenth Amendment responded by providing that when Congress used its existing

power to tax incomes, it was no longer required to apportion such taxes among the states.  *See*

*NFIB*, 567 U.S. at 571.  As the Supreme Court explained shortly after the ratification of the

Amendment: "It was not the purpose or effect of that amendment to bring any new subject within

the taxing power.  Congress already had power to tax all incomes. . . .  The Amendment . . .

obliterated the distinction . . . between taxes on income that are direct taxes and those that are

not, and so put on the same basis all incomes from whatever source derived."  *Bowers v.*

*Kerbaugh-Empire Co.*, 271 U.S. 170, 174 (1926) (quotation marks omitted).  Because the States

misconceive the meaning and effect of the Sixteenth Amendment, their argument that the

Amendment silently requires a SALT deduction must fail.

  **2. Nothing in the Sixteenth Amendment's Ratification History Limits Congress's Plenary Power to Set or Limit Tax Deductions**

  Despite the Sixteenth Amendment's limited effect, the States contend that events

surrounding its ratification imply an unwritten contemporaneous agreement on the

"constitutional necessity of a deduction for all or a significant portion of state and local taxes."

Compl. at 18.  There is no basis for this claim.  In fact, the ratification history of the Amendment

shows nothing of the sort, and the sources cited in the complaint do not show that such an

understanding ever existed.

  The complaint cites historical sources describing some opposition to the Sixteenth

Amendment based on general federalism concerns.  But notably absent from the sources cited by

the States is any mention of SALT deductions.  Federalism concerns may well have been debated

in the ratification process.  For example, certain legislators from Southern states opposed

ratification because they were concerned that it would give rise to a permanent federal income

tax (which did not exist at the time)—which would entail federal tax collectors operating in their

states, or whose proceeds would be used to fund benefits for Union, but not Confederate,

veterans.  *See* John D. Buenker, *The Ratification of the Federal Income Tax Amendment*, 1 Cato

J. 183, 204 (1981), *available at* http://alt.coxnewsweb.com/statesman/politifact/121610_

buenker.pdf, *cited in* Compl. ¶ 51 n.23.[5]  But the Sixteenth Amendment was ratified despite such

opposition.  And in any event, the concerns of the Amendment's opponents do not support a

constitutional implication mandating a perpetual, unlimited SALT deduction.

Indeed, the federalism arguments regarding the Sixteenth Amendment, at least as

highlighted in the materials cited in the complaint, were principally focused on a specific issue

unrelated to the SALT deduction: whether the Amendment would upend judicial limitations then

in place forbidding federal taxation of income from various state instrumentalities, including

state bonds.  The Supreme Court had ruled that taxation of income from state instrumentalities

---

[5] *See also Georgia Avoids Income Tax*, N.Y. Times, Aug. 6, 1909, at 1, *available at*
https://www.nytimes.com/1909/08/06/archives/georgia-avoids-income-tax-senate-by-vote-of-37-
to-2-refuses-to.html, *cited in* Compl. ¶ 54 n.29 (describing Georgia's initial vote against
ratification on grounds that it would give more power to the federal government, encourage
federal wastefulness, and increase the tax burden on Southern states); *A Decisive Blow at the
Income Tax Amendment*, Daily Press (Newport News, Va.), Mar. 10, 1910, at 4, *available at*
https://chroniclingamerica.loc.gov/lccn/sn83045830/1910-03-10/ed-1/seq-4.pdf, *cited in* Compl.
¶ 54 n.30 ("It will be a long time before Virginia will set her sister States the example of
surrendering unnecessarily to the central government any important right now reserved to the
States."). Even in these Southern states the majority view was that "a federal income tax would
not seriously impair state sovereignty."  Buenker*, supra*, at 204.  Ultimately, most Southern
states voted in favor of ratification, in part because they concluded that federal income taxes
would fall more heavily on taxpayers in the richer Northeastern states.  *See* John D. Buenker,
*The Income Tax and the Progressive Era* 194 (1985); S. Comm. on the Judiciary, Subcomm. on
the Constitution, 99th Cong., *Amendments to the Constitution: A Brief Legislative History*, at 41
(Comm. Print 1985), *available at* https://www.senate.gov/artandhistory/history/resources/pdf/
SPrt99-87.pdf ("Amendments to the Constitution").

violated constitutional federalism principles.  *See, e.g.*, *Pollock*, 158 U.S. 601, *overruled in*

*relevant part by South Carolina v. Baker*, 485 U.S. 505, 515-27 (1988) (discussing history of

cases addressing federal taxation of income of state instrumentalities).  During the ratification

debates, opponents of the Sixteenth Amendment, including New York Governor Charles Evans

Hughes, argued that the broad language of the Amendment might encourage courts to revisit

their earlier determinations precluding federal taxation of certain forms of state-related income.

