UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br>STATE OF CONNECTICUT,<br>STATE OF MARYLAND, and STATE OF<br>NEW JERSEY,<br><br>               Plaintiffs,<br><br>        v.<br><br>STEVEN MNUCHIN, in his official capacity<br>as Secretary of the United States Department<br>of Treasury; the UNITED STATES<br>DEPARTMENT OF THE TREASURY;<br>CHARLES P. RETTIG, in his official capacity<br>as Commissioner of the United States Internal<br>Revenue Service; the UNITED STATES<br>INTERNAL REVENUE SERVICE; and the<br>UNITED STATES OF AMERICA,<br><br>               Defendants. | Civil Action No. 1:18-cv-06427 (JPO) |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ........................................................................... 2

STANDARD OF REVIEW ..................................................................................................... 4

ARGUMENT ............................................................................................................................. 5

   I.   THERE IS NO BASIS FOR DISMISSAL UNDER RULE 12(B)(1). ............................... 5

     A.   The Plaintiff States Have Standing. ................................................................. 5

     B.   The Anti-Injunction Act Does Not Bar the Complaint. .................................. 10

     C.   The Political Question Doctrine Does Not Render the Case Non-Justiciable. .............. 13

   II.   THE 2017 TAX ACT'S DRASTIC CURTAILMENT OF THE SALT DEDUCTION EXCEEDS CONGRESS'S TAXING POWER. ...................................................... 14

     A.   The 2017 Tax Act's Sharp Break with Congress's Uniform Practice of Providing a Substantial SALT Deduction Violates the Limits of the Federal Taxing Power. ................. 15

     B.   The New Cap on the SALT Deduction Severely and Unconstitutionally Burdens the Plaintiff States. ................................................................................. 22

   III.   THE NEW CAP ON THE SALT DEDUCTION UNCONSTITUTIONALLY COERCES THE PLAINTIFF STATES INTO FORGOING THEIR PREFERRED TAXATION AND FISCAL POLICIES. ................................................................ 26

     A.   Congress May Not Impose Financial Pressures That Effectively Coerce States' Sovereign Choices. ......................................................................... 26

     B.   Congress Deliberately Targeted the Plaintiff States and Improperly Sought to Curtail Their Public Investments and Programs by Capping the SALT Deduction. ............... 29

     C.   Defendants' Arguments Do Not Overcome the Abundant Evidence of Coercion. ....... 33

CONCLUSION ......................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alden v. Maine,*
    527 U.S. 706 (1999)................................................................19-20, 25

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)........................................................................5

*Baker v. Carr,*
    369 U.S. 186 (1962)......................................................................13

*Centro De La Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017)............................................................6

*City of Boerne v. Flores,*
    521 U.S. 507 (1997)..................................................................20, 25

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco*
    *Tax & Trade Bureau,*
    843 F.3d 810 (9th Cir. 2016) .........................................................12

*Dep't of Energy v. State of Louisiana,*
    690 F.2d 180 (Temp. Emer. Ct. App. 1982) ....................................8

*Dimond v. District of Columbia,*
    792 F.2d 179 (D.C. Cir. 1986) ......................................................12

*District of Columbia v. Trump,*
    291 F. Supp. 3d 725 (D. Md. 2018) ...........................................7, 10

*Florida v. Mellon,*
    273 U.S. 12 (1927)....................................................................8, 34

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010).................................................................15, 17

*Fund For Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003) ......................................................12

*In re Leckie Smokeless Coal Co.,*
    99 F.3d 573 (4th Cir. 1996) ..........................................................11

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928)......................................................................35

*John v. Whole Foods Mkt. Grp.*,
    858 F.3d 732 (2d Cir. 2017) .................................................................6

*Johnson v. S. Pac. Co.*,
    196 U.S. 1 (1904) .............................................................................36

*Judicial Watch, Inc. v. Rossotti*,
    317 F.3d 401 (4th Cir. 2003) ..................................................... 11-12

*Lane County v. Oregon*,
    74 U.S. 71 (1868) ............................................................................18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...........................................................................5

*Massachusetts v. E.P.A.*,
    549 U.S 497 (2007) ............................................................................6

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ...........................................................................7

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ................................................................8, 26

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................................. passim

*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) .........................................................................15

*New Mexico v. Dep't of Interior*,
    854 F.3d 1207 (10th Cir. 2017) .........................................................6

*New York v. United States*,
    505 U.S. 144 (1992) .............................................................. 19, 25-26

*Pollock v. Farmer's Loan & Trust Co.*,
    158 U.S. 601 (1895) .........................................................................19

*Printz v. United States*,
    521 U.S. 898 (1997) .................................................................. passim

*RYOMachine, LLC v. United States Dep't of Treasury*,
    696 F.3d 467 (6th Cir. 2012) ...........................................................11

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) ...................................................................... 25-26

*Shelby Cty., Ala. v. Holder*,
570 U.S. 529 (2013)....................................................................13, 29

*Sonzinsky v. United States*,
300 U.S. 506 (1937)................................................................................35

*South Carolina v. Baker*,
485 U.S. 505 (1988)........................................... 13, 24-25, 33

*South Carolina v. Regan*,
465 U.S. 367 (1984).......................................................................... 10-12

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)..............................................................................5

*State of Ga. v. Pennsylvania R. Co.*,
324 U.S. 439 (1945)..................................................................................9

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
752 F.3d 239 (2d Cir. 2014)......................................................................4

*Texas v. United States*,
300 F. Supp. 3d 810 (N.D. Tex. 2018) ...................................................11

*Texas v. United States*,
787 F.3d 733 (5th Cir. 2015) ....................................................... 6-7, 9

*Thomson v. Pacific R.R. Co.*,
76 U.S. 579 (1869)..................................................................................16

*United States v. Lopez*,
514 U.S. 549 (1995)................................................................................25

*United States v. Ptasynski*,
462 U.S. 74 (1983)..................................................................................34

*United States v. Reitano*,
862 F.2d 982 (2d Cir. 1988)....................................................................36

*Virgilio v. City of New York*,
407 F.3d 105 (2d Cir. 2005)......................................................................5

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000)................................................................................10

*Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*,
247 F. Supp. 2d 352 (S.D.N.Y. 2002).....................................................5

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992)........................................................................8-9

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012)..................................................................... 13-14

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ................................................................................15

U.S. Const. amend. X...........................................................................1, 10, 12

U.S. Const. amend. XIV .........................................................................20

U.S. Const. amend. XVI ..................................................................... passim

U.S. Const. art. I, § 2............................................................................19

## FEDERAL STATUTES

26 U.S.C. § 63(b) .................................................................................21

An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent
Resolution on the Budget for Fiscal Year 2018,
Pub. L. No. 115-97, 131 Stat. 2054 (2017)................................. passim

Anti-Injunction Act,
26 U.S.C. § 7421(a) ....................................................................... 10-12

Revenue Act of 1913,
ch. 16, 38 Stat. 114 (1913)...............................................................20

Tax Reform Act of 1986,
Pub. L. No. 99-514, 100 Stat. 2085 (1986)......................................22

## RULES

Fed. R. Civ. P. 12(b)(1).........................................................................4-5

Fed. R. Civ. P. 56(a) ..............................................................................5

Fed. R. Civ. P. 56(b) ..............................................................................5

Fed. R. Evid. 201(b)................................................................................3

## LEGISLATIVE MATERIALS

Tax Equity and Fiscal Responsibility Act of 1982, *Report of the Committee on
Finance*, S. Rep. 97-494 ....................................................................21

U.S. Cong. Res. Serv., *Restrictions on Itemized Tax Deductions: Policy Options and Analysis* 5 (2014), *at* https://fas.org/sgp/crs/misc/R43079.pdf. .......................................21

SECONDARY SOURCES

Institute on Taxation and Economic Policy, *Final GOP-Trump Bill Still Forces California and New York to Shoulder a Larger Share of Federal Taxes Under Final GOP-Trump Tax Bill; Texas, Florida, and Other States Will Pay Less* (Dec. 17, 2017), *at* https://itep.org/final-gop-trump-bill-still-forces-california-and-new-york-to-shoulder-a-larger-share-of-federal-taxes-texas-florida-and-other-states-will-pay-less/ ...........................................................................................32

Nat'l Ass'n of State Budget Officers, *2010 State Expenditure Report: Examining Fiscal 2009-2011 State Spending*, (2011), at https://higherlogicdownload.s3.amazonaws.com/NASBO/9d2d2db1-c943-4f1b-b750-0fca152d64c2/UploadedImages/SER%20Archive/2010%20State%20Expenditure%20Report.pdf ....................................................................................................28

Robert P. Harvey and Jerry Tempalski, *The Individual AMT: Why It Matters*, 50 Nat'l Tax J. 453, 453 (1997) .....................................................................................21

Roy G. Blakey & Gladys C. Blakey, *The Federal Income Tax* (1940) .........................................16

Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes*, 65 S. Cal. L. Rev. 845 (1992) ..................................................................................................36

Tax Foundation, *The Sources of State and Local Tax Revenues*, *at* https://taxfoundation.org/sources-state-and-local-tax-revenues/ ................................................22

Tax Policy Center, *Briefing Book*, *at* https://www.taxpolicycenter.org/sites/default/files/briefing-book/tpc-briefing-book_0.pdf .....................................................................................................................22, 23

William E. Borah, *Income-Tax Amendment*, 191 N. Am. Rev. 755, 758 (1910) .........................19

## PRELIMINARY STATEMENT

The States of New York, Connecticut, Maryland, and New Jersey (the "Plaintiff States") bring this action seeking declaratory and injunctive relief to invalidate the new $10,000 cap on the federal tax deduction for state and local taxes ("SALT"). Congress has included a deduction for all or a significant portion of state and local taxes in every income tax statute since the enactment of the first federal income tax in 1861. The new cap on the SALT deduction overturns more than 150 years of precedent by drastically curtailing the deduction's scope.

