UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK,<br>STATE OF CONNECTICUT,<br>STATE OF MARYLAND, and STATE OF<br>NEW JERSEY,<br><br>             Plaintiffs,<br><br>         v.<br><br>STEVEN MNUCHIN, in his official capacity<br>as Secretary of the United States Department<br>of Treasury; the UNITED STATES<br>DEPARTMENT OF THE TREASURY;<br>CHARLES P. RETTIG, in his official capacity<br>as Commissioner of the United States Internal<br>Revenue Service; the UNITED STATES<br>INTERNAL REVENUE SERVICE; and the<br>UNITED STATES OF AMERICA,<br><br>             Defendants. | Civil Action No. 1:18-cv-06427 (JPO) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT .......................................................................................................... 3

I.   ESTABLISHED CONSTITUTIONAL PRINCIPLES PRECLUDE CONGRESS
     FROM EVISCERATING THE SALT DEDUCTION. ...................................................... 3

II.  THE CAP ON THE SALT DEDUCTION IS AN IMPERMISSIBLE ATTEMPT
     TO INTERFERE WITH THE STATES' SOVEREIGN POLICY CHOICES BY
     IMPOSING UNDUE PENALTIES ON DISFAVORED STATES.................................... 8

     A.   Defendants Have Not Meaningfully Challenged the Economic Injuries the Plaintiff
          States Suffer Due to the Cap on the SALT Deduction. .................................... 8

     B.   By Targeting the Plaintiff States for Unfavorable Treatment, the New Cap on the
          SALT Deduction Also Violates the Principle of Equal State Sovereignty.................... 13

CONCLUSION....................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Alden v. Maine,
527 U.S. 706 (1999)..................................................................................... 3-4

Bailey v. Drexel Furniture Co. (Child Labor Tax Case),
259 U.S. 20 (1922).........................................................................................16

Batalla Vidal v. Nielsen,
291 F. Supp. 3d 260 (E.D.N.Y. 2018) ...........................................................16

Celotex Corp. v. Catrett,
477 U.S. 317 (1986).......................................................................................14

Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,
508 U.S. 520 (1993).................................................................................. 16-17

Davis v. Michigan Dep't of Treasury,
489 U.S. 803 (1989)..........................................................................................7

Dawson v. Steager,
139 S. Ct. 698 (2019)..................................................................................... 7-8

Encino Motorcars, LLC v. Navarro,
136 S. Ct. 2117 (2016).....................................................................................5

FERC v. Mississippi,
456 U.S. 742 (1982).........................................................................................4

Florida v. Mellon,
273 U.S. 12 (1927).........................................................................................13

Free Enter. Fund v. Public Co. Accounting Oversight Bd.,
561 U.S. 477 (2010)..................................................................................4, 10

Gordon v. Kaleida Health,
299 F.R.D. 380 (W.D.N.Y. 2014)..................................................................14

Graves v. People of the State of New York ex rel. O'Keefe,
306 U.S. 466 (1939).........................................................................................8

Massachusetts v. United States Dep't of Health & Human Servs.,
682 F.3d 1 (1st Cir. 2012)........................................................................ 15-16

iii

*McCreary County v. ACLU of Ky.*,
    545 U.S. 844 (2005).............................................................................14, 17

*National Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)........................................................ 4-5, 10, 14

*Printz v. United States*,
    521 U.S. 898 (1997)............................................................... 3-4

*Roe v. City of Waterbury*,
    542 F.3d 31 (2d Cir. 2008).......................................................2

*Shelby County v. Holder*,
    570 U.S. 529 (2013)..............................................................13, 15

*South Carolina v. Baker*,
    485 U.S. 505 (1988).....................................................3-4, 7-8, 13

*Sutera v. Schering Corp.*,
    73 F.3d 13 (2d Cir. 1995)........................................................9

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018)..........................................................14, 16

*Veazie Bank v. Fenno*,
    75 U.S. 533 (1869)...............................................................4

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012)................................................. 15-16

*Zhao-Royo v. New York State Educ. Dep't*,
    14-cv-0935, 2017 WL 149981 (N.D.N.Y. Jan. 13, 2017) ......................2

## FEDERAL STATUTES

An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent
    Resolution on the Budget for Fiscal Year 2018,
    Pub. L. No. 115-97, 131 Stat. 2054 (2017)............................................1

Tax Increase Prevention Act of 2014,
    Pub. L. No. 113-295, 128 Stat. 4040 ...............................................6

26 U.S.C. § 36B .................................................................................10

42 U.S.C. § 18031(a)(1)-(3).................................................................10

52 U.S.C. § 10303(b) .........................................................................15

52 U.S.C. § 10304(a)-(b) ....................................................................15

**FEDERAL REGULATIONS**

Contributions in Exchange for State or Local Tax Credits, 83 Fed. Reg. 43,563
(proposed Aug. 27, 2018) ....................................................................................18

**LEGISLATIVE MATERIALS**

49 Cong. Rec. 1696-98 (Feb. 10, 1910)......................................................................7

**SECONDARY SOURCES**

Alan J. Auerbach & Laurence J. Kotlikoff, *Evaluating Fiscal Policy with a
Dynamic Simulation Model*, 77 Am. Econ. Rev. 49, 54 (1987) ............................10

Annie McDonough, *Comptroller Thomas DiNapoli on the state's $2.8 billion
budget shortfall*, City & State New York (Feb. 6, 2019), *at*
https://www.cityandstateny.com/articles/policy/policy/comptroller-thomas-
dinapoli-states-28-billion-budget-shortfall.html....................................................12