*See Hughes Is Against Income Amendment*, N.Y. Times, Jan. 6, 1910, at 2 (citing *Pollock*, 158

U.S. 601), *available at* https://www.nytimes.com/1910/01/06/archives/hughes-is-against-

income-amendment-tells-legislature-it-gives.html, *cited in* Compl. ¶ 52 nn.26-27.  Several U.S.

senators promoting the Amendment, however, asserted that, because the Amendment's language

had nothing to say on this topic, it would not affect the federalism jurisprudence.[6]  The senators

did not, thus, argue that the Sixteenth Amendment would affirmatively prevent the federal

government from "encroach[ing] on the States' traditional tax authority."  Compl. ¶ 56

(emphasis added).  Ultimately, the Supreme Court did overturn the broad prohibition on taxing

---

[6] Senator William Borah agreed with the jurisprudence of his time that federalism principles precluded federal taxation of income from state bonds, as well as the salaries of state officials.  *See* 45 Cong. Rec. 1696-98 (Feb. 10, 1910), *cited in* Compl. ¶ 56 n.31.  But he saw no reason the Amendment would upend that limitation: he explained that Congress had long had plenary authority to tax incomes, subject only to the apportionment requirement, and that relaxing this requirement would not otherwise expand its taxation power.  *See id.* at 1698.  Other legislators echoed Senator Borah's view that the proposed Amendment would not expand the federal taxing power.  *See, e.g.*, *Root for Adoption of Tax Amendment*, N.Y. Times, Mar. 1, 1910, at 4, *available at* https://www.nytimes.com/1910/03/01/archives/root-for-adoption-of-tax-amendment-no-danger-to-state-bonds-in.html, *cited in* Compl. ¶ 57 n.33 (Senator Root "took the ground that the proposed amendment did not give the National Government any new power. State and municipal bonds, he argued, were excluded from the application of the tax by general and established constitutional principles inherent in the very nature of the dual Government of the United States."); *Bailey Pleads for Income Tax*, Times Dispatch (Richmond, Va.), Mar. 2, 1910, at 1, *available at* https://chroniclingamerica.loc.gov/lccn/sn85038615/1910-03-02/ed-1/seq-1/, *cited in* Compl. ¶ 58 n.38.

income from state bonds and other state-related sources, and nothing in the expectations

surrounding the ratification of the Sixteenth Amendment stood in the Court's way.  *See Baker*,

485 U.S. at 515-26.

While this history concerns only the federal taxation of income from state bonds and

instrumentalities, the States attempt to extract from it a sweeping legal requirement: that the

Sixteenth Amendment supposedly forbids the federal government from doing anything that

arguably "encroaches" on state tax authority.  *See, e.g.*, Compl. ¶ 59 ("Based on the[ ] assurances

of [the Senators promoting the amendment], the States understood that the new authority they

were conferring on the federal government [in the Sixteenth Amendment] would not empower

the federal government to encroach on the States' sovereign tax power, including their ability to

impose their own state tax regimes free from federal interference.").  But there is no basis for

that theory, one that would contradict the essential supremacy of federal law, *see Florida v.

Mellon*, 273 U.S. at 17.  Whatever might have been the expectation with respect to the taxation

of income from state bonds and instrumentalities, that expectation establishes no broad principle

of state supremacy in federal tax law, and it certainly comes nowhere close to establishing an

unwritten right to a SALT deduction.  Simply put, none of the discussions surrounding the

ratification debate cited by the States so much as mentioned whether there should or should not

be a federal income tax deduction for state and local taxes, let alone whether one is

constitutionally required.[7]  These discussions thus lend no support to the States' position.

Finally, there is no basis for the suggestion that in ratifying the Sixteenth Amendment

states relied on an understanding, unspoken in the Amendment's text, that any federal income tax

---

[7] To the extent it was understood that a SALT deduction was constitutionally required, for which
there is no evidence, this further assumes states with lower taxes ratified the Amendment
notwithstanding that such a deduction would benefit higher-tax states disproportionately.

would include a deduction for state taxes.  There is no authority for the idea that such a tacit understanding can become binding upon ratification, much less how the understandings of the various state legislatures, ratifying an amendment often over the course of many years, could be reliably and fully ascertained.  Nor is there any historical support for such an understanding here. Indeed, at the time the Amendment was finally ratified in 1913, only two states (neither of which is a plaintiff here) had an individual income tax at all.  *See* Edward T. Howe & Donald J. Reeb, *The Historical Evolution of State and Local Tax Systems*, 78 Soc. Sci. Q. 109, 114 (1997) (Wisconsin and Mississippi).  New York did not adopt such a tax until 1919.  *See Dep't of Revenue v. Davis*, 553 U.S. 328, 335 (2008).  And Connecticut, which did not adopt an individual income tax until 1991, can hardly assert that it relied on a SALT deduction when it ratified the Sixteenth Amendment, because Connecticut has never ratified it.  *See Amendments to the Constitution*, *supra* n.4, at 44.