As every prior Congress to enact a federal income tax has understood, the SALT deduction is essential to prevent the federal income tax power from interfering with the States' sovereign authority to make their own choices about whether and how much to invest in their own residents, businesses, infrastructure, and more—authority that is guaranteed by the Tenth Amendment and foundational principles of federalism. The new cap disregards this previously unquestioned respect for the States' distinct and inviolable role in our federalist scheme. And, as many members of Congress and officials in the Executive Branch transparently admitted, it deliberately seeks to compel certain States to reduce their public spending. This Court should invalidate this unconstitutional assault on the States' sovereign choices.

Defendants fundamentally mischaracterize the Plaintiff States' claims as "posit[ing] a radical theory" that the Sixteenth Amendment "grant[ed] states the right to limit federal taxation." Defendants' Motion to Dismiss ("Defs.' Mot.") at 1. The Plaintiff States' claims are not based on the Sixteenth Amendment alone, but rather on structural principles of federalism that have long been recognized as important background constraints on federal taxation and other powers granted to Congress. The Plaintiff States do not seek a general limitation on the federal taxing power, but rather ask this Court to recognize the unique history of the SALT deduction, which

prior Congresses have repeatedly and specifically recognized as critical to maintaining the proper balance between federal and state authority. And it is the new cap on the SALT deduction, not the Plaintiff States' position, that marks a "radical" departure from more than 150 years of unbroken history by disrupting the proper balance between federal and state authority struck by the Constitution.

This Court should also reject Defendants' threshold arguments for dismissing the Plaintiff States' claims. The Plaintiff States have standing to bring this lawsuit in light of the new SALT deduction cap's immediate interference with their sovereignty, the loss of tax revenue they will suffer as a direct result of the cap, and the deliberate and unequal targeting of the Plaintiff States. The Anti-Injunction Act is inapplicable because it is undisputed that there is no alternative legal avenue for the Plaintiff States to seek relief here. And the claims here do not present a political question beyond this Court's competence: instead, they simply require this Court to engage in the familiar judicial exercise of interpreting the text and structure of the Constitution and the history and meaning of federal statutes.

Because this matter presents entirely legal questions and the few material facts are not in dispute, the Plaintiff States cross-move for summary judgment. The Plaintiff States respectfully request that the Court deny Defendants' motion to dismiss and grant the cross-motion for summary judgment.

## STATEMENT OF UNDISPUTED FACTS

While the parties have not yet engaged in discovery, the essential facts necessary to resolve this case are undisputed and in large part can be "accurately and readily determined from

sources whose accuracy cannot reasonably be questioned." Federal Rule of Evidence 201(b).[1]

When the Constitution was ratified, the States reserved to themselves a concurrent tax authority. Pls.' 56.1 Stmt. ¶ 2. Out of respect for that authority, Congress included in the first federal income tax in 1861 a deduction for "all national, state, or local taxes assessed upon the property, from which the income is derived." *Id*. ¶ 5. Until 2017, subsequent federal tax statutes uniformly maintained the core of the deduction for state and local property and income taxes, aside from some incidental limitations. *Id*. ¶¶ 8-9, 18, 25. Federal and state officials throughout American history have repeatedly recognized the importance of the SALT deduction to ensuring the dual sovereignty of state and federal governments. *Id*. ¶¶ 6-7, 10-17, 19-24.

Under the 2017 Tax Act,[2] for the first time in the history of federal taxation, individuals may deduct only up to $10,000 total in (i) state and local real and personal property taxes, and (ii) either state and local income taxes or state and local sales taxes. Pls.' 56.1 Stmt. ¶ 31. Married taxpayers filing separately may deduct only up to $5,000 each. *Id*. ¶ 32. Federal officials and conservative commentators repeatedly described this new cap on the SALT deduction as being intentionally targeted at States with predominately Democratic elected officials, with the aim of pressuring the Plaintiff States to lower their taxes and cut government services by making state and local taxes more expensive. *Id*. ¶¶ 34-46.

The Plaintiff States have borne the brunt of the economic harm caused by the new cap on the SALT deduction. As a result of the new cap, the Plaintiff States are among the States with the

---

[1] Additional undisputed facts and sources appear in Plaintiffs' Local Civil Rule 56.1 Statement ("Pls.' 56.1 Stmt."). The Plaintiff States' exhibits are attached to the Declaration of Owen T. Conroy.

[2] An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent Resolution on the Budget for Fiscal Year 2018 (the "2017 Tax Act" or "Act"), Pub. L. No. 115-97, § 11042, 131 Stat. 2054 (2017) (H.R. 1).

highest percentages of taxpayers whose federal tax burden increased under the 2017 Tax Act. *Id.* ¶ 47. Under the 2017 Tax Act, the share of the federal tax cuts received by the Plaintiff States was smaller than their baseline share of the federal tax base. *Id.* ¶ 48. Taxpayers in the Plaintiff States must pay hundreds of billions of dollars in additional federal income taxes because of the cap on the SALT deduction, relative to what they would have paid if the 2017 Tax Act had been enacted without the cap. *Id.* ¶¶ 49-53. The 2017 Tax Act increased the portion of the federal government's income tax revenues paid by taxpayers in the Plaintiff States, while reducing the portion of the federal government's income tax revenues paid by most other States. *Id.* ¶¶ 55-56.

Further, by capping the deductibility of property taxes that were previously fully deductible, the 2017 Tax Act makes homeownership in the Plaintiff States more expensive and decreases the value of real estate in the Plaintiff States by billions of dollars. *Id.* ¶ 57. As a result, the Plaintiff States expect to lose billions of dollars in home equity value, causing a reduction in household spending, reduced sales for businesses within the Plaintiff States, job losses, and a decline in real estate tax collections of millions of dollars. *Id.* ¶¶ 58-66.

In the months since the enactment of the 2017 Tax Act, the Plaintiff States have been forced to take legislative and other action to alleviate the burden the 2017 Tax Act places on their taxpayers. *Id.* ¶ 67. In response, Defendants Department of the Treasury and Internal Revenue Service issued proposed regulations that would prevent the States from providing this relief to their citizens. *Id.* ¶¶ 68-69.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 12(b)(1), "the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,

752 F.3d 239, 243 (2d Cir. 2014). On a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice" because the court must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation omitted). To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). A complaint may be dismissed "only if there are no legal grounds upon which relief may be granted." *Virgilio v. City of New York*, 407 F.3d 105, 111 (2d Cir. 2005).

The Plaintiff States cross-move for summary judgment pursuant to Rule 56. Parties may move for summary judgment "at any time," Fed. R. Civ. P. 56(b), and if the party opposing the motion "cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery." *Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002). Summary judgment must be granted if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. THERE IS NO BASIS FOR DISMISSAL UNDER RULE 12(B)(1).

Defendants submit three bases for dismissal pursuant to Rule 12(b)(1). None of them has merit.

#### A. The Plaintiff States Have Standing.

To demonstrate Article III standing, the Plaintiff States must (1) suffer an injury in fact, (2) that is fairly traceable to the challenged conduct of Defendants, and (3) that is likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016). This injury must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S.

at 560 (internal quotations omitted). The Second Circuit has emphasized that the injury requirement is "a low threshold" meant only to ensure that "the plaintiff has a personal stake in the outcome of the controversy." *John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 736 (2d Cir. 2017) (internal quotation omitted).[3]

"States are not normal litigants for the purposes of invoking federal jurisdiction" and are given "special solicitude" in the standing analysis. *Massachusetts v. E.P.A.*, 549 U.S 497, 518-20 (2007). As Defendants concede, "the Supreme Court has entertained state challenges to federal tax statutes." *See* Defs.' Mot. at 13, n.3 (citing *South Carolina v. Baker,* 485 U.S. 505, 511 (1988)). Nonetheless, Defendants argue the Complaint should be dismissed for lack of standing. Contrary to Defendants' assertion, the Plaintiff States have at least three independent categories of sovereign or quasi-sovereign interests that suffer concrete harm and thus establish standing.

First, as the Complaint alleges, the new cap on the SALT deduction imposes pressure on the Plaintiff States to depart from "their current taxation and fiscal policies" and "force[s] the Plaintiff States to choose between their current level of public investments and higher tax rates." *See* Compl. ¶ 15. That forced choice is sufficient to establish standing because "being pressured to change state law constitutes an injury." *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).[4] The new cap puts pressure on the Plaintiff States in a number of ways—by making it more difficult as a practical matter for them to impose state taxes; by depressing home equity value; by reducing state tax revenue; and more. *See, e.g.*, Compl. ¶¶ 73, 98-105, 117-121. This

---

[3] It is "well settled that where, as here, multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Centro De La Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation omitted).

[4] *See also, e.g.*, *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1218 (10th Cir. 2017) (explaining that pressure to change state law is a direct and recognized "injury because the [applicable] regulations imposed a forced choice on it").

pressure is real and non-speculative, as evidenced by the fact that the Plaintiff States have already enacted changes to some of their respective laws in response to the new cap on the SALT deduction. *See* Compl. ¶ 121.[5] And it is irrelevant that the States can potentially avoid the financial harms intended by the new cap by changing their policies. "A plaintiff suffers an injury even if it can avoid that injury by incurring other costs." *Texas*, 787 F.3d at 749.[6] In addition to state legislative changes already adopted, the new cap on the SALT deduction further implicates the sovereign interests of Plaintiff States by attempting to override their public investment decisions.

Defendants assert that these pressures are insufficient to confer standing on the Plaintiff States because none of these outcomes is *directly* compelled by the new SALT deduction cap. Defs.' Mot. at 12. But the Supreme Court recognized in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (hereinafter "*NFIB*"), that economic pressure imposed by a federal statute may improperly interfere with state sovereignty—and thus by itself support a State challenge to the statute—even without a specific mandate. *Id.* at 581-82. Here, Defendants have provided nothing more than generalizations to dispute the Plaintiff States' evidence that the pressure

---

[5] *See also* Pls.' 56.1 Stmt. ¶¶ 67-69.