*Decisive Blow at the Income Tax Amendment*, Daily Press (Newport News, V.A.),
Mar. 10, 1910...........................................................................................................7

Internal Revenue Service, *Guidance on Certain Payments Made in Exchange for
State and Local Tax Credits*, Notice 2018-54 (May 23, 2018), *at*
https://www.irs.gov/pub/irs-drop/n-18-54.pdf.........................................................18

Jim Tankersley, *SALT Limit Is Hitting 11 Million Tax Returns, Audit Finds*, N.Y. Times,
Feb. 26, 2019, *at* https://www.nytimes.com/2019/02/26/us/politics/treasury-salt.html..........18

John D. Buenker, *The Ratification of the Federal Income Tax Amendment*,
1 Cato J. 183 (1981)..................................................................................................7

Press Release, U.S. Dep't of Treasury, *Treasury Secretary Mnuchin Statement on
Clarification for Business Taxpayers: Contributions Under State and Local
Tax Credit Programs Generally Deductible as Business Expenses* (Sept. 5,
2018), *at* https://home.treasury.gov/news/ press-releases/sm472...........................18

*Root for Adoption of Tax Amendment*, N.Y. Times, Mar. 1, 1910 ................................7

*The Elliman Report*, Quarterly Survey of Manhattan Co-op & Condo Sales
(Douglas Elliman Real Estate, Jan. 2019), *at*
https://www.millersamuel.com/files/2019/01/Manhattan-4Q_2018.pdf.................12

*The Elliman Report*, Quarterly Survey of Westchester County Residential Sales
(Douglass Elliman Real Estate, Jan. 2019), *at*
https://www.millersamuel.com/files/2019/01/Westchester-4Q_2018.pdf..............12

## PRELIMINARY STATEMENT

The States of New York, Connecticut, Maryland, and New Jersey (the "Plaintiff States") submit this reply brief in further support of their motion for summary judgment. As the Plaintiff States established in their opening brief, Congress violated fundamental principles of federalism when it enacted a $10,000 cap on the federal tax deduction for state and local taxes ("SALT"). *See* An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent Resolution on the Budget for Fiscal Year 2018 (the "2017 Tax Act" or "Act"), Pub. L. No. 115-97, § 11042, 131 Stat. 2054 (2017) (H.R. 1). The new cap on the SALT deduction disregards fundamental constitutional restraints that prevent the federal government from interfering with the States' sovereign authority to make their own choices about whether and how much to invest in their own residents, businesses, infrastructure, and more. Both the purpose and the effect of the new cap is to inflict economic harm on the Plaintiff States, with the intent of coercing them into lowering their tax rates and cutting public investments. Although Congress's tax power is broad, it does not justify such an egregious interference with the sovereign authority of the States to determine their own taxation and fiscal policies.

As the Plaintiff States have previously explained, there are no threshold barriers to the Court's resolution of the Plaintiff States' claims. See Mem. of Law in Opp'n to Defendants' Mot. to Dismiss and in Supp. of Plaintiffs' Cross-Mot. for Summ. J. ("States' Br.") at 5-14. Moreover, defendants have failed to demonstrate any disputed issue of fact precluding summary judgment. Defendants have not challenged the veracity *any* of the 69 statements of material fact underlying the Plaintiff States' constitutional claims—including the economic analyses establishing the substantial harms the Plaintiff States are suffering because of the new cap, which include billions

of dollars of lost tax revenue and lower economic growth. *See* Government's Resp. to the States' Local Rule 56.1 Statement ("Defs.' 56.1 Resp.").[1]

As with their opening brief, defendants primarily object to the novelty of the Plaintiff States' constitutional theory. But as the Plaintiff States have explained, the constitutional necessity of the SALT deduction is firmly grounded in the structure of the Constitution, more than 150 years of precedent, and the substantial reliance interests that have developed around Congress's consistent historical practice of providing a SALT deduction for nearly all state and local income and property taxes.

This Court should grant the Plaintiff States' motion for summary judgment and deny defendants' motion to dismiss.

---

[1] In lieu of disputing the facts, Defendants copy and paste into each of their Rule 56.1 responses the same boilerplate assertion that the Plaintiff States' factual statements are not material. But each fact in Plaintiffs' Rule 56.1 statement is material because it could "affect the outcome of the suit under the governing law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quotation marks omitted). For example, the undisputed facts regarding the history of the federal tax power make clear that the new SALT deduction cap is an unprecedented expansion of federal power vis-à-vis the States, which is a core concept underlying the Plaintiff States' claims. See *infra* at 3-8. Defendants do not offer any basis for their conclusory assertion that these facts do not affect the outcome of this action. The Plaintiff States' statements should therefore be deemed admitted. *See Zhao-Royo v. New York State Educ. Dep't*, 14-cv-0935, 2017 WL 149981, at *2 n.2 (N.D.N.Y. Jan. 13, 2017) ("[W]here a non-movant has merely objected to the materiality of a fact, and the Court has concluded that the fact is material, the fact will be deemed admitted."). Defendants also assert several baseless admissibility objections, which are addressed below.

**ARGUMENT**

I.  **ESTABLISHED CONSTITUTIONAL PRINCIPLES PRECLUDE CONGRESS FROM EVISCERATING THE SALT DEDUCTION.**

As the Plaintiff States have explained (States' Br. at 15-18), basic principles of federalism require the federal government to respect the sovereign authority of the States to determine their own taxation and fiscal policies. The new cap on the SALT deduction plainly violates this constitutional requirement by eviscerating a deduction that is essential to ensuring that the States are neither precluded from raising revenue from traditional sources, nor compelled to adopt the federal government's preferred taxation and fiscal policies.