The States argue that assurances about federalism were important in persuading them to ratify the Amendment.  But it remains true today, as it was at the time of ratification, that "[e]verything the State can do or tax now it can do after this amendment is adopted."  Compl. ¶ 58 (quoting Sen. Bailey).  The States are just as free to impose taxes or collect revenues as they were in 2017—or in 1912.  Nothing in the Sixteenth Amendment's text or history suggests that an uncapped SALT deduction is necessary to preserving the States' powers.

### 3.     Nothing in the History of Federal Income Taxation Suggests That a SALT Deduction Is Constitutionally Required

The States' final Sixteenth Amendment argument is that Congress's history of permitting a deduction for state and local taxes implies that such a deduction is constitutionally required. This argument, too, is faulty.  While in some cases the history of congressional action may be relevant in resolving close constitutional questions, nothing in the text of the Sixteenth

Amendment or in its ratification history reflects the supposed constitutional principle advanced by the States. This is not a close question. Thus, even if Congress had continuously provided for an unlimited federal deduction for state and local taxes before the 2017 Tax Act—which it has not—such practice would hardly mean that its continuation is constitutionally required. *See, e.g.*, *NFIB*, 567 U.S. at 549 ("Legislative novelty is not necessarily fatal; there is a first time for everything."); *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 260 (2011) ("Novelty . . . is often the consequence of past constitutional doubts, but we have no reason to believe that is the case here.").

Indeed, the Supreme Court has rejected this argument in a similar context. When Congress removed the tax exemption for state-issued bearer bonds, it acted against the "historical fact that [it had] always exempted state bond interest from taxation by statute, beginning with the very first federal income tax statute." *Baker*, 485 U.S. at 523. South Carolina thus argued that "the legislative history of the Sixteenth Amendment . . . manifests an intent to freeze into the Constitution the tax immunity for state bond interest that existed in 1913." *Id.* at 522 n.13. The Supreme Court flatly disagreed. The Amendment's history demonstrated, to the contrary, that it was not meant to have any "effect on which incomes were subject to federal taxation." *Id.* And the state's historical argument ran contrary to decades of precedent: "if the Sixteenth Amendment had frozen into the Constitution all the tax immunities that existed in 1913, then most of modern intergovernmental tax immunity doctrine would be invalid." *Id.*

In any event, the history of the federal SALT deduction does not support the States' contention that the 2017 Tax Act effects an unprecedented change. As they acknowledge and as described above, *see supra* at 3-5, Congress has imposed numerous limits on the SALT deduction throughout the history of the modern federal income tax, including the standard

26

deduction, the AMT, the Pease limitation, and curtailments of the deductibility of specific types of state and local taxes.  Perhaps the most significant of these is the AMT, which precluded many high earners from taking any deduction for state or local taxes.  *See* 26 U.S.C. § 56(b)(1)(A)(ii).  Similarly, the Pease limitation caps the amount of the SALT deduction taxpayers may claim.  *See id.* § 68.  These enactments have been the subject of court challenges, and have been found to be constitutional.  *See, e.g.*, *Okin v. Comm'r*, 808 F.2d 1338, 1342 (9th Cir. 1987) (per curiam) (upholding constitutionality of AMT provision and collecting cases); *Campbell v. United States*, No. 00 Civ. 4746, 2001 WL 1262934, at *2-4 (S.D.N.Y. Oct. 22, 2001) (rejecting challenges to the Pease limitation based on the Tenth and Sixteenth Amendments, and Article I, § 8), *aff'd*, 45 F. App'x 50 (2d Cir. 2002).