[6] Defendants argue this harm is "foreclosed" by *Massachusetts v. Mellon*, 262 U.S. 447 (1923). But that case largely involved Massachusetts' attempt to invoke *parens patriae* standing—a ground for standing that the Plaintiff States do not invoke here. Nothing in *Mellon* prevents States from asserting *their own* rights under federal law, as the Plaintiff States seek to do here. *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 747 (D. Md. 2018) ("there is a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)") (quoting *Massachusetts v. E.P.A.*, 549 U.S. at 520 n.17). To the extent *Mellon* spoke at all to the rights of Massachusetts, the plaintiff there, the case is inapplicable as the Court expressly noted that the statute at issue did not "require the States to do or to yield anything." *Mellon,* 262 U.S. at 482. In contrast, Plaintiff States allege that Congress overreached its constitutional powers by taking action that targeted specific streams of State revenue, forcing the Plaintiff States to make spending and taxation decisions as a result of the SALT deduction cap. *See, e.g.*, Compl. ¶¶ 73, 98-105, 117-121. The Court may choose to reject that argument on the merits, but Plaintiff States have standing to make that argument here.

created by the new SALT deduction cap is severe—a "gun to the head" that "leaves the States with no real option" but to respond. *Id.* And Defendants' reliance (Defs.' Mot. at 12) on *Florida v. Mellon*, 273 U.S. 12 (1927), is unavailing: that nearly century-old case long predated the Supreme Court's much more recent case law recognizing the state sovereignty concerns discussed in *NFIB* and its predecessors. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018) (citing *New York v. United States*, 505 U.S. 144 (1992), as the "pioneering case" for this doctrine).

Second, the Plaintiff States will lose substantial tax revenue as a result of the new cap on the SALT deduction.[7] The Plaintiff States submitted detailed declarations from multiple experts in their respective states making clear that they will lose specific streams of tax revenue due to the decline in home equity value and lower household spending caused by the new cap on the SALT deduction.[8] For example, the decline in household spending in New York will mean that the State collects less in sales taxes because residents will have less income to spend on goods and services. *See* Compl. ¶ 101. Likewise, New York, New Jersey, and Maryland will all collect

---

[7] *See Wyoming v. Oklahoma*, 502 U.S. 437, 447 (1992) (standing for Wyoming exists where the "effect of the Oklahoma statute has been to deprive Wyoming of severance tax revenues"); *Dep't of Energy v. State of Louisiana*, 690 F.2d 180, 187 (Temp. Emer. Ct. App. 1982) (holding Louisiana had standing where a Department of Energy determination on the denomination of oil impacted the State's collection of tax on oil).

[8] Declaration of Lynn Holland (ECF No. 1-1) ("Holland Decl.") ¶ 21; Declaration of Andrew M. Schaufele (ECF No. 1-4) ("Schaufele Decl.") ¶ 7; Declaration of Martin Poethke (ECF No. 1-5) ("Poethke Decl.") ¶ 20. These detailed affidavits, from experts in state taxation and budgeting from the Plaintiff States analyzing the impact of the new cap on the SALT deduction on their respective states, negate Defendants general assertion that "the alleged injury-in-fact in this case would still be too speculative to maintain a claim." Defs.' Mot. at 13. *Cf. Florida v. Mellon*, 273 U.S. at 18 (no standing only where "there is no substance in the contention that the state has sustained, or is immediately in danger of sustaining, any direct injury as the result of the enforcement of the act in question").

less in real estate transfer taxes due to the new cap on the SALT deduction, and Maryland will suffer a decline in certain property tax revenue as well.[9]

Defendants assert that "[h]arm based on a predicted decline in general tax revenues does not constitute a sufficient injury-in-fact." *See* Defs.' Mot. at 13. But the Plaintiff States do not allege the loss of general revenues—rather, they have lost specific streams of tax revenue in the form of lost sales taxes, real estate transfer taxes, and certain property taxes. This type of injury is precisely what the Supreme Court recognized as sufficient to confer standing in *Wyoming v. Oklahoma*. In that case, the Court found that Wyoming had standing to challenge an Oklahoma statute that caused in-state utility companies to reduce coal purchases from Wyoming producers and thus resulted in decreased tax revenue to Wyoming. *Wyoming*, 502 U.S. at 442-43, 447. Similarly, the Plaintiff States have standing here because the new cap on the SALT deduction has caused, and will continue to cause, individuals in the Plaintiff States to change their economic behavior—decreasing specific streams of tax revenues to the Plaintiff States. *See* Compl. ¶ 106.[10]

Third, Congress expressly targeted the Plaintiff States for unequal treatment in the federal tax code. This targeting violates the fundamental principle of equal sovereignty among the States and further supports the Plaintiff States' standing. *See State of Ga. v. Pennsylvania R. Co.*, 324 U.S. 439, 451 (1945) (State has standing where the Court found that the allegations, if true,

---

[9] *See* Schaufele Decl. ¶¶ 5-6 (Maryland Office of the Comptroller projecting $13.2 million in lost real property tax revenue and $6.4 million in lost transfer tax revenue in 2018); Poethke Decl. ¶ 20 (New Jersey Department of the Treasury projecting a decline of $105.1 million in realty transfer fees).

[10] Even if certain residents will benefit from the 2017 Tax Act, as Defendants suggest, Defs.' Mot. at 11 n.2, the Complaint need only challenge the constitutionality of the new cap on the SALT deduction "because attempting to balance all costs and benefits associated with a challenged policy would leave plaintiffs without standing to challenge legitimate injuries, given that defendants could point to unrelated benefits, improperly shifting to the plaintiffs the burden of showing that the costs outweigh them." *Texas*, 787 F.3d at 750.

"relegates [the plaintiff State] to an inferior economic position among her sister States"); *see also District of Columbia*, 291 F. Supp. 3d at 742 (same). As the Plaintiff States have alleged, and backed up with supporting evidence, the 2017 Tax Act intentionally treats the States unequally by increasing the portion of the federal government's tax revenue paid by the taxpayers of the Plaintiff States while decreasing the Plaintiff States' local tax revenue. Moreover, as explained below, see *infra* at 29-33, this disparity was part of a deliberate effort to interfere with the Plaintiff States' authority to set their own fiscal and taxation policies by coercing them to reduce taxes and cut the vital public infrastructure those taxes support. Contrary to Defendants' arguments, the Plaintiff States are not helpless to defend themselves against this deliberate and unequal targeting.

## B. The Anti-Injunction Act Does Not Bar the Complaint.

Defendants incorrectly argue that the Complaint should be dismissed on the basis of the Anti-Injunction Act ("AIA").[11] "Congress intended the Act to bar a suit only in situations in which Congress had provided the aggrieved party with an alternative legal avenue by which to contest the legality of a particular tax." *South Carolina v. Regan*, 465 U.S. 367, 373 (1984).[12] Because the Plaintiff States have no such alternative legal avenue here, the AIA is no barrier to their claims.

*Regan* is directly on point. In that case, South Carolina brought a Tenth Amendment claim to enjoin the collection of federal taxes on interest from certain state-issued bearer bonds. *Id.* at 370-71. The Supreme Court rejected the government's attempt to invoke the AIA, reasoning that,

---

[11] The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

[12] Defendants appear to presume that the term 'person' in the AIA includes a sovereign State, but that conclusion inverts ordinary principles of interpretation. There is an "interpretive presumption that 'person' does not include the sovereign," a presumption that "may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780-81 (2000). Defendants' motion to dismiss makes no such "affirmative showing."

unlike an individual taxpayer who has "the option of paying the tax and bringing a suit for a refund," South Carolina could not bring a refund suit because it would not directly incur any tax liability. *Id.* at 374. Because Congress had not provided South Carolina with any alternative remedy to challenge the tax at issue, the AIA did not bar the lawsuit. *Id.* at 381. So too here: Defendants identify no other procedure under which the Plaintiff States may challenge the constitutionality of the new cap on the SALT deduction. *See* Compl. ¶ 28; s*ee also In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 584 (4th Cir. 1996) (rejecting application of the AIA where no other forum existed to adjudicate the issue). Courts have routinely recognized that States have standing under *Regan* to challenge federal taxes under analogous circumstances. *See, e.g., Texas v. United States*, 300 F. Supp. 3d 810, 835-836 (N.D. Tex. 2018) (rejecting application of the AIA to lawsuit brought by various States challenging tax on medical devices because the States "have no alternative remedy and therefore fall under the *Regan* exception").[13]

Defendants' attempts to distinguish *Regan* are meritless. In particular, Defendants fundamentally mischaracterize the Plaintiff States' sovereign interests here as merely "secondary" to or "derivative of" the interests of private taxpayers. Defs.' Mot. at 16. But the Plaintiff States' sovereignty here is as directly implicated by the new cap on the SALT deduction as South Carolina's interests were implicated by the federal tax provision at issue in *Regan*. As the Plaintiff States have argued, the new cap interferes with their freedom to make their own spending choices, results in the loss of tax revenue, and violates the federalism constraints

---

[13] In contrast, Defendants attempt to draw attenuated parallels to cases primarily involving private parties. Defs.' Mot. at 15-16. *See RYOMachine, LLC v. United States Dep't of Treasury*, 696 F.3d 467 (6th Cir. 2012) (corporate plaintiff); *Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401 (4th Cir. 2003) (non-profit plaintiff).

imposed by the Tenth and Sixteenth Amendments—all of which impose sovereign harms separate and distinct from the financial burdens that the new cap may impose on individual taxpayers.