Defendants continue to insist that the court should reject the Plaintiff States' claims because they are novel. *See* Reply Mem. of Law in Further Supp. of the Government's Mot. to Dismiss and in Opp'n to the States' Cross-Mot. for Summ. J. ("Defs.' Reply Br.") at 11, 15. But the claims are novel only because Congress's action here was so unprecedented. In over 150 years, Congress has never before encroached on the States' tax sovereignty in this manner by capping the SALT deduction.

While the violation itself may be new, there are three basic principles that underlie the Plaintiff States' claims, each of which is firmly rooted in constitutional doctrine:

*First*, to police the limits of congressional power vis-à-vis the States, the Supreme Court has repeatedly looked to "the structure of the Constitution" to "discern among its 'essential postulates.'" *Printz v. United States*, 521 U.S. 898, 918 (1997) (quoting *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322 (1934)) (brackets omitted).[2] In the context of Congress's tax

---

[2] *See also, e.g.*, *Alden v. Maine*, 527 U.S. 706, 728 (1999) ("These holdings reflect a settled doctrinal understanding, consistent with the views of the leading advocates of the Constitution's ratification, that sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself."); *South Carolina v. Baker*, 485 U.S. 505, 518 n.11 (1988) (doctrine of intergovernmental tax immunity "arises from the constitutional structure and

power, the Court has recognized that our system of dual federalism precludes the federal government from "exert[ing] a 'power akin to undue influence'" over the States. *National Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 577 (2012) (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)); *see also Veazie Bank v. Fenno*, 75 U.S. 533, 541 (1869) (Congress's tax power is subject to "certain virtual limitations" and cannot be used "to impair the separate existence and independent self-government of the States"). In violation of these bedrock principles, the new cap on the SALT deduction directly infringes on the sovereign authority of the States to determine their own taxation and fiscal policies by imposing severe burdens on relatively high-tax States to coerce them into lowering their taxes and reducing their public investments. *See FERC v. Mississippi*, 456 U.S. 742, 761 (1982) ("[T]he power to make decisions and to set policy is what gives the State its sovereign nature.").

*Second,* in federalism cases, the Supreme Court has repeatedly emphasized the significance of historical practice. *See, e.g.*, *Printz*, 521 U.S. at 905-18; *Alden v. Maine*, 527 U.S. 706, 715-28 (1999). In *Printz*, for example, the Supreme Court invalidated the Brady Act's commandeering requirement, which required state officials to administer the federal background-check system for gun purchasers, based, in part, on the "unprecedented" nature of the requirement. 521 U.S. at 905. As the Supreme Court stated, "if . . . earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist." *Id.*; *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) ("Perhaps the most telling indication of [a] severe constitutional problem . . . is the lack of historical

---

a concern for protecting state sovereignty"). *See generally Baker*, 485 U.S. at 511 n.5 ("We use 'the Tenth Amendment' to encompass any implied constitutional limitation on Congress' authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution.").

precedent." (quotation marks omitted)). The new cap on the SALT deduction represents a gross departure from the settled historical practice. In over 150 years, Congress has never before imposed a direct and severe cap on the deductibility of state and local taxes, much less a cap with a coercive intent. This history strongly suggests that Congress lacks the power to impose the 2017 Tax Act's $10,000 cap.

*Third*, in a variety of contexts, constitutional and otherwise, the Supreme Court subjects to greater scrutiny federal action that upsets long-standing reliance interests. *See, e.g.*, *NFIB*, 567 U.S. at 582-85 (federalism); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (administrative action). Over the past century, the Plaintiff States have developed significant reliance interests, having structured their income tax regimes around the existence of a deduction for all or nearly all state and local income and property taxes. See States' Br. at 24; Compl. ¶¶ 71-77. The new cap on the SALT deduction upends these settled expectations, and is therefore constitutionally suspect.

Taken together, these basic principles make clear that Congress transgressed the constitutional limitations on its power when it drastically curtailed the SALT deduction.

Defendants assert (Defs.' Reply Br. at 10-11) that the Plaintiff States have abandoned their reliance on the Sixteenth Amendment, but they continue to misunderstand the nature of our claims. As the Plaintiff States have repeatedly explained (States' Br. at 15-20; Compl. ¶¶ 45-65), the Sixteenth Amendment supports the constitutional necessity of the SALT deduction. The history of the amendment's ratification demonstrates that the States viewed the amendment as a compact, in which the States granted the federal government the power to impose an unapportioned income tax on the condition that all of the other limitations on the federal tax power would remain unaltered. One of the recognized limitations on the federal government's tax power at the time of

the amendment's enactment was that Congress could not exercise its income tax power without providing a deduction for all or nearly all state and local taxes. That understanding dates back to the War of 1812, when Congress first considered enacting an income tax with a deduction for all state and local taxes. And it was enshrined in Congress's constitutional practice when, in the first income tax enacted in 1861, Congress included a broad deduction for state and local taxes. And a broad SALT deduction has been included in every income tax statute until the 2017 Tax Act. See States' Br. at 14-22. Thus, far from abandoning the Sixteenth Amendment, the Plaintiff States have expressly relied on it as an important aspect of their broader structural arguments.