Thus, as the States acknowledge, *see* Compl. ¶ 81, the SALT deduction has been effectively capped for decades for many of the taxpayers who would otherwise be able to claim it (indeed, like the 2017 Tax Act's cap, the previous limits mostly affected high earners).  The States are accordingly reduced to arguing that it is more constitutionally problematic for Congress to impose a "direct" cap on this deduction rather than cap it through overall limits on deductions and that, while some (unspecified) limits are permissible, Congress is constitutionally required to permit a deduction for at least a "significant portion" of each taxpayer's state and local taxes.  *See id.* ¶¶ 37, 45, 65, 71, 81, 132.  There is no basis for these arguments.

The States do not specify exactly what they mean by a "direct" limitation on the deduction,[8] nor is there any reason to believe that the method Congress uses to cap a deduction

---

[8] The States characterize the 2017 limitation as the "first *direct* limitation on the deduction," in supposed distinction from prior "general limits."  Compl. ¶ 81.  But the only grounds for that distinction they offer are, first, that the previous limits were "often intended to maintain the progressive nature of the income tax and to raise revenue"—ignoring the fact that

makes any difference to its constitutionality.[9]  And, as discussed above, the AMT and Pease

limitation restrict the overall amount of deductions that many high-earning taxpayers can claim,

based on their income.  Those limits have similar effects to the 2017 Tax Act, by reducing the

amount of the federal deductions that can be claimed for paying state and local taxes.  The Act

changed the limit on the SALT deduction from one mostly based on income (the AMT and Pease

limitation) to a fixed limit on the dollar amount of the deduction (coupled with a substantial

narrowing of the AMT's applicability and a near-doubling of the standard deduction).  But either

approach has the same effect of limiting many taxpayers' ability to claim the deduction.  It is

difficult to fathom any constitutional principle under which the new limitation violates the

Constitution, while the previous limitations did not.  The States offer none.

Relatedly, the States do not specify the standard they propose the Court adopt.  Their

complaint alternately suggests that the Sixteenth Amendment requires a deduction for "*all or a

significant portion*" of state and local taxes, Compl. ¶ 5 (emphasis added), or just a "substantial

portion" of such taxes, *id.*  Elsewhere, they argue that any limit on the SALT deduction must at

most be "incidental" to survive constitutional scrutiny, *id.* ¶ 66, and that the reason the cap in the

_____

the 2017 limitation also raises revenue and applies primarily to raise the taxes of high-income taxpayers, and that neither a focus on revenue nor a progressive tax structure are constitutionally required.  In further defense of their "direct" distinction, the States contend that the 2017 limitation was meant to "curtail deductions for taxpayers of all incomes, with the goal of injuring a handful of States."  *Id.*  As discussed here, both assertions are incorrect.

[9] Congress can limit tax deductions in a variety of ways, and there is no constitutional reason to prefer one method over the other, whether characterized as "direct" or otherwise. Some deductions can be claimed only by taxpayers earning up to a specific income or decrease in value as their income increases (*e.g.*, the deduction for student loan interest, 26 U.S.C. § 221(b)(2)), others can be claimed only if the amount of the deduction exceeds a certain percentage of the taxpayer's income (*e.g.*, the deduction for healthcare expenses, *id.* § 213(a)), and still others are subject to specific dollar caps on the amount of the deduction (*e.g.*, student loan interest again, *id.* § 221(b)(1)) or on the basis for the expense (*e.g.*, the deduction for mortgage interest, *id.* § 163(h)(3)).

28

2017 Tax Act is problematic is because it is "particularly low," *id.*  Even if these standards were reconcilable, the States fail to explain how there can be a constitutional right to deduct only a "significant" (or "substantial") portion of state and local taxes, or what portion of taxpayers' state and local tax liability is sufficient to satisfy their purported constitutional standard.  This argument appears to reflect the States' recognition that the SALT deduction has been limited for decades, and their resulting need to come up with a standard under which the previous limits were constitutional (which they do not contest) while the new cap is not.

As to the States' argument that the new $10,000 limitation is "particularly low," *id.* ¶ 82, they offer no standard rooted in constitutional law as to how low is too low.  Their position does not, and cannot, address, for instance, whether the Constitution would allow a $15,000 cap, or a specific limit on the deduction based on the taxpayer's income, or an expansion of the prior AMT that would eliminate SALT deductions for a far greater class of taxpayers.  At bottom, the States rely on no constitutional standard at all, but only their own policy preferences as to how much of a deduction they would like to have for their residents.