Defendants also argue that the Plaintiff States' interests could be served just as well by relying on individual lawsuits by taxpayers who "have a direct economic interest in challenging the Act." Defs.' Mot. at 16.[14] But the Supreme Court expressly rejected a similar argument in *Regan*, holding that "Congress did not intend the [AIA] to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims." *Regan*, 465 U.S. at 381; *cf. Judicial Watch,* 317 F.3d at 408 (*Regan* exception did not apply where plaintiff "need not depend on third parties to pursue [its] claim"). Moreover, courts have repeatedly recognized that private parties have different incentives and objectives than governmental entities that are "charged by law with representing the public interest of [their] citizens." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986); *see also Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 736-37 (D.C. Cir. 2003) (same). Defendants thus may not force the Plaintiff States to delegate the defense of their distinct sovereign interests to private parties alone.[15]

---

[14] Defendants attempt to move the bar by arguing the Plaintiff States "cannot show such a challenge [by an individual taxpayer] is a possibility so remote that the [new cap on the SALT deduction] would likely remain unreviewed." Defs.' Mot. at 16. This is not the standard articulated in *Regan*, which held that the AIA did not apply in instances where "it is by no means certain" that the law in question will be challenged. *Regan*, 465 U.S. at 380.

[15] Defendants rely heavily on *Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810 (9th Cir. 2016). However, that case involved an instance where third-party cigarette manufacturers, who could potentially bring suit, "were originally parties to this action . . . ." *Id.* at 815. This fact made it a near certainty that the challenge to the tax at issue would be brought in the future in an alternative forum. *Id*. In addition to being from a different Circuit, the case is also inapplicable because the Plaintiff States here plead a sovereign interest that is separate and distinct from an individual taxpayer's tax burden. In contrast, in *Confederated Tribes & Bands of Yakama Indian Nation,* the Court found that the Yakama Nation's asserted injury was "wholly derivative" of an injury suffered by the third-party cigarette manufacturer that was situated to bring the same claims. *Id.* at 815. Finally, the case did

**C.      The Political Question Doctrine Does Not Render the Case Non-Justiciable.**

The "narrow" political question doctrine, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012), is also no bar to the Plaintiff States' claims. *See* Defs.' Mot. at 17-18. Defendants do not (and cannot) argue that the Constitution has committed the federal taxing power solely to the political branches and thus insulated the new cap on the SALT deduction from judicial review. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (political question exists when there has been "textually demonstrable constitutional commitment of the issue to a coordinate political department"). Instead, they argue only that there are no "judicially manageable standards to guide the Court's analysis of [the Plaintiff States'] claims." Defs.' Mot. at 17.

Contrary to Defendants' argument, however, the Plaintiff States' challenge to the new cap on the SALT deduction relies on "familiar principles of constitutional interpretation," including a "careful examination of the textual, structural, and historical evidence put forward by the parties . . . ." *Zivotofsky*, 566 U.S. at 201; *see infra* at 15-22. Courts routinely adjudicate claims similar to the ones that the Plaintiff States have brought here, including claims that a federal tax exceeds Congress's powers, *see, e.g.*, *South Carolina v. Baker*, 485 U.S. at 511; that a federal statute imposes undue economic pressure on States, *see, e.g.*, *NFIB*, 567 U.S. at 581-82; and that States are being targeted or otherwise treated unequally in violation of "the fundamental principle of equal sovereignty," *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 544 (2013). If Defendants were to successfully argue that the arguments and evidence presented here do not support the Plaintiff States' claims, the result of that conclusion is a failure of those claims on the merits—not a

_____

not involve a constitutional or structural challenge to the congressional taxing power (as exists here), but instead involved the interpretation of a tax statute and treaty.

dismissal on the ground that the Court's review is "truly rudderless." *Zivotofsky*, 566 U.S. at 204 (Sotomayor, J., concurring in part and concurring in the judgment).

There is also no merit to Defendants' assertion that this case raises a political question because the Plaintiff States have not proposed a precise test for determining when any "given SALT deduction limit or cap passes constitutional muster." Defs.' Mot. at 17. All that this Court must determine in this case is whether the particular cap recently imposed by Congress is constitutional. *See Zivotofsky*, 566 U.S. at 195-96. And this Court may find the cap unconstitutional based on the compelling evidence of its unprecedented nature, *see infra* at 15-22, and the clear indications of congressional and presidential intent to coerce certain States, *see infra* at 26-29, without addressing whether a different tax statute, under different facts, might pass constitutional muster. *See NFIB*, 567 U.S. at 585 (finding "no need to fix a line" about outer limits of restrictions on federal funding, since "[i]t is enough for today that wherever that line may be, this statute is surely beyond it"). As in *Zivotofsky*, Defendants' concerns over the lack of judicially manageable standards "dissipate . . . when the issue is recognized to be the more focused one of the constitutionality" of the particular statute at issue. 566 U.S. at 197.

## II. THE 2017 TAX ACT'S DRASTIC CURTAILMENT OF THE SALT DEDUCTION EXCEEDS CONGRESS'S TAXING POWER.

By severely capping the SALT deduction, Congress has waged an unprecedented assault on the Plaintiff States' financial security and undermined their long reliance on federal noninterference with the States' own taxing and spending powers. Defendants fundamentally misunderstand the Plaintiff States' position by arguing that there is no specific textual limitation on Congress's power to alter or even eliminate the SALT deduction. Defs.' Mot. at 18, 20. Structural restrictions on congressional power often are not expressly stated but instead inferred from the "essential postulates" of the Constitution's history and structure. *Printz v. United States*,

521 U.S. 898, 918 (1997). Here, the extraordinarily long and consistent history of the SALT deduction is based on constitutionally grounded views about state sovereignty and the limits of the federal taxing power. That settled understanding supports the Plaintiff States' constitutional claims here.

### A. The 2017 Tax Act's Sharp Break with Congress's Uniform Practice of Providing a Substantial SALT Deduction Violates the Limits of the Federal Taxing Power.

The unprecedented nature of the new cap on the SALT deduction weighs heavily against its constitutionality. The "lack of historical precedent" for a new assertion of congressional power is "[p]erhaps the most telling indication" of a "severe constitutional problem." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (quotation marks omitted); *see also Printz*, 521 U.S. at 905 ("if . . . earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist"). Here, the new SALT deduction cap breaks sharply from more than 150 years of uniform congressional precedent that was based on a settled understanding of the proper relationship between federal and state taxing powers.

From the earliest days of the Republic, Congress consistently included a near-total SALT deduction when considering or adopting an income tax. The very first income tax Congress considered, shortly after the Founding, included such a deduction. Pls.' 56.1 Stmt. ¶ 4.[16] *See Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (early congressional recusal rules adopted within fifteen years of the Founding were "dispositive" of First Amendment

---

[16] *See also* U.S. Treasury, State of the Treasury, No. 438, 13th Cong., 3d Sess., in 2 *American State Papers, Finance* 885, 887 (1815) (proposing consideration of an income tax to fund the War of 1812).

question). And all federal income taxes from the Civil War through the Sixteenth Amendment's ratification included such a deduction. Pls.' 56.1 Stmt. ¶¶ 8-9.

Throughout this period, Congress expressly acknowledged that a deduction for all or a substantial portion of SALT was necessary to respect the sovereign tax authority of the States. Congress well understood that the States entered the union with "the power to tax all property, business, and persons, within their respective limits," and that such power "is original in the States and has never been surrendered." *Thomson v. Pacific R.R. Co.*, 76 U.S. 579, 591 (1869). And Congress also understood that the SALT deduction was essential to prevent improper federal interference with the States' taxing power. Thus, for example, when Congress enacted a federal income tax at the outset of the Civil War in August 1861, Pls.' 56.1 Stmt. ¶ 5, it explained its inclusion of a SALT deduction by saying (in the words of House Ways and Means Committee member Justin Smith Morrill): "It is a question of vital importance to [the States] that the General Government should not absorb all their taxable resources—that the accustomed objects of State taxation should, in some degree at least, go untouched. The orbit of the United States and the States must be different and not conflicting." *Id.* ¶ 6. Committee Chairman Thaddeus Stevens further explained that Congress was primarily concerned with avoiding "double taxation," and that it was a paramount goal of the drafters to "exclud[e] from this tax the articles and subjects of gain and profit which are taxed in another form." *Id.* ¶ 7.

Relying on the Civil War income tax as an important precedent,[17] Congress retained the SALT deduction through six additional federal tax statutes from 1862 to 1894. Pls.' 56.1 Stmt. ¶¶ 8-9. And Congress has continued to provide a substantial SALT deduction in every federal

---

[17] *See* Roy G. Blakey & Gladys C. Blakey, *The Federal Income Tax* 5 (1940) (Plaintiff States' Exhibit 3).

income tax enacted in the last century, preserving the core of the deduction for state and local property and income taxes across 51 different Congresses and 56 different tax acts. *Id*. ¶ 25. Moreover, throughout this period, Congress has consistently reiterated its recognition of the deduction's importance as a federalism safeguard: for example, in 1963, a House Report explained that it was necessary to retain the SALT deduction to protect the States' sovereign taxing powers when "the State and local governments on one hand and the Federal Government on the other hand tap this same revenue source." *Id*. ¶ 20.

Defendants assert that Congress's uniform provision of a substantial SALT deduction is mere historical practice with no constitutional significance whatsoever. Defs.' Mot. at 26. But the Supreme Court has made clear that a sharp break with consistent historical precedent may itself be a "telling indication" of a "severe constitutional problem." *Free Enterprise Fund*, 561 U.S. at 505. More fundamentally, the Plaintiff States' argument here relies not just on the mere fact of Congress's uniform practice, but rather on the constitutional underpinnings that Congress itself acknowledged drove its unbroken adoption of a substantial SALT deduction. "[C]ontemporaneous legislative exposition of the Constitution . . ., acquiesced in for a long term of years, fixes the construction to be given its provisions." *Printz*, 521 U.S. at 905 (quoting *Myers v. United States*, 272 U.S. 52, 175 (1926) (citing numerous cases)).