Defendants also misinterpret the history of the SALT deduction when they argue (Defs.' Reply Br. at 12) that the incidental limitations that have been placed on the deduction over the years suggest that a deduction is not constitutionally required. As the Plaintiff States have previously explained (States' Br. at 21-22), the past limitations on the deduction were of a different degree and kind—they either were not direct limitations on the SALT deduction, or they carved out from the deduction incidental taxes. By contrast, income and property taxes are not incidental. The States have imposed income and property taxes since before the formation of the union, and the revenue from those taxes remains an essential source of public sector revenue. See *id.* at 22-23; Compl. ¶¶ 39-42. Past limitations on the deductibility of other categories of taxes—such as the elimination of the deduction for state motor vehicle taxes[3]—simply did not infringe on the States' sovereignty in the same way as a direct cap on the deductibility of income and property taxes. The main takeaway from the incidental limitations that Congress has imposed on the SALT deduction is not that the deduction is not required, but rather that, for over 150 years,

---

[3] *See* Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, § 221, 128 Stat. 4010, 4040 (eliminating deduction for state motor vehicle taxes).

51 different Congresses have felt compelled to provide a deduction for all or nearly all state and local income and property taxes—until now.[4]

Defendants devote a significant portion of their reply brief to the doctrine of intergovern-mental tax immunity (Defs.' Reply Br. at 13-15), which prohibits the States and the federal government from imposing direct or discriminatory taxes on each other. *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 811 (1989); *Dawson v. Steager*, 139 S. Ct. 698, 703 (2019). The Plaintiff States agree with defendants that the doctrine is not directly relevant here, because the Plaintiff States do not challenge the constitutionality of the new SALT deduction cap under that doctrine.[5] Nonetheless, the doctrine further highlights the unconstitutionality of the new cap. Like the federalism principles on which the Plaintiff States rely here, the doctrine of intergovernmental tax immunity does not arise from a particular phrase of the constitution, but "from the constitutional structure and a concern for respecting state sovereignty." *South Carolina v. Baker*,

---

[4] As the Plaintiff States have already explained (States' Br. at 21-22), neither the Pease Provision nor the Alternative Minimum Tax were direct limitations on the SALT deduction, and neither undercuts Congress's consistent historical practice of providing a deduction for nearly all state and local income and property taxes.

[5] The fact that the framers of the Sixteenth Amendment discussed the doctrine during the ratification debates does not, as defendants contend (Defs.' Reply Br. at 13-14), establish that the States were not concerned with the deductibility of SALT. That doctrine was just one issue highlighting an overarching constitutional concern that the Sixteenth Amendment would permit the federal tax power to intrude on state sovereignty. *See, e.g.*, John D. Buenker, *The Ratification of the Federal Income Tax Amendment*, 1 Cato J. 183, 204 (1981) (Exhibit to the Declaration of Owen T. Conroy ("Pls.' Ex.") 14) (describing the States' general "concern . . . that a federal income tax would not seriously impair state sovereignty"); *Decisive Blow at the Income Tax Amendment*, Daily Press (Newport News, V.A.), Mar. 10, 1910, at 4 (Pls.' Ex. 18) (Virginia newspaper noting general concern of States "surrendering unnecessarily to the central government any important right now reserved to the States"); 49 Cong. Rec. 1696-98 (Feb. 10, 1910) (Pls.' Ex. 19) (U.S. Senator William Borah stating "there must always be subtracted from [the federal tax] power the right of the different sovereignties to perform their functions as such"); *Root for Adoption of Tax Amendment*, N.Y. Times, Mar. 1, 1910, at 4 (Pls.' Ex. 20) (U.S. Senator Elihu Root affirming general principle that the Constitution requires separate federal and state tax sovereigns to operate "unembarrassed and unimpaired by any action of the other").

485 U.S. 505, 518 n.11 (1988). The Supreme Court has construed the doctrine to provide meaningful protections for the States' sovereign authority to determine their own taxation and fiscal policies. At its core, the doctrine recognizes that, when the federal and state government's tax powers are concurrent, "neither through its power to tax can be allowed to cripple the operations of the other." *Graves v. People of the State of New York ex rel. O'Keefe*, 306 U.S. 466, 488 (1939) (Frankfurter, J., concurring.). Although the scope of intergovernmental tax immunity has narrowed over the years, it continues to bar "*discriminatory* taxes." *Dawson*, 139 S. Ct. at 703. This prohibition reflects the understanding that neither the States, nor the federal government, may use its tax power to target the other for disfavored treatment. As the Plaintiff States have repeatedly explained, however, that is exactly what the federal government has done by capping the SALT deduction. See States' Br. at 22-26; Compl. ¶¶ 78-122.

## II. THE CAP ON THE SALT DEDUCTION IS AN IMPERMISSIBLE ATTEMPT TO INTERFERE WITH THE STATES' SOVEREIGN POLICY CHOICES BY IMPOSING UNDUE PENALTIES ON DISFAVORED STATES.

### A. Defendants Have Not Meaningfully Challenged the Economic Injuries the Plaintiff States Suffer Due to the Cap on the SALT Deduction.

As the Plaintiff States have explained (States' Br. at 22-26; Compl. ¶¶ 71-77), the new cap on the SALT deduction has both the purpose and effect of injuring the Plaintiff States and their residents. Because of the cap, taxpayers in the Plaintiff States will pay an additional $121 billion in federal taxes between 2018 and 2025. The new cap also makes it more expensive to own a home, which will ultimately depress home prices and deprive the Plaintiff States of tens of millions of dollars in revenue from real estate transfer taxes. By making state taxes more expensive overall, the new cap will ultimately make it more difficult for the Plaintiff States to raise revenue through taxes, and to decide how to invest in public safety, infrastructure, and

schools, among other things. Congress enacted the SALT deduction cap knowing that the Plaintiff States would suffer these harms, with the expectation that the Plaintiff States would be compelled to alter their taxation and fiscal policies in accordance with Congress's preferences.