### C.    The Complaint Fails to State a Violation of the Tenth Amendment

The complaint also alleges that "[t]he Tenth Amendment prohibits the federal government from invading the sovereign tax authority of the States," and claims that because "[t]he cap on the SALT deduction has both the purpose and effect of interfering with the . . . States' sovereign authority to determine their own fiscal policies," it "violates the Tenth Amendment and the constitutional guarantees of federalism."  Compl. ¶¶ 125, 127, 129.  But the SALT cap does not run afoul of the Tenth Amendment, and this claim too is meritless.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to

the people."  U.S. Const. amend. X.  The Supreme Court recently summarized the constitutional

constraints on the legislative authority of Congress and the states as follows:

> The Constitution limits state sovereignty in several ways.  It directly prohibits the
> States from exercising some attributes of sovereignty.  Some grants of power to
> the Federal Government have been held to impose implicit restrictions on the
> States.  And the Constitution indirectly restricts the States by granting certain
> legislative powers to Congress, while providing in the Supremacy Clause that
> federal law is the "supreme Law of the Land . . . ."
>
> The legislative powers granted to Congress are sizable, but they are not unlimited.
> The Constitution confers on Congress not plenary legislative power but only
> certain enumerated powers.  Therefore, all other legislative power is reserved for
> the States, as the Tenth Amendment confirms.  And conspicuously absent from
> the list of powers given to Congress is the power to issue direct orders to the
> governments of the States.

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475-76 (2018) (citations omitted);

*see also Garcia*, 469 U.S. at 548-49 ("[T]he sovereignty of the States is limited by the

Constitution itself . . . .  The States unquestionably do retain a significant measure of sovereign

authority [but] only to the extent that the Constitution has not divested them of their original

powers and transferred those powers to the Federal Government." (citation, quotation marks, and

brackets omitted)).

        The rule that Congress may not compel state legislative action is known as the "anti-

commandeering principle."  *Murphy*, 138 S. Ct. at 1476.  Simply stated, Congress may not

directly compel states to enact and enforce a federal regulatory program: "Where a federal

interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not

conscript state governments as its agents."  *Id.* at 1477 (citations, quotation marks, and brackets

omitted); *see id.* at 1476-77 (reviewing instances where Congress unconstitutionally

commandeered states: by requiring them to take title to radioactive waste and by requiring them

to perform federal background checks on firearm purchases).

There is no question that Congress has broad constitutional authority to decide what is deductible from taxable income, *see Kerbaugh-Empire Co.*, 271 U.S. at 174, but the States nevertheless claim that the SALT deduction cap violates their "sovereign tax authority," Compl. ¶ 125.  As explained above, there is no interference with the States' taxing power.  If anything, accepting the States' argument would give them a veto over federal tax legislation.  Nothing in the Act requires states to change any aspect of their tax regimes.  That the SALT deduction cap may result in some of their residents paying more in federal taxes—while others may pay less as a result of other changes in the law—does not prevent the States from using their own sovereign authority to tax their residents in any way they choose.  By capping the SALT deduction, Congress has not commandeered the States in any way; it has merely exercised its own constitutional power to tax income on the federal level.  If a power is delegated to Congress in the Constitution, for example, the federal taxing power, then the Tenth Amendment expressly disclaims any reservation of that power to the states.  *See New York v. United States*, 505 U.S. 144, 156 (1992); *Garcia*, 469 U.S. at 549.  The SALT deduction is a federal tax provision, and for Tenth Amendment "sovereignty" purposes, that is the end of the matter.[10]

---

[10] The complaint quotes selectively from legislative hearing transcripts to suggest, incorrectly, that Congress's decision not to directly limit the SALT deduction in the past was constitutionally compelled.  In some cases, political supporters of the SALT deduction spoke in constitutional or quasi-constitutional tones about principles of federal-state comity, but the substance of their concerns was rooted in policy, not constitutional law.  For example, New York Senator Daniel Patrick Moynihan argued not that Congress was forbidden from repealing the SALT deduction, but rather that doing so would "change the constitutional balance" between the federal and state governments by continuing the "ineluctable process [whereby] more and more decisions will be made in Washington." *Tax Reform Proposals—XIX: Hearing Before the S. Finance Comm.*, 99th Cong. 70 (1985), *cited in* Compl. ¶ 68 n.48; *see also* Compl. ¶¶ 67-68 & nn.46-50 (similar).  However, legislative hearing transcripts are not, and never have been, controlling authority especially given that Congress repeatedly modified and limited the deduction over a period of decades, belying any notion that Congress ever believed the deduction was mandated by the Constitution or that any limit on it would be unconstitutional.