Defendants also entirely ignore Congress's treatment of the SALT deduction before the ratification of the Sixteenth Amendment, dating all the way back to the War of 1812. Defendants' omission of this history is based on a fundamental misunderstanding of the Plaintiff States' claims. Contrary to Defendants' characterization (*e.g.*, Defs.' Mot. at 19), the Plaintiff States are not arguing that the Sixteenth Amendment itself established the constitutional significance of the SALT deduction. Rather, the source of the constitutional claim here is the States' original and

sovereign "power of taxation," which predates the Founding and was incorporated into our constitutional structure. *Lane County v. Oregon*, 74 U.S. 71, 76 (1868). What is proven by the history described above—including congressional enactments before the Sixteenth Amendment's ratification—is that Congress consistently understood the States' inherent sovereignty to necessitate the inclusion of a deduction for all or a substantial portion of SALT in any federal income tax.

The Sixteenth Amendment's ratification history further confirms the settled understanding of both Congress and the States that the federal government's income tax powers are constrained by federalism—specifically, by the need to avoid undue interference with the States' ability to raise their own revenue from traditional sources. Defendants do not dispute that federalism was a predominant issue during the ratification debates, or that federalism-based concerns posed a serious obstacle to ratification. *See* Compl. ¶¶ 52-58.[18] Nor can Defendants dispute that, to secure ratification, the Sixteenth Amendment's leading advocates assured opponents that implied structural federalism constraints would continue to constrain Congress's taxing power. *See* Compl. ¶¶ 56-58. As Senator William Borah explained, Congress's taxing power had long been subject to "the whole scope and plan of Government as outlined in the Constitution being that

---

[18] *See also* John D. Buenker, The Ratification of the Federal Income Tax Amendment, 1 Cato J. 183, 204 (1981) (Plaintiff States' Exhibit 14) (noting that States' rights "was the most frequently voiced reason for opposing the amendment"). As Plaintiffs noted, Compl. ¶ 52, and as Defendants note in response, Defs.' Mot. at 23-24, the particular issue in these ratification debates was whether Congress would be granted the power to tax interest earned on state and local bonds. But the assurances given to ratifying legislatures were broader: that principles of structural federalism would protect the States from undue federal encroachment via the taxing power.

there were two separate and distinct sovereignties unembarrassed by each other," and Congress's additional powers under the Sixteenth Amendment would be so constrained as well.[19]

These "persuasive assurances" by the Sixteenth Amendment's "leading advocates" during the ratification process are additional evidence that the Amendment guaranteed continued federalism constraints on Congress's taxing powers. *Alden v. Maine*, 527 U.S. 706, 719 (1999); *see also New York*, 505 U.S. at 163-66. Indeed, as Defendants themselves acknowledge, Defs.' Mot. at 21, the Sixteenth Amendment was not meant to *expand* Congress's taxing power but merely to eliminate a judicial limitation to an income tax that the Supreme Court had imposed in *Pollock v. Farmer's Loan & Trust Co.*, 158 U.S. 601 (1895). *See* Compl. ¶ 50 n.21.[20] Defendants' admission thus confirms that structural federalism constraints that had limited Congress's taxing power *before* the Sixteenth Amendment's ratification would still do so *after* its ratification, as the Amendment's leading proponents argued.

Defendants dismiss the Sixteenth Amendment's ratification history because it was "principally focused on a specific issue unrelated to the SALT deduction"—namely, "the federal taxation of income from state bonds and instrumentalities," Defs.' Mot. at 22, 24—but that argument misses the point. To be sure, as the Complaint acknowledges, the specific intrusion on state sovereignty discussed during the ratification of the Sixteenth Amendment was "whether the amendment would enable the taxation of income derived from state and municipal securities." Compl. ¶ 52. But the debate over ratification highlighted far broader concerns over state

---

[19] William E. Borah, *Income-Tax Amendment*, 191 N. Am. Rev. 755, 758 (1910) (Plaintiff States' Exhibit 106).

[20] The Supreme Court in *Pollock* held 5-4 that the 1894 federal income tax was unconstitutional because it contained direct taxes that were unapportioned. 158 U.S. at 637; *see also* U.S. Const. art. I, § 2.

sovereignty, and resulted in the ratifiers' agreement that, notwithstanding the Sixteenth Amendment, the federal government's income tax power would continue to be subject to meaningful federalism constraints to protect the States' taxing authority. *See* Compl. ¶¶ 55-61.

The relevance of this consensus to the current dispute is that the Congress that proposed and ratified the Sixteenth Amendment—like every Congress before it—took as given that a substantial SALT deduction was an essential part of this federalist structure. Indeed, whatever other controversy there may have been about the federal government's taxing powers during the ratification of the Sixteenth Amendment, there was never any question that the federal income tax would include a substantial SALT deduction. The federal income tax statute that led to the *Pollock* decision (and ultimately to the Sixteenth Amendment itself) included a broad deduction for "all national, State, county, school, and municipal taxes . . . ." Pls.' 56.1 Stmt. ¶ 9. And an equally broad deduction was part of the Revenue Act of 1913, the very first federal income tax that Congress adopted using the power conferred by the Sixteenth Amendment. *Id.* ¶ 18. That statute's continuation of a substantial SALT deduction that had been included since the first federal income tax to prevent federal interference with the States' sovereign taxing powers, *see id.* ¶ 19, when paired with Congress's contemporaneous acknowledgment that the Sixteenth Amendment preserved long-standing federalism constraints on the federal tax power, "provide[s] contemporaneous and weighty evidence of the Constitution's meaning." *Printz*, 521 U.S. at 905 (quotation marks omitted); *see also Alden*, 527 U.S. at 741 (state sovereign immunity "was so well established that no one conceived it would be altered by the new Constitution"); *City of Boerne v. Flores*, 521 U.S. 507, 522-24 (1997) (construing Fourteenth Amendment in light of earlier proposed version).

Finally, Defendants attempt to undermine the consistency of Congress's adoption of a substantial SALT deduction by pointing to certain incidental limits (including the so-called "Pease Limitation" and the Alternative Minimum Tax ("AMT")), enacted for the first time toward the end of the twentieth century, that were not directly targeted at the SALT deduction or particular States and only collaterally affected the amount of the deduction that some taxpayers could claim.[21] These limits do not diminish the force of the long-standing practice that the Plaintiff States rely on here. As Defendants do not meaningfully dispute, the new cap on the SALT deduction is dramatically different from these recent incidental limitations (or any previous limitations): the 2017 Tax Act *directly* limits the deduction for state and local income and property taxes, which no prior federal income tax has ever done; it imposes an unusually low dollar limitation that has far starker effects on the SALT deduction than any previous tax statute; and it was enacted for the purpose of coercing particular States to change their fiscal policies. *See* Compl. ¶¶ 80-82; *see also infra* 29-33. The indirect and less consequential effect that these other provisions had on the SALT deduction thus cannot overcome nearly two centuries of history in

---

[21] Defendants argue that the standard deduction "effectively eliminated the SALT Deduction for the substantial majority of taxpayers . . . ." Defs.' Mot. at 5. That assertion is absurd. A taxpayer who elects a higher standard deduction has not lost the benefit of the SALT deduction. *See* 26 U.S.C. § 63(b) (defining taxable income for "an individual who does not *elect* to itemize his deductions") (emphasis added). Defendants also invoke the Pease Limitation, but that provision (enacted in 1990) was "designed in such a way that it [was] unlikely to have an effect on the value of itemized deductions," including the SALT deduction. U.S. Cong. Res. Serv., *Restrictions on Itemized Tax Deductions: Policy Options and Analysis* 5 (2014), *at* https://fas.org/sgp/crs/misc/R43079.pdf. Likewise, the AMT was not targeted at the SALT deduction, but instead designed to prevent a small number of high-income taxpayers from using incentive provisions to "avoid all tax liability by using exclusions, deductions and credits." Tax Equity and Fiscal Responsibility Act of 1982, *Report of the Committee on Finance*, S. Rep. 97-494, at 108; *see also* Robert P. Harvey and Jerry Tempalski, *The Individual AMT: Why It Matters*, 50 Nat'l Tax J. 453, 453 (1997). Thus, neither the AMT nor the Pease Limitation was adopted to target the SALT deduction specifically or to coerce particular States to change their taxation and fiscal policies, as is the case here.

which Congress without exception respected state sovereignty by providing a substantial SALT deduction.[22]

## B. The New Cap on the SALT Deduction Severely and Unconstitutionally Burdens the Plaintiff States.

By abruptly and severely curtailing the deduction for core sources of state and local government revenue, Congress unconstitutionally interfered with state sovereignty in precisely the way that the history described above makes clear constitutes a violation of the Constitution's federalist structure.

The new cap affects not minor state or local taxes but the pillars of how States and their subdivisions sustain themselves. Revenue from income, property, and sales taxes comprise as much as ninety percent of state and local revenue.[23] Even the materials cited by Defendants acknowledge that the majority of state and local government revenue depends on the taxes that the new cap on the SALT deduction will directly affect.[24]

The effect on the Plaintiff States will be substantial: in just one year, the new cap will cost New York taxpayers $14.3 billion, New Jersey taxpayers $3.136 billion, Connecticut taxpayers

---

[22] Congress's decision in 1986 to limit taxpayers' ability to deduct state and local sales taxes, *see* Tax Reform Act of 1986, Pub. L. No. 99-514, § 134, is irrelevant because (a) Congress left undisturbed the unlimited deduction for income and property taxes, and (b) sales taxes are far less significant to most States and localities than income and property taxes. Pls.' 56.1 Stmt. ¶ 27 (personal income tax raised $51.5 billion for New York in fiscal year 2017-2018, compared to $15.7 billion in sales, excise, and user taxes).

[23] *See* Tax Foundation, *The Sources of State and Local Tax Revenues*, *at* https://taxfoundation.org/sources-state-and-local-tax-revenues/ (noting, based on Census data, that 89 percent of state and local government tax revenues come from individual income taxes, property taxes, and sales and gross receipts taxes).

[24] *See* Tax Policy Center, *Briefing Book*, 449-50, 453-54, *at* https://www.taxpolicycenter.org/sites/default/files/briefing-book/tpc-briefing-book_0.pdf (sales and income taxes comprise more than 63 percent of the average State's budget, and approximately 61 percent of local revenue comes from property, sales, and income taxes).