Defendants do not challenge the truth any of the States' testimony regarding economic harm. See Defs.' 56.1 Resp. at 19-27.[6] In the face of detailed declarations (Compl., Exhibits (Exs.) 1-5) submitted from tax and economic experts within the relevant state agencies detailing the economic consequences of the new SALT deduction cap, defendants have submitted nothing. Instead, they assert (Defs.' Reply Br. at 15-16) that the Plaintiff States have applied the wrong framework to assess the economic harms of the new cap—i.e., the Plaintiff States have chosen to compare the effects of the 2017 Tax Act to a world in which the Act was enacted without the SALT deduction cap. According to defendants, the correct comparison is "between the 2017 Tax Act as enacted and the state of the Internal Revenue Code beforehand." *Id*. at 16. Defendants' arguments fail for several reasons.

As a matter of basic statutory construction, comparing the 2017 Tax Act with and without the SALT deduction is a valid framework for assessing the economic consequences of the SALT deduction cap, because it isolates the economic effects of the cap without considering extraneous provisions of the Act or other provisions of the federal tax code. A court considering the constitutionality of a particular statutory provision necessarily looks to that provision's effect—

---

[6] Defendants object only to the materiality and admissibility of Plaintiffs' declarations, but these objections are meritless. The evidence of economic harm is supported by sworn declarations of representatives of the state agencies that have direct knowledge of the harms described therein. And defendants do not identify any part of the testimony that they believe to be factually inaccurate or which requires further expert or fact discovery. *See Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995) (party opposing a motion for summary judgment can defeat the motion by identifying information that is "essential to his opposition" that he has not had the opportunity to discover (quotation marks omitted)).

not the effects of the entire enactment that contained it. That principle underlies severability analysis; courts consider the validity of a challenged provision on its own terms before turning to the question of *remedy*—i.e., whether the offensive provision is separable.[7] *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 508-09 (considering the constitutionality of the structure of the Public Company Accounting Oversight Board without considering the constitutionality of the entire Sarbanes-Oxley Act). And it is precisely the framework the Supreme Court has used when it has considered whether the burdens imposed on the States by a particular provision of a statute are unduly coercive. For example, in *NFIB*, when determining whether the Affordable Care Act (ACA) improperly coerced the States into expanding their Medicaid programs, the Supreme Court considered only the financial costs to the States of refusing to expand their Medicaid programs without asking whether other provisions of the ACA—such as the financial incentives for setting up health care exchanges, 42 U.S.C. § 18031(a)(1)-(3), or health insurance premium subsidies, 26 U.S.C. § 36B—offset the financial burdens on the States. *See* 567 U.S. at 575-87.[8] Defendants' alternative framework—comparing the 2017 Tax Act to the prior tax code—is not only at odds with the Court's approach in *NFIB*, but it also fails to capture the ways in which individual taxpayers will change their behavior in response to the 2017 Tax Act.[9]

_____

[7] For this reason, defendants' contention (Defs.' Reply Br. at 16 & n.10) that Congress would not have enacted the 2017 Tax Act without the SALT deduction cap does not bear on the constitutionality of that provision, but only on whether the court should invalidate the entire Act or just the cap if it concludes that the cap is unconstitutional.

[8] The Plaintiff States believe, consistent with the basic law of severability, that the SALT deduction cap is severable from the 2017 Tax Act. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 508-09. Given the complexity and scope of the 2017 Tax Act, however, we respectfully submit that the court should permit the parties to engage in separate briefing on the question of severability if this Court determines that the new cap on the SALT deduction is unconstitutional.

[9] *See, e.g.*, Alan J. Auerbach & Laurence J. Kotlikoff, *Evaluating Fiscal Policy with a Dynamic Simulation Model*, 77 Am. Econ. Rev. 49, 54 (1987) (in tax policy context, "[d]ynamic

In any event, defendants are simply wrong when they assert that the Plaintiff States' "entire economic analysis" compares the 2017 Tax Act with and without the SALT deduction cap. Defs.' Reply Br. at 15. Only one category of analyses relies on that comparison. Those analyses show that the Plaintiff States will pay an additional $121 billion in federal income taxes between 2018 and 2025 because of the cap on the SALT deduction, relative to what taxpayers would have paid if the 2017 Tax Act had been enacted without the SALT deduction. As explained above, that approach was valid and highlights in stark terms one of several burdens the new SALT deduction cap imposes on the Plaintiff States.

The Plaintiff States have also offered a plethora of other analyses that compare the economic effects of the 2017 Tax Act to a world under the prior tax code—i.e., defendants' preferred framework. For example, the models predicting a significant decline in New York's real estate market use the prior tax law as a baseline for comparison. *See* Declaration of Lynn Holland (ECF No. 1-1) ("Holland Decl.") ¶ 10. That analysis shows that the SALT deduction cap will depress real estate values and home sales, and that the resulting decline in household wealth could result in the loss of between 12,500 and 31,300 jobs and depress New York's economy generally. *See id.* ¶¶ 16-21. The comparative analyses cited in the complaint likewise show that the Plaintiff States are harmed by the 2017 Tax Act relative to a world under prior tax law. Among other things, these analyses show that the Act increases the portion of the federal government's income tax revenues paid by taxpayers of the Plaintiff States, even though those taxpayers already pay an outsize portion of federal income taxes. The analyses also show that, relative to taxpayers in other

simulation models can resolve a number of important issues that cannot be adequately considered in static or steady-state analyses").