The central Tenth Amendment question presented by the complaint is whether any political pressure from the States' residents for lower state taxes because of the SALT deduction cap would amount to unconstitutional congressional commandeering.[11]  It does not, as Supreme Court precedent demonstrates.  In the case of Congress's elimination of the tax exemption for interest earned on unregistered state-issued bearer bonds, the Court addressed a similar argument and found no constitutional violation.  *See Baker*, 485 U.S. at 511, 513-15.  Specifically, in denying a federal tax exemption to interest on bearer bonds but maintaining the exemption for interest on registered bonds, Congress was certainly providing a tax-based incentive for states to alter their bond-issuing practices.  *See id*.  But as the *Murphy* Court later explained, the tax provision "did not order the States to enact or maintain any existing laws.  Rather, it simply had the indirect effect of pressuring States to increase the rate paid on their bearer bonds in order to make them competitive with other bonds paying taxable interest."  138 S. Ct. at 1478.  The Court found no constitutional violation in such legislative pressure.  *See id.*; *Baker*, 485 U.S. at 513-15.  Similarly, when Florida alleged that Congress had altered the federal tax code to try to "coerce" it into imposing an inheritance tax, and had "interfere[d] with [its] exercise . . . of its full powers of taxation," the Supreme Court held that the supremacy of federal law meant that there was no ground for relief.  *Florida v. Mellon*, 273 U.S. at 17.

The incentives offered by Congress with regard to state bonds were, if anything, more direct limits on the states than the "pressures" at issue in this case.  The registered-bond rule effectively directed the manner in which state bonds should be issued and regulated.  *See Baker*, 485 U.S. at 513-15.  Here, the SALT deduction cap merely limits a federal tax deduction without

---

[11] The States also argue that the SALT deduction cap interferes with their Tenth Amendment right to "equal sovereignty."  Compl. ¶ 126.  This is discussed in the next section.

changing state tax law.  It thus does not violate the Tenth Amendment's anti-commandeering principle.

### D.       The Complaint Fails to State a Violation of Article I, Section 8

Finally, the States allege that the SALT deduction cap violates Article I, Section 8 of the Constitution, which provides that "[t]he Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises . . . ; but all Duties, Imposts and Excises shall be uniform throughout the United States."  This claim too is meritless.  The States' allegations generally duplicate the federalism- and sovereignty-related contentions already addressed above with respect to the Tenth[12] and Sixteenth Amendments.  *See* Compl. ¶¶ 7, 15, 88, 138.  Their complaint does not purport to identify any independent limit located within Article I, Section 8 on Congress's power to tax, nor any supposed requirement in the actual language of that provision to preserve a particular version of the SALT deduction.  *Id.*

To the extent the complaint is read as alleging a violation of the Uniformity Clause of Article I, Section 8, it fails to state a claim because the SALT deduction cap applies uniformly in each state, regardless of its revenue laws and the differential effects of the cap on its taxpayers. As the Supreme Court has held, "Congress cannot accommodate its legislation to the conflicting or dissimilar laws of the several states, nor control the diverse conditions to be found in the various states, which necessarily work unlike results from the enforcement of the same tax.  All

---

[12] The States' citation of *NFIB*, 567 U.S. at 580-85, for the proposition that the SALT deduction cap is unduly coercive in violation of Article I, Section 8 because they have relied on the deduction, is inapposite.  Compl. ¶¶ 71, 137.  In *NFIB*, the Supreme Court ruled that conditioning states' receipt of their existing Medicaid funds on their agreement to dramatically expand their healthcare coverage was improperly coercive given that Medicaid spending accounted for more than 20 percent of the average state budget, "with federal funds covering 50 to 83 percent of those costs."  *See* 567 U.S. at 581, 585.  In this case, as explained above, the SALT deduction cap does not coerce states to do anything, nor does it wield Congress's spending power to condition the receipt of federal funding on any particular state action.  The States' "reliance" interest on any prior federal taxation scheme is irrelevant in this context.

that the Constitution (article 1, § 8, cl. 1) requires is that the law shall be uniform in the sense that by its provisions the rule of liability shall be alike in all parts of the United States." *Florida v. Mellon*, 273 U.S. at 17 (rejecting state's challenge to facially uniform federal tax law with differing effects on taxpayers due to whether their state levied an inheritance tax).