$2.8 billion, and Maryland taxpayers $1.7 billion. Pls.' 56.1 Stmt. ¶¶ 50-53.[25] Plaintiffs' undisputed declarations further confirm the substantial economic and fiscal impact of the new cap on the SALT deduction. The new cap on the SALT deduction makes it more expensive to own a home by increasing the cost of property taxes. The resulting effect could reduce home equity in New York by $63.1 billion and reduce real estate transfer tax revenues by millions of dollars per year.[26] These losses could result in as many as 31,300 jobs lost in New York (and more in the other Plaintiff States)—further reducing income and sales tax collections. Holland Decl. ¶ 20. These impacts will occur in virtually all income brackets across the Plaintiff States. Declaration of Scott Palladino (ECF No. 1-2) ("Palladino Decl.") ¶¶ 19-20; *see also* Adamo Aff. ¶ 11 (same for Connecticut).[27]

---

[25] These figures refer to the net increase in taxpayers' tax liability caused by the inclusion of the new cap on the SALT deduction in the 2017 Tax Act. Where possible, these figures were generated by comparing an estimate of tax liability under the 2017 Tax Act with the cap to an estimate of that liability without the cap. *See* Palladino Decl. ¶ 14; Affidavit of Ernest Adamo (ECF No. 1-3) ("Adamo Aff.") ¶¶ 9-11; Poethke Decl. ¶ 8. The Schaufele Declaration (for the State of Maryland) used a different method, assessing the lost deductions and converting those figures into increased tax liability using 2017 rate tables. Schaufele Decl. ¶ 3.

[26] Holland Decl. ¶¶ 16, 19, 20, 21; *see also* Schaufele Decl. ¶ 6 (forecasting reduced real estate transfer tax revenue in Maryland of $7.5 million for 2019). The same factors would reduce property tax revenue and sales tax revenue for States and local governments. Holland Decl. ¶ 17 (describing depressed home values), ¶ 18 (correlating reduced spending because of "wealth effect" with lower sales tax revenue); Schaufele Decl. ¶¶ 4-5 (forecasting reduction in Maryland, as compared to prior forecasts before enactment of 2017 Tax Act, of more than $22.5 billion in property value and $25.2 million in property tax revenue in 2019); Poethke Decl. ¶¶ 16, 20 (projecting that New Jersey home values will decline by 8.5% and reduce transfer fee and property tax revenues "by a combined total of $105.1 million, or 9.3%, from fiscal year 2019 through fiscal year 2020").

[27] Defendants minimize the number of taxpayers affected by the new cap on the SALT deduction. *See* Defs.' Mot. at 5. The Tax Policy Center *Briefing Book* cited by Defendants points out that, of taxpayers who itemize, "virtually all" claim the SALT deduction: including nearly 20 percent of taxpayers making between $20,000 and $50,000 per year, 41.5% of taxpayers making between $50,000 and $75,000 per year, and 58.3% of taxpayers making between $75,000 and $100,000 per year. *See* Tax Policy Center, *Briefing Book* at 482-83. New York projects that the

By decreasing state tax revenue and making state taxes more expensive, the new cap on the SALT deduction will inevitably make it more difficult for the Plaintiff States to raise their own tax revenue. This, in turn, will impede their ability to make public investments and maintain current levels of public services—just as the Act's authors and proponents intended. Compl. ¶ 86; *see infra* 29-33. This direct interference with state sovereignty and state taxing authority is precisely the kind of interference that prior Congresses and the ratifiers of the Sixteenth Amendment identified as constitutionally impermissible—a violation of the Constitution's federalist structure and its promise that the federal taxing power would not substantially interfere with the States' ability to govern themselves.

The magnitude of this interference is heightened by the States' historical reliance on a substantial SALT deduction. *See NFIB*, 567 U.S. at 581-82 (identifying state reliance as an indication that a radical change in federal funding amounted to unconstitutional "economic dragooning"). States and localities have structured their tax regimes around the existence of the SALT deduction for more than one hundred years. Compl. ¶¶ 69-77; *see also supra* 15-20. And the new cap on the SALT deduction impacts not only the States themselves but also their political subdivisions, forcing them to compensate for the unexpected curtailment of longtime federalism-based protections for state and local tax policy.

Contrary to Defendants' arguments, the federal tax statute upheld by the Supreme Court in *South Carolina v. Baker* is simply not comparable to what Congress has done here. That case concerned a statute that imposed a federal tax on "the interest on state bonds [that are] not issued in the form Congress requires." 485 U.S. at 516. While South Carolina vigorously opposed this

new cap on the SALT deduction will cause New York taxpayers making more than $25,000 to pay $121 billion to the federal government, relative to what they would have paid under the 2017 Tax Act without the SALT deduction cap. Palladino Decl. ¶¶ 18-20.

tax, the Special Master appointed by the Court to adjudicate the dispute found that the tax would have only a "*de minimis* impact on the States"—it would have "no substantive effect on the abilities of States to raise debt capital, on the political processes by which States decide to issue debt, or on the power of the States to choose the purpose to which they will dedicate the proceeds of their tax-exempt borrowing." *Id.* at 529 (Rehnquist, C.J., concurring in the judgment). In any event, *Baker* was decided before the Supreme Court's more recent decisions re-invigorating principles of federalism as a structural feature of the Constitution.[28] Accordingly, *Baker* provides no justification to uphold Congress's broad-based assault on core sources of state and local tax revenue here.

Finally, Defendants argue that granting relief to the Plaintiff States would give litigants unfettered power to "nullify" Congress's taxation power. Defs.' Mot. at 2. But the Plaintiff States' claims do not risk any such slippery slope. What is distinctive about this case is Congress's extraordinarily stark departure from a core tax deduction that has been part of every federal income tax statute for more than 150 years. There is no basis to believe that this Court's recognition of the constitutional significance of this unique history will more broadly threaten the federal government's taxing power. Nor is it plausible that invalidating the new cap will cause any significant harm to the federal government: Defendants' "sweeping statement" that Plaintiffs' position poses a threat to federal powers "ignores the fact that the Nation survived for nearly two centuries" while Congress consistently respected State and local tax authority by providing a

---

[28] *See, e.g.*, *NFIB*, 567 U.S. at 556-58 (Commerce Clause), 559-60 (Necessary and Proper Clause), 580-82 (Spending Clause); *Alden*, 527 U.S. at 713; *Printz*, 521 U.S. at 918-35; *Flores*, 521 U.S. at 522-24; *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 (1996); *United States v. Lopez*, 514 U.S. 549 (1995); *New York*, 505 U.S. at 161. Justice Kennedy, who voted to limit federal power in those cases, did not participate in *Baker*. 485 U.S. at 506.

substantial SALT deduction. *Seminole Tribe of Florida*, 517 U.S. at 71 (rejecting similar argument regarding state sovereign immunity).

### III. THE NEW CAP ON THE SALT DEDUCTION UNCONSTITUTIONALLY COERCES THE PLAINTIFF STATES INTO FORGOING THEIR PREFERRED TAXATION AND FISCAL POLICIES.

Congress may not use its Article I powers to enact legislation that coerces the States' exercise of their sovereign police powers. But the allegations and undisputed facts here demonstrate that the federal government enacted the SALT cap with exactly that goal—the bill's proponents intended to force the States to lower their taxes and cut State government services, and the severe impact of the cap threatens precisely that coercive effect.

#### A. Congress May Not Impose Financial Pressures That Effectively Coerce States' Sovereign Choices.

The Supreme Court has repeatedly "recognized limits on Congress's power . . . to secure state compliance with federal objectives." *NFIB*, 567 U.S. at 576. While Congress may "'encourage a State to regulate in a particular way,'" it may not put so much pressure on States as to effectively undermine their sovereignty. *Id.* at 576-77 (quoting *New York*, 505 U.S. at 166).

A federal statute transgresses this line if it directly mandates that States perform, or decline to perform, certain regulatory actions. *See, e.g.*, *Murphy*, 138 S. Ct. at 1478 (federal statute prohibiting state authorization of sports gambling violates anticommandeering rule); *Printz*, 521 U.S. at 933 (federal government may not compel States to perform background checks on handgun purchasers); *New York*, 505 U.S. at 174-175 (federal government may not compel States to either take title to nuclear waste or enact particular state waste regulations). But state sovereignty is also violated, even without such direct commandeering, if Congress uses "financial inducements to exert a 'power akin to undue influence'" over the States. *NFIB*, 567 U.S. at 577 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). While Congress may provide

26

"incentives for States to act in accordance with federal policies," "when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.* at 577-78 (quoting *Steward Machine*, 301 U.S. at 590).

Although the Supreme Court has not "'fix[ed] the outermost line' where [permissible] persuasion give way to [impermissible] coercion," *id.* at 585 (quoting *Steward Machine*, 301 U.S. at 591), its decision in *NFIB* provides guidelines that are directly applicable to this case. In *NFIB*, the Court held that Congress had impermissibly coerced the States by threatening them with the loss of all federal Medicaid funds—which amounted to over 10 percent of most States' total revenue—if they did not expand their Medicaid programs. *Id.* The Court found that "[t]he threatened loss of over 10 percent of a State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582. Moreover, the harms threatened by the loss of Medicaid funding were amplified because the States had "developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid," all of which would be undermined by the loss of Medicaid funding. *Id.* at 581.

Here, the magnitude of the harms that the Plaintiff States face as a result of the new SALT deduction cap is comparable to the threatened loss of Medicaid funding that the Supreme Court found to be unconstitutional coercion in *NFIB*. As noted earlier, in just one year, the new cap will cost New York taxpayers $14.3 billion in additional taxes, New Jersey taxpayers $3.136 billion, Connecticut taxpayers $2.8 billion, and Maryland taxpayers $1.7 billion. Pls.' 56.1 Stmt. ¶¶ 50-53. These figures are similar in magnitude to the federal Medicaid funding that these States

receive, and that the statutory provision in *NFIB* threatened to eliminate.[29] Moreover, as explained above, the harm to the Plaintiff States is magnified by their long reliance on a substantial SALT deduction in making decisions about public investments and level of services provided. *See supra* at 15-20.