States, taxpayers in the Plaintiff States get a disproportionately smaller share of the tax cuts in the 2017 Tax Act overall. *See* Compl. ¶¶ 89-92; Declaration of Scott Palladino (ECF No. 1-2) at 6-12.

If there were any question about whether the Plaintiff States will be economically harmed by the SALT deduction cap, recent developments dispel any doubt. As predicted by the New York Division of the Budget (Holland Decl.), home sales in Westchester County, Long Island, and Manhattan are down, and growth in home sale prices has either slowed or declined in several counties.[10] Moreover, according to New York State Comptroller Thomas DiNapoli, New York is now facing a $2.3 billion budget deficit, in no small part because the SALT deduction cap has caused high-income taxpayers to relocate to other States to avoid the increased tax burden in New York.[11] It is thus beside the point (Defs.' Reply Br. at 16-17) that some residents in the Plaintiff States may have lower federal tax liability. Regardless of the financial consequences of the Act for individual taxpayers, the 2017 Tax Act is already inflicting substantial financial burdens on the Plaintiff States, which makes it more difficult for the Plaintiff States to raise revenue through taxation.[12]

---

[10] *See, e.g.*, *The Elliman Report*, *Quarterly Survey of Manhattan Co-op & Condo Sales* (Douglas Elliman Real Estate, Jan. 2019), https://www.millersamuel.com/files/2019/01/Manhattan-4Q_2018.pdf; *The Elliman Report*, *Quarterly Survey of Westchester County Residential Sales* (Douglass Elliman Real Estate, Jan. 2019), https://www.millersamuel.com/files/2019/01/Westchester-4Q_2018.pdf.

[11] *See, e.g.*, Annie McDonough, *Comptroller Thomas DiNapoli on the state's $2.8 billion budget shortfall*, City & State New York (Feb. 6, 2019), https://www.cityandstateny.com/articles/policy/policy/comptroller-thomas-dinapoli-states-28-billion-budget-shortfall.html (quoting New York Comptroller Thomas DiNapoli) ("[T]he most significant change we've seen relates to the impact of SALT.").

[12] The fact that the Plaintiff States are already suffering harm also rebuts defendants' contention that the Plaintiff States' injuries are too speculative to establish standing. See Mem. of Law in Supp. of the Government's Mot. to Dismiss at 13-14; Defs.' Reply Br. at 22.

Defendants also argue (Defs.' Reply Br. at 17) that the burdens imposed on the States by the 2017 Tax Act are not severe enough to constitute "impermissible coercion." As previously explained (States' Br. at 27-29), however, the federal government's actions here go well beyond the mild forms of encouragement of state policy that the Supreme Court has upheld previously. Not only are the economic burdens—amounting to billions of dollars in additional tax payments to the federal government—akin to the financial harms that the Supreme Court found to be coercive in *NFIB*, but the harms here were also enacted with the *purpose* of interfering with the Plaintiff States' sovereign policy control over taxation and fiscal policy.[13]

**B.      By Targeting the Plaintiff States for Unfavorable Treatment, the New Cap on the SALT Deduction Also Violates the Principle of Equal State Sovereignty.**

As the Plaintiff States have explained (States' Br. at 9, 29-33), there is a "'fundamental principle of *equal* sovereignty' among the States," which requires courts to review legislation with exacting scrutiny when the federal government intentionally discriminates among the States. *See Shelby County v. Holder*, 570 U.S. 529, 544 (2013) (quoting *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). Defendants have violated this principle by targeting the Plaintiff States to pay for tax cuts that primarily benefit the rest of the country, with the expectation that the unequal burdens imposed on the Plaintiff States will coerce them into lowering taxes and cutting public investments.

---

[13] The cases on which defendants rely (Defs.' Reply Br. at 18) are distinguishable, because it was evident in both cases that the challenged law would have a minimal impact on the Plaintiff States. *See Baker*, 485 U.S. at 529 (Rehnquist, C.J., concurring) (noting that a Special Master had already found that the tax law at issue would have only a minimal impact on the States); *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (finding that there was "no substance in the contention that the state has sustained, or is immediately in danger of sustaining, any direct injury as the result of the enforcement of the action in question").

The Plaintiff States have offered ample evidence establishing that Congress intentionally targeted the Plaintiff States for disparate and unequal treatment—including (i) comparative economic analyses, (ii) post-enactment regulatory developments, and (iii) statements from the public officials responsible for enacting and enforcing the SALT deduction cap. See States' Br. at 29-33. Defendants do not attempt to meaningfully refute the evidence in either of the first two categories.

With respect to the third category, defendants also do not challenge the veracity of any of the statements from public officials, nor do they suggest that the lawmakers did not, in fact, intend to punish the Plaintiff States when they enacted the SALT deduction cap. Instead, defendants argue that this Court should turn a blind eye to this evidence because Congress was acting pursuant to its Article I power, and thus Congress's motive was irrelevant. Defendants are again mistaken.[14] Although Congress's tax power is broad, Article I is not the only constitutional provision at play. "[A]ny tax must still comply with other requirements in the Constitution." *NFIB*, 567 U.S. at 570. It is thus no defense to say that the new cap on the SALT deduction is within Congress's tax powers if the cap also violates fundamental principles of federalism, including the principle of equal state sovereignty.