After *Florida v. Mellon*, the Supreme Court has repeatedly held that Article I, Section 8 is not violated merely because a federal tax affects the residents of some states more than others. *See, e.g.*, *United States v. Ptasynski*, 462 U.S. 74, 82 (1983) ("the Clause does not require Congress to devise a tax that falls equally or proportionately on each State"); *Fernandez v. Wiener*, 326 U.S. 340, 359 (1945); *Phillips v. Comm'r*, 283 U.S. 589, 602 (1931); *Poe v. Seaborn*, 282 U.S. 101, 117-18 (1930); *see also Campbell*, 2001 WL 1262934, at *3-4 (rejecting challenge to the Pease limitation because "the Uniform[ity] Clause only protects against unequal application in the *provisions* of the law," and the limitation "applies equally to residents of all states as it limits the itemized deductions that all taxpayers above a specific adjusted gross income can take"). Indeed, federal tax laws necessarily affect different states differently: changes to tax rates by income disproportionately affect states with larger numbers of high or low earners; tax subsidies for various industries or activities disproportionately benefit states where those industries or activities are concentrated. What is prohibited is for Congress to make one rule for certain states and a different rule for others. But that is not the case here, where Congress has announced a nationally uniform tax rule.

The States alternatively argue that the SALT deduction cap violates Article I, Section 8 because it "accomplish[es] unconstitutional ends" by "purposefully treat[ing] a handful of States unfavorably." Compl. ¶ 120. This argument fails as well. As an initial matter, the Supreme Court has made clear that, when a tax is within the scope of power granted by Article I, Section

8, "the existence of other motives in the selection of the subjects of taxes cannot invalidate congressional action." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 412 (1928); *see also Sonzinsky v. United States*, 300 U.S. 506, 513-14 (1937) ("Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts.").  But even if Congress's motives were relevant to this claim, the States fall far short of plausibly alleging that the SALT deduction cap was enacted to intentionally punish them.  As noted above, the States acknowledge that the provision was designed to generate revenue to offset some of the costs of the 2017 Tax Act—a valid purpose.  *See supra* at 5-6; Compl. ¶¶ 10, 97.  Furthermore, the analyses cited in the complaint, to which the States refer in alleging that the cap has a disproportionate effect on them, ignore that the Act's provisions as a whole (including the lower tax rates and the changes to AMT) are projected to *lower* the overall federal tax liabilities of many of their taxpayers who previously took advantage of the uncapped SALT deduction.  *See supra* at 5; ITEP Report at tbls. 2, 3.

The States nevertheless allege an improper motive behind the SALT deduction cap by cherry-picking and distorting a few public comments of certain federal officials.  *See, e.g.*, Compl. ¶¶ 16, 38, 70, 87, 106, 108-12.  These comments are legally irrelevant to the States' claims: as a general matter, public officials' expression of their views, even strong views, does not undercut the presumption that the government acts in a proper and lawful manner.  *See United States v. Morgan*, 313 U.S. 409, 421 (1941); *accord Batagiannis v. W. Lafayette Cmty. Sch. Corp.*, 454 F.3d 738, 742 (7th Cir. 2006); *United Steelworkers v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980).  Moreover, comments made by officials in the Executive Branch may not be imputed to the Congress that enacted the 2017 Tax Act.  *See United States v. Johnson*, 40

35

F.3d 436, 440 (D.C. Cir. 1994); *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429

U.S. 252, 266-68 (1977); *United States v. Moore*, 54 F.3d 92, 96 (2d Cir. 1995).

 In any event, whether citing statements by legislators or Executive officials, the States

mischaracterize what was said.  For example, the States assert that Senator Rob Portman

admitted that the SALT deduction cap was intended to "'kick' and coerce the Plaintiff States."

Compl. ¶ 70; *see also id.* ¶¶ 16, 87, 110.  His actual statement shows that this characterization is

misleading:

> The biggest issue you're pointing to is the state and local tax issue.  And you're
> right, particularly people at the higher end, this goes . . . it's a regressive tax in the
> sense that over 50 percent of the benefit goes to families making over $200,000 a
> year.  And for states like New York and states like California, not having that
> deduction any longer does kick some of those folks who are upper middle class or
> high income folks into a situation where they don't get that deduction.

Transcript, *Moore Back on Campaign Trail*, CNN (Nov. 28, 2017), *available at* http://transcripts.

cnn.com/TRANSCRIPTS/1711/28/cnr.02.html, *cited in* Compl. ¶ 110 n.80.  Senator Portman

thus did not say that Congress meant to "kick" the States or their taxpayers in any malicious or

coercive sense, as the States imply; he merely observed that removing the SALT deduction

would move ("kick") high-income taxpayers into a situation in which more of their income is

taxable.  He went on to note that "the alternative minimum tax takes [the deduction] away right

now and we're repealing the Alternative Minimum Tax, which is a complication.  So [high-

income taxpayers] don't actually get that deduction often now."  *Id.*  And he further explained

his view that the debate over SALT deductions stemmed from a "philosophical question" of

whether taxpayers should "get a benefit in a high tax state or should there be sort of a level

playing field," and whether taxpayers in states "who have an average state and local tax

deduction of about $2,500 [should] be paying to subsidize folks in New York County, who have

an average of $25,000 in terms of their deduction."  *Id.*  Whether one agrees with Senator