The federal government's actions in this case thus go well beyond the "relatively mild encouragement" of state policy that the Supreme Court has found to be permissible. The purpose and effect of the new SALT deduction cap was to force State governments to lower taxes and cut State programs. To accomplish this goal, the SALT cap penalizes those States that decline to lower taxes and rewards those that bow to federal pressure. Moreover, the target of the coercion is at the very core of State sovereignty: the States' ability to set their own taxation and fiscal policies. All of these factors make the SALT cap much like the "gun to the head" of the States that the Supreme Court found unconstitutional in *NFIB*.

Defendants mistakenly characterize the Plaintiff States' coercion claim as alleging direct commandeering of state legislative action, and fault the Complaint for failing to identify any specific mandate imposed by the 2017 Tax Act. *See, e.g.*, Defs.' Mot. at 29-30. In fact, as just explained, the Plaintiff States' claim is based on the economic coercion created by the new cap on the SALT deduction—a well-established violation of state sovereignty that is distinct from direct commandeering.

It is no answer to such a claim that Congress was acting pursuant to its Article I powers, as Defendants assert. *See* Defs.' Mot. at 31. In *NFIB*, there was no question that Congress was

_____

[29] *See* Nat'l Ass'n of State Budget Officers, *2010 State Expenditure Report: Examining Fiscal 2009-2011 State Spending*, p. 47 (2011), *at* https://higherlogicdownload.s3.amazonaws.com/NASBO/9d2d2db1-c943-4f1b-b750-0fca152d64c2/UploadedImages/SER%20Archive/2010%20State%20Expenditure%20Report.pdf; *NFIB*, 567 U.S. at 682 (joint dissent) (citing report).

exercising its Article I powers under the Spending Clause, yet the Supreme Court nonetheless held that the coercive pressure created by the statute at issue transgressed a "limit[] on Congress's power." 567 U.S. at 576. So too here.

**B. Congress Deliberately Targeted the Plaintiff States and Improperly Sought to Curtail Their Public Investments and Programs by Capping the SALT Deduction.**

Beyond economic coercion, the new cap on the SALT deduction violates state sovereignty for the separate reason that it unequally targets the States, thus violating "the fundamental principle of equal sovereignty," *Shelby County*, 570 U.S. at 544. The effect of the new SALT deduction cap on the Plaintiff States was no coincidence. To the contrary, the federal legislators who spearheaded the effort to pass the 2017 Tax Act repeatedly stated their belief that the SALT cap would have a disproportionate effect on States with relatively high tax rates and generous public programs, and would force these States to reduce their taxes and eliminate their programs.

On September 7, 2017, Speaker of the House Paul Ryan argued that the 2017 Tax Act should eliminate the SALT deduction because "[p]eople in states that have balanced budgets, whose state governments have done their job and kept their books balanced and don't have big massive pension liabilities, they're effectively paying for states that don't." Pls.' 56.1 Stmt. ¶ 34. On October 12, 2017, Speaker Ryan again argued for the elimination of the SALT deduction by stating: "I would argue we're propping up profligate, big government states and we're having states that actually got their act together pay for states that didn't. I think Wisconsin versus Illinois." *Id*. ¶ 39. Both times Speaker Ryan was incorrect, as it is undisputed that Plaintiffs New York, New Jersey, and Connecticut all paid more in federal taxes than their residents receive in federal spending, even before the 2017 Tax Act. *Id*. ¶ 29. On October 27, 2017, Republican House Member Duncan Hunter commented on the SALT deduction: "California, New Jersey, New York, and other states that have horrible governments, yes. It's not as good for those states." *Id*.

¶ 40. On October 31, 2017, Republican House Majority Leader Kevin McCarthy called the cap on the SALT deduction a "challenge [to] our governors" to lower state taxes. *Id.* ¶ 41. Other Republican Senators made similar statements, including Senator Ted Cruz's admission that he expected "[o]ne hopefully positive result of this legislation will be that state and local officials will be less eager to jack up the taxes on hard working Americans." *Id.* ¶ 46. Senator Rob Portman also conceded that the SALT cap "does kick some of those folks who are upper middle class or high income folks" in "states like New York and states like California." *Id.* ¶ 44.[30]

Likewise, members of the executive branch admitted the law's coercive intent. On November 9, 2017, Secretary Mnuchin stated: "I do hope that [the SALT deduction cap] sends a message to the state governments that, perhaps, they should try to get their budgets in line. . . . And the question is: why do you need 13 or 14% state taxes?" *Id.* ¶ 43. On October 12, 2017, Secretary Mnuchin stated: "We don't want [the proposed elimination of the SALT cap] to hurt New York, and California, and New Jersey, and Connecticut, and Illinois too much, but on the other hand we can't have the federal government continue to subsidize the states."[31] *Id.* ¶ 38. On October 11, 2017, President Trump appeared at an event with Sean Hannity to discuss the 2017 Tax Act. Hannity stated his belief that for taxpayers "in a state like New York or Illinois and New Jersey or California, you won't be able to deduct your local or state income tax" under the new law, which he understood to be sending a message that "[i]n other words, if you elect politicians

---

[30] Defendants seek to minimize many of these statements, Defs.' Mot. at 36-38, but the statements, which are attached in full as Plaintiffs' Exhibits 90 to 99, speak for themselves. Contrary to Defendants' characterization, the quoted officials did not "*merely* urg[e] states to lower their taxes or reduce their spending[.]" Defs.' Mot. at 37 n.13 (emphasis added). Rather, they followed through on these statements by enacting a punitive tax measure expressly designed to coerce the States to adopt these federal officials' preferred taxation and fiscal policies.

[31] Like Speaker Ryan's assertion, Secretary Mnuchin's suggestion that the federal government subsidizes the Plaintiff States is incorrect.

that want to raise taxes, you will going to pay [sic] the penalty." *Id*. ¶ 35. President Trump agreed, singling out Florida's Republican-led state government for praise and stating: "And those are the people that frankly should—the people that had the intelligence to elect them should really benefit. And that's what we are doing. We are creating an incentive." *Id*. ¶ 36. President Trump also stated: "it's finally time to say, hey, make sure that your politicians do a good job of running your state. Otherwise, you are not going to benefit" from the 2017 Tax Act. *Id*. ¶ 37. Republican political commentators were even more candid in their comments about the SALT cap's coercive intent, with one admitting that "[t]he fact that these tax increases will fall most heavily on 'blue' parts of the country is obviously not an accident," and another declaring that the 2017 Tax Act meant "death to Democrats." *Id*. at ¶¶ 42, 45.

To accomplish this stated goal of forcing the Plaintiff States to change their taxation and fiscal policies, Congress designed the 2017 Tax Act to penalize taxpayers in States with relatively high levels of taxation and State-funded public services, while rewarding taxpayers in other States. The essential details of this dynamic are undisputed. New York, Connecticut, Maryland, New Jersey, and California have the highest percentages of taxpayers whose federal tax burden increased under the 2017 Tax Act. *Id*. ¶ 47. Moreover, each of the Plaintiff States received a smaller share of the federal tax cuts in the 2017 Tax Act than their share of the federal tax base. *Id*. ¶ 48. Taxpayers in the Plaintiff States are paying many billions of dollars in additional federal income taxes because of the cap on the SALT deduction, relative to what they would have paid if the 2017 Tax Act had been enacted without the cap. *Id*. ¶¶ 49-53.[32] While the 2017 Tax Act

_____

[32] New York taxpayers will pay an additional $14.3 billion in federal income taxes in tax year 2018 because of the new cap on the SALT deduction, relative to what they would have paid if the 2017 Tax Act had been enacted without the new cap. The New York State Department of Taxation and Finance estimates that, between 2018 and 2025, New Yorkers will pay an additional

reduced the portion of the federal government's income tax revenues paid by most other States, it increased the portion of the federal government's income tax revenues paid by taxpayers in the Plaintiff States. *Id.* ¶¶ 55-56. Further, by capping the deductibility of property taxes that were previously fully deductible, the 2017 Tax Act makes homeownership in the Plaintiff States more expensive and decreases the value of real estate in the Plaintiff States by billions of dollars, leading to a wide variety of severe economic consequences for the Plaintiff States.[33]

These harms relent only if the Plaintiff States bow to federal coercion by cutting State-funded services and lowering State taxes. States that have adopted less generous public policies get a much better deal under the 2017 Tax Act. For example, Alaska received a 137% share of the federal tax cuts in the 2017 Tax Act, compared to its share of the federal tax base. Palladino Decl. ¶ 38. Texas received 127%, and Florida received 122%. *Id.* Only 5% and 2% of taxpayers in Florida and North Dakota, respectively, will see their net federal taxes increase, as compared to 13% in New York, 12% in Maryland, 11% in New Jersey, and 9% in Connecticut. *Id.* ¶ 28. An analysis by the Institute on Taxation and Economic Policy found that "lower-taxed states would be treated much better" under the 2017 Tax Act.[34]

---

$121 billion in federal taxes because of the cap on the SALT deduction, notwithstanding any other provisions of the bill. Pls.' 56.1 Stmt. ¶ 50.

[33] The New York State Division of the Budget projects that, in aggregate, the new cap on the SALT deduction could result in a loss of home equity value of approximately $63.1 billion statewide. Pls. 56.1 Stmt. ¶ 58. This decline in home equity could result in a corresponding decrease in economic activity in the State of between $1.26 billion - $3.15 billion, in the State losing between 12,500 and 31,300 jobs, and the state taking in millions less in real estate transfer tax collections. *Id.* ¶¶ 59-62. The other Plaintiff States expect similar consequences. *Id.* ¶¶ 63-66.