---

[14] Defendants' argument (Defs.' 56.1 Resp. ¶¶ 34-46) that the statements of public officials are inadmissible hearsay is meritless. There is no requirement "that the materials be presented in an admissible form on summary judgment." *Gordon v. Kaleida Health*, 299 F.R.D. 380, 393 (W.D.N.Y. 2014). Federal Rule of Civil Procedure 56 requires only that "the evidence must be capable of presentation in admissible form at the time of trial." *Id.*; *cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). It is sufficient that the Plaintiff States could call the relevant officials for their direct testimony at trial. In any event, courts routinely consider public statements similar to those at issue here. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018) (relying on publicly reported statements of President Trump); *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 851 (2005) (publicly reported statements of local officials). Given that defendants have not challenged the accuracy of the quoted statements, there is no prejudice to defendants if the court considers the evidence.

Moreover, Congress's motives are relevant in this case. As the Supreme Court has explained, when the federal government "intru[des] into sensitive areas of state and local policymaking," courts must conduct a searching inquiry of the legislative rationale. *Shelby County*, 570 U.S. at 544 (quotation marks omitted). In *Shelby County*, that inquiry took the form of careful scrutiny of voter turnout and other statistics to determine whether the rationale for subjecting certain States to the Voting Rights Act's preclearance requirement was still valid. *See id.* at 548-53. In federalism cases, courts have probed deeply into Congress's motives for enacting legislation, recognizing that an intrusion into the sovereign sphere of the States necessitates "closer than usual scrutiny" of the statutory "justifications," and that federalism concerns "diminish somewhat the deference ordinarily accorded" to Congress." *Massachusetts v. United States Dep't of Health & Human Servs.*, 682 F.3d 1, 11-12 (1st Cir. 2012); *see also Windsor v. United States*, 699 F.3d 169, 186 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) (court required to take a "cold eye" to the justifications for Defense of Marriage Act, which represented an "unprecedented intrusion into an area of traditional state regulation" (quotation marks omitted)) .

Here, as in those cases, Congress's intrusion into the core of the States' sovereign tax authority requires this Court to take a hard look at the motives underlying the new cap on the SALT deduction.[15] See States' Br. at 34-35. The public statements the Plaintiff States cite in their

---

[15] Defendants' attempts (Defs.' Reply Br. at 21) to distinguish *Shelby County* are unavailing. Here, as in *Shelby County*, Congress's actions disparately affect the Plaintiff States while also constituting an "extraordinary" intervention into the Plaintiff States' sovereign affairs. 570 U.S. at 544-45 (quotation marks omitted). The preclearance requirement at issue in *Shelby County* applied only to certain States based on a formula without identifying any particular State by name. *See* 52 U.S.C. §§ 10303(b) (formula), 10304(a)-(b) (preclearance requirement). Here, by setting the SALT deduction cap below the average cost of state and local taxes in the Plaintiff States, Congress has effectively employed a formula just as it did in *Shelby County*. In any event, *Shelby County* is far from the only precedent making clear that the a court should apply a more

complaint provide substantial evidence that, despite the facial neutrality of the 2017 Tax Act, Congress enacted the SALT deduction cap with an illegitimate motive—to punish States that have elected to raise revenue through relatively high taxes and to make substantial public investments. In similar contexts, courts have considered similar kinds of statements to determine whether the responsible governmental actors were motivated by illegitimate ends. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018) (considering publicly reported statements of President Trump); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276-77 (E.D.N.Y. 2018) (finding evidence of discriminatory purpose in the elimination of the Deferred Action for Childhood Arrivals program based on President Trump's public statements). And courts have done so even in the context of Congress's Article I powers. *See, e.g.*, *Bailey v. Drexel Furniture Co.* (*Child Labor Tax Case*), 259 U.S. 20, 37 (1922) ("[A] court must be blind not to see that the so-called tax is imposed to stop the employment of children within the age limits prescribed. . . . All others can see and understand this. How can we properly shut our minds to it?").[16] Given that the SALT deduction cap "intrudes broadly into an area of traditional state regulation, a closer examination of the justifications that would prevent" the cap "from exceeding federal authority[] is uniquely reinforced by federalism concerns." *Massachusetts*, 682 F.3d at 13.

---

searching inquiry into Congress's motives when it intrudes on federalism concerns, as it has done here. *See, e.g.*, *Massachusetts*, 682 F.3d at 11-12; *Windsor*, 699 F.3d at 186.

[16] Defendants also suggest (Defs.' Reply Br. at 20) that the statements are unpersuasive because they were made outside of legislative proceedings. But in determining whether a facially neutral law has discriminatory intent, courts have looked at a broad array of evidence, not confined to the strict confines of the legislative process. *See, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) ("Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.").

Defendants' fear (Defs.' Reply Br. at 20) that the Court's consideration of public statements will result in a slippery slope of constitutional invalidity is unfounded. As noted, courts routinely consider statements made by public officials to evaluate whether a facially neutral law was motivated by an invidious purpose. *See also, e.g.*, *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 851 (2005) (First Amendment); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (same). And the statements cited in the complaint were not off-hand comments. Rather, they were considered statements about the SALT deduction cap from the principal sponsors and enforcers of the 2017 Tax Act, including Speaker of the House Paul Ryan and Treasury Secretary Steven Mnuchin. *See* Pls.' Exs. 90, 97. Courts are fully able to discern between the kinds of probative statements at issue here, and insignificant statements that have little bearing on Congress's true motive.