Portman or not on this policy question, the States' characterization of the Senator's comments as expressing a desire to "kick" other states is plainly inaccurate.[13]

The States mischaracterize Executive Branch statements as well, quoting President Trump and Treasury Secretary Mnuchin misleadingly and out of context.  *See* Compl. ¶¶ 16, 38, 87, 106, 108-09.  With respect to an interview given by President Trump on October 11, 2017, the full context of the quotation makes clear the President's view that every state, including the plaintiff States, would benefit from the tax cuts provided for in the Act, but that taxpayers may "not . . . benefit" if their politicians do not "do a good job of running [their] state[s]."  Interview with President Donald J. Trump, Fox News (Oct. 11, 2017), *available at* https://video.foxnews. com/v/5606452902001/?#sp=show-clips, *cited in* Compl. ¶ 109 n.79.  The complaint also over-reads Secretary Mnuchin's comments on November 9, 2017.  He described his experience over a "long period of time" with businesses' response to state and local taxes and conveyed his "hope that this sends a message to the state governments that perhaps they should try to get their budgets in line.  And the question is, why do you need 13 or 14% state taxes?"  *Mnuchin Fires Warning Shot to High-Tax States*, FOXBusiness, Nov. 9, 2017, *available at* https://www. econclubny.org/recent-speakers/-/blogs/steven-mnuchin, *cited in* Compl. ¶ 108 n.77.  Secretary Mnuchin's comment came at the end of a discussion about the SALT deduction cap, and did not convey any view that it was intended to punish certain states, nor force them to enact different state laws or policies.  These remarks and others cited by the States fall far short of

---

[13] As for the cited comments by Senator Cruz and Representatives McCarthy, Ryan, and Hunter, *see* Compl. ¶¶ 110-12, merely urging states to lower their taxes or reduce their spending is hardly tantamount to an expression of malice toward them, or an intent to coerce them.

demonstrating that the SALT deduction cap was enacted by Congress as a whole with the purpose of punishing  or forcing them to enact new state laws or policies.[14]

In sum, the complaint fails to state a claim that the SALT deduction cap violates the Uniformity Clause of Article I, Section 8, or unconstitutionally singles out the States for unfavorable treatment.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the States' complaint.

Dated:   New York, New York
         November 2, 2018
                                    Respectfully submitted,

RICHARD E. ZUCKERMAN                     GEOFFREY S. BERMAN
Principal Deputy Assistant Attorney General   United States Attorney for the
U.S. Department of Justice, Tax Division      Southern District of New York

By:   s/Edward J. Murphy                 By:   s/Jean-David Barnea
    EDWARD J. MURPHY                          JEAN-DAVID BARNEA
    JORDAN A. KONIG                           REBECCA S. TINIO
    Trial Attorneys                           Assistant United States Attorneys
    P.O. Box 55, Ben Franklin Station         86 Chambers Street, Third Floor
    Washington, D.C. 20044                    New York, New York 10007
    Tel.: (202) 307-6064/305-7917            Tel.: (212) 637-2679/2774
    Fax: (202) 514-5238                       Fax: (212) 637-2686
    Email: Edward.J.Murphy@usdoj.gov         Email: Jean-David.Barnea@usdoj.gov
        Jordan.A.Konig@usdoj.gov                  Rebecca.Tinio@usdoj.gov

---

[14] The complaint also refers to anticipated IRS regulations as supposed evidence that the Government is "targeting the Plaintiff States for adverse treatment" and "intentionally seek[ing] to interfere with the[ir] sovereign policy authority over taxation and fiscal policy."  Compl. ¶ 122.  In August 2018, the IRS proposed regulations regarding the availability of federal charitable contribution deductions when taxpayers receive or expect to receive corresponding state or local tax credits in exchange for contributions.  *See* IRS, *Proposed Rules: Contributions in Exchange for State or Local Tax Credits*, 83 Fed. Reg. 43,563 (Aug. 27, 2018).  This proposed rulemaking is irrelevant to the States' claims for a number of reasons, including the fact that no regulation has actually been adopted and any challenge to it is far from ripe, and also that the proposed rule does not target any particular state.  The proposed rule would apply to all state or local tax credits received or expected to be received in exchange for contributions to charitable organizations, and does not make a distinction between credits that are provided through state tax credit programs created before or after the SALT deduction cap was enacted.  *See id.*