[34] Institute on Taxation and Economic Policy, *Final GOP-Trump Bill Still Forces California and New York to Shoulder a Larger Share of Federal Taxes Under Final GOP-Trump Tax Bill; Texas, Florida, and Other States Will Pay Less* (Dec. 17, 2017), *at* https://itep.org/final-gop-trump-bill-still-forces-california-and-new-york-to-shoulder-a-larger-share-of-federal-taxes-texas-florida-and-other-states-will-pay-less/.

The deliberately targeted nature of the 2017 Tax Act is also apparent in the federal government's response to the Plaintiff States' efforts to alleviate the burden the Act places on their taxpayers. In the months since the enactment of the 2017 Tax Act, the Plaintiff States have taken, or are considering taking, legislative and other action to alleviate the burden the 2017 Tax Act places on their taxpayers. Pls.' 56.1 Stmt. ¶ 67. Defendants Department of the Treasury and Internal Revenue Service quickly responded by announcing their intent to take additional regulatory action, again targeting the Plaintiff States, to prevent them from protecting their current levels of taxation and public services. *Id.* ¶¶ 68-69. This response confirms that Defendants seek to preserve the 2017 Tax Act's unequal treatment of the Plaintiff States by preventing them from exercising their sovereign authority over taxation and fiscal policy to remedy the federal statute's disparate effects.

### C. Defendants' Arguments Do Not Overcome the Abundant Evidence of Coercion.

Defendants make several arguments downplaying the coercive nature of the 2017 Tax Act. None of them overcome the allegations and undisputed evidence.

First, the two cases cited by Defendants, Defs.' Mot. at 32, are easily distinguishable. In *South Carolina v. Baker*, as discussed earlier, a Special Master had already found that the federal tax at issue would have minimal impact on the States. *See* 485 U.S. at 529 (Rehnquist, C.J., concurring in the judgment). The magnitude of the impact of the federal tax provision at issue in *Baker* is thus not comparable to the new cap on the SALT deduction. Instead, the *Baker* statute is more analogous to the federal highway funding statute upheld in *South Dakota v. Dole*, which threatened States with losing only a "relatively small percentage of certain federal highway funds" if they did not raise their drinking age to 21, and thus did not unduly interfere with State sovereignty. 483 U.S. 203, 211 (1987).

Defendants' other case citation, *Florida v. Mellon*, 273 U.S. 12 (1927), is also inapposite. In that case, the Supreme Court dismissed Florida's claim that a nationwide federal inheritance tax violated state sovereignty. *Id.* at 17-18. But, as noted earlier, that case long predated the Supreme Court's recent coercion cases. And, unlike in *Florida*, where the Court found that there was "no substance in the contention that the state has sustained, or is immediately in danger of sustaining, any direct injury," *id.* at 18, the Plaintiff States here have alleged numerous specific injuries attributable to the new SALT deduction cap that eliminate any suggestion that their injuries are merely speculative. *See supra* at 22-26.

Second, Defendants cite the Uniformity Clause for the proposition that the Constitution permits the burden of a federal tax to have differential effects on taxpayers in different States. Defs.' Mot. at 33-34. While true as a general principle, this argument does not address the distinct circumstances of this case, where undisputed evidence shows that the federal government expressly designed the new SALT deduction cap to coerce States with relatively high rates of taxation and state services. For the same reason, Defendants' reliance on *United States v. Ptasynski*, 462 U.S. 74 (1983), is misplaced: while the Supreme Court acknowledged in that case that "the [Uniformity] Clause does not require Congress to devise a tax that falls equally or proportionately on each State," it expressly warned that "actual geographic discrimination" in a federal tax remained impermissible. *Id.* at 82, 85.

Third, Defendants cite cases from 1928 and 1937 for the alleged proposition that "when a tax is within the scope of power granted by Article I, Section 8, 'the existence of other motives in the selection of the subjects of taxes cannot invalidate congressional action.'" Defs.' Mot. at 34-35 (citing *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) & *Sonzinsky v. United States*, 300 U.S. 506 (1937)). But this overbroad claim ignores far more recent case law

holding that a federal statute is unconstitutional if it is the product of Congressional intent "to exert a 'power akin to undue influence'" over the States—even if the statute was otherwise within Congress's Article I powers. *NFIB*, 567 U.S. at 577 (quoting *Steward Machine*, 301 U.S. at 590).[35] Because the 2017 Tax Act's proponents have openly admitted that they intended to coerce the States, the SALT cap should be struck down.[36]

Fourth, Defendants claim that there is a "presumption that the government acts in a proper and lawful manner," which they argue applies to this analysis. Defs.' Mot. at 35. But this argument simply begs the question. Unlike in the ordinary case where the presumption of regularity would have some force, the Plaintiff States do not claim here that some secret motivation by federal officials requires invalidation of a facially valid federal tax. To the contrary, what the Plaintiff States have alleged, and supported by additional evidence, is that the express purpose and effect of the new cap on the SALT deduction was to coerce certain States to change their policies. If the Plaintiff States' allegations and evidence support this claim, then the presumption of regularity simply has no application.

---

[35] In any event, the cases cited by Defendants contain nothing like the expressly stated improper motives at issue in this case. In *Hampton*, the Supreme Court held that it was acceptable for Congress to enact a tariff that was dually motivated by securing revenue and protecting domestic industry. 276 U.S. at 412-13. In *Sozinsky*, the Court declined to "speculate" about "hidden motives" behind a particular federal tax. 300 U.S. at 513-14.

[36] Defendants also argue that these admissions do not matter because, even if Congress was partially motivated by an invalid purpose, it was also motivated by the "valid purpose" of "generat[ing] revenue to offset some of the costs of the 2017 Tax Act." Defs.' Mot. at 35. Defendants cite no support for such a 'mixed motives' exception to the anti-coercion case law, and such a proposed rule is at odds with *NFIB* because there can be no dispute that the Medicaid expansion at issue in that case was at least partially motivated by the valid goals of "increas[ing] the number of Americans covered by health insurance and decreas[ing] the cost of health care." *NFIB*, 567 U.S. at 538.

Finally, Defendants argue that the Court should ignore the admissions of President Trump and Secretary Mnuchin because "comments made by officials in the Executive Branch may not be imputed" to Congress. Defs.' Mot. at 35. But that argument is beside the point. The views of the Executive Branch are plainly relevant here in ascertaining whether the new cap on the SALT deduction is constitutional because the Executive Branch supported the statute, the President signed it, and his agencies will enforce the new cap. In other words, the views of the Executive Branch, just as much as the views of Congress, are material to understanding the meaning and purpose of a federal statute. *See, e.g., Johnson v. S. Pac. Co.*, 196 U.S. 1, 19–20 (1904) (citing presidential statements to ascertain meaning of a federal statute); *United States v. Reitano*, 862 F.2d 982, 985 (2d Cir. 1988) (same); *see also* Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes*, 65 S. Cal. L. Rev. 845, 845 (1992) ("congressional floor debates, committee reports, hearing testimony, and presidential messages" all a part of statutory interpretation). More importantly, Defendants cite no case suggesting that the federal government may impose a tax that is intentionally crafted to force particular States to change their most fundamental taxation and fiscal policies to match the federal government's preferences. Pursuant to *NFIB*, such a coercive use of Congress's Article I powers is prohibited.

## CONCLUSION

For all the foregoing reasons, the Plaintiff States respectfully request that the Court deny Defendants' motion to dismiss and grant the Plaintiff States' cross-motion for summary judgment.

Dated: New York, New York
      December 14, 2018

STATE OF NEW YORK

BARBARA D. UNDERWOOD
*Attorney General*

By:  */s/ Owen T. Conroy*

    Owen T. Conroy
     *Assistant Attorney General*
     owen.conroy@ag.ny.gov
    Caroline A. Olsen
     *Assistant Solicitor General*
     caroline.olsen@ag.ny.gov
    Steven C. Wu
     *Deputy Solicitor General*
     steven.wu@ag.ny.gov
    Eric Haren
     *Special Counsel*
     eric.haren@ag.ny.gov
    Justin Wagner
     *Assistant Attorney General*
     justin.wagner@ag.ny.gov
    New York Office of the Attorney General
    28 Liberty Street, 23rd Floor
    New York, New York 10005
    212-416-6184 (tel.)
    212-416-8962 (fax)

    *Attorneys for Plaintiff*
    *State of New York*

(Signature block continues on next page)

STATE OF CONNECTICUT

    GEORGE JEPSEN
    *Attorney General*

By:  */s/ Mark F. Kohler*
    Mark F. Kohler*
    *Assistant Attorney General*
    mark.kohler@ct.gov
    Michael K. Skold*
    *Assistant Attorney General*
    michael.skold@ct.gov
    Connecticut Office of the Attorney General
    55 Elm Street, P.O. Box 120
    Hartford, Connecticut 06141
    860-808-5020 (tel.)
    860-808-5347 (fax)

    *Attorneys for Plaintiff*
    *State of Connecticut*

STATE OF MARYLAND

    BRIAN E. FROSH
    *Attorney General*

By:  */s/ Sarah W. Rice*
    Sarah W. Rice*
    *Assistant Attorney General*
    SRice@oag.state.md.us
    Maryland Office of the Attorney General
    Civil Division
    200 St. Paul Place, 20th Floor
    Baltimore, Maryland 21202
    410-576-7847 (tel.)
    410-576-6955 (fax)

    *Attorney for Plaintiff*
    *State of Maryland*

STATE OF NEW JERSEY

    GURBIR S. GREWAL
    *Attorney General*

By:  */s/ Jeremy M. Feigenbaum*
    Jeremy M. Feigenbaum*
    *Assistant Attorney General*
    jeremy.feigenbaum@njoag.gov
    New Jersey Office of the Attorney General
    Richard J. Hughes Justice Complex
    25 Market Street, 8th Floor, West Wing
    Trenton, New Jersey 08625
    609-292-4925 (tel.)
    609-777-4015 (fax)

    *Attorney for Plaintiff*
    *State of New Jersey*

———————————————

*Admitted pro hac vice.*