Defendants are also mistaken when they argue that this Court should ignore Congress's illegitimate motive because Congress also "had a legitimate purpose: to raise revenue to offset the effects of tax cuts in the Act." Defs.' Reply Br. at 20. As the Plaintiff States have explained (Compl. ¶¶ 89-97), that motive, too, is suspect, as the Plaintiff States will pay the vast majority of the revenue generated by the 2017 Tax Act, although they get the least benefits from the Act relative to other States. Congress's revenue-generating motive only highlights that Congress targeted the Plaintiff States for unequal treatment.

Even if this Court does not consider the statements of public officials, summary judgment on the Plaintiff States' equal sovereignty claim is still warranted, because there is ample additional evidence that the Plaintiff States continue to be targeted for unfavorable treatment. Most recently, the IRS published guidance undercutting one of the legislative solutions that States have enacted

to alleviate the adverse effects of the SALT deduction cap.[17] A recent audit of IRS's processes for issuing the guidance makes clear that it is targeted at the Plaintiff States: "high-ranking administration departments and officials—including the White House Office of Management and Budget, the National Economic Council and Treasury Secretary Mnuchin—all collaborated to neutralize those State efforts."[18]

Defendants argue (Defs.' Reply Br. at 22 n.15) that this guidance is irrelevant because it is "neutrally applicable." But, as explained above, Congress is not free to target the States for unequal treatment under the pretense of facial neutrality. Moreover, evidence is already emerging that the new guidance will be enforced in a discriminatory manner that favors defendants' political interests. For example, when discussing the proposed rule, Secretary Mnuchin invited small businesses to exploit a loophole that would undermine the SALT deduction cap itself—the very purpose of the guidance in the first place.[19]

---

[17] *See* Internal Revenue Service, *Guidance on Certain Payments Made in Exchange for State and Local Tax Credits*, Notice 2018-54 (May 23, 2018), https://www.irs.gov/pub/irs-drop/n-18-54.pdf. IRS subsequently proposed a rule to formally codify the guidance. *See* Contributions in Exchange for State or Local Tax Credits, 83 Fed. Reg. 43,563 (proposed Aug. 27, 2018) (to be codified at 26 C.F.R. pt. 1).

[18] Jim Tankersley, *SALT Limit Is Hitting 11 Million Tax Returns, Audit Finds*, N.Y. Times, Feb. 26, 2019, https://www.nytimes.com/2019/02/26/us/politics/treasury-salt.html.

[19] Press Release, U.S. Dep't of Treasury, *Treasury Secretary Mnuchin Statement on Clarification for Business Taxpayers: Contributions Under State and Local Tax Credit Programs Generally Deductible as Business Expenses* (Sept. 5, 2018), https://home.treasury.gov/news/press-releases/sm472.

## CONCLUSION

For all of the foregoing reasons and those stated in the Plaintiff States' complaint and prior brief, the Plaintiff States respectfully request that the Court deny Defendants' motion to dismiss and grant the Plaintiff States' cross-motion for summary judgment.

Dated: New York, New York
      March 22, 2019

STATE OF NEW YORK

LETITIA JAMES
*Attorney General*

By:  */s/ Caroline A. Olsen*

    Caroline A. Olsen
     *Assistant Solicitor General*
     caroline.olsen@ag.ny.gov
    Eric Haren
     *Special Counsel to the Solicitor General*
     eric.haren@ag.ny.gov
    Owen T. Conroy
     *Assistant Attorney General*
     owen.conroy@ag.ny.gov
    New York Office of the Attorney General
    28 Liberty Street, 23rd Floor
    New York, New York 10005
    212-416-6184 (tel.)
    212-416-8962 (fax)

    *Attorney for Plaintiff*
    *State of New York*

Barbara D. Underwood
 *Solicitor General*
 barbara.underwood@ag.ny.gov
Matthew Colangelo
 *Chief Counsel for Federal Initiatives*
 matthew.colangelo@ag.ny.gov
Steven C. Wu
 *Deputy Solicitor General*
 steven.wu@ag.ny.gov

(Signature block continues on next page)

STATE OF CONNECTICUT

   WILLIAM TONG
   *Attorney General*

By:  */s/ Mark F. Kohler*
   Mark F. Kohler*
   *Assistant Attorney General*
   mark.kohler@ct.gov
   Michael K. Skold*
   *Assistant Attorney General*
   michael.skold@ct.gov
   Connecticut Office of the Attorney General
   55 Elm Street, P.O. Box 120
   Hartford, Connecticut 06141
   860-808-5020 (tel.)
   860-808-5347 (fax)

   *Attorney for Plaintiff*
   *State of Connecticut*

STATE OF MARYLAND

   BRIAN E. FROSH
   *Attorney General*

By:  */s/ Sarah W. Rice*
   Sarah W. Rice*
   *Assistant Attorney General*
   SRice@oag.state.md.us
   Maryland Office of the Attorney General
   Civil Division
   200 St. Paul Place, 20th Floor
   Baltimore, Maryland 21202
   410-576-7847 (tel.)
   410-576-6955 (fax)

   *Attorney for Plaintiff*
   *State of Maryland*

STATE OF NEW JERSEY

   GURBIR S. GREWAL
   *Attorney General*

By:  */s/ Jeremy M. Feigenbaum*
   Jeremy M. Feigenbaum*
   *Assistant Attorney General*
   jeremy.feigenbaum@njoag.gov
   New Jersey Office of the Attorney General
   Richard J. Hughes Justice Complex
   25 Market Street, 8th Floor, West Wing
   Trenton, New Jersey 08625
   609-292-4925 (tel.)
   609-777-4015 (fax)

   *Attorney for Plaintiff*
   *State of New Jersey*

---

\* *Admitted pro hac vice.*