UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK,
STATE OF CONNECTICUT,
STATE OF MARYLAND, and
STATE OF NEW JERSEY,

                              Plaintiffs,

                    -v-

STEVEN T. MNUCHIN, *in his official
capacity as Secretary of the United States
Department of Treasury*, UNITED
STATES DEPARTMENT OF
TREASURY, DAVID J. KAUTTER, in
his official capacity as Acting
Commissioner of the Internal Revenue
Service, UNITED STATES INTERNAL
REVENUE SERVICE, and the UNITED
STATES OF AMERICA,

                              Defendants.

18-CV-6427 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

On December 22, 2017, President Trump signed into law the Tax Cuts and Jobs Act,[1]

Pub. L. No. 115-97, 131 Stat. 2054 (2017), which made several substantial amendments to the

federal Tax Code.  Among other things, the Act took the novel step of placing an upper limit on

the amount a taxpayer may deduct from her federally taxable income to offset those sums she has

paid toward certain state and local taxes (the "SALT cap").  *Id.* § 11042, 131 Stat. at 2085–86.

Concerned that the introduction of the SALT cap could impair their ability to pursue their

own preferred tax policies, four Plaintiff States — Connecticut, Maryland, New Jersey, and New

---

[1] The Act is more formally denominated "An Act to Provide for Reconciliation Pursuant
to Titles II and V of the Concurrent Resolution on the Budget for Fiscal Year 2018."

York (the "States") — filed this suit against the federal government (the "Government"),

alleging that the SALT cap violates the federalism principles that undergird the U.S.

Constitution.[2]  (Dkt. No. 1.)  The Government has moved to dismiss, contending that this Court

lacks jurisdiction over the suit and that the States have failed to state a valid legal claim.  (Dkt.

No. 42.)  The States, in turn, have filed a cross-motion for summary judgment.  (Dkt. No. 44.)

For the reasons that follow, the Government's motion to dismiss is granted and the States' cross-

motion is denied.

## I.      Background

The Court begins its treatment of this case's background by providing some historical

context regarding the federal government's taxing power and the deduction affected by the

SALT cap.  The Court then describes the enactment of the SALT cap and the public discussion

around it.  Finally, the Court explains the path this litigation has traveled to date.

### A.      Historical Background

The federal government derives its authority to "lay and collect Taxes" from Article I,

section 8 of the U.S. Constitution.  U.S. Const. art. I, § 8, cl. 1.  But, as all taxpayers well know,

this grant of authority has not displaced the concurrent taxing power of the states.  *See Gamble v.*

*United States*, 139 S. Ct. 1960, 1969 (2019) (citing taxation as an example of dual state-federal

regulation "that comes immediately to mind").  Nor was it intended to do so.  As the Constitution

was being ratified, the Framers attempted to address concerns about the scope of the proposed

federal tax authority by reassuring the public that although a federal law "laying a tax for the use

of the United States would be supreme in its nature, and could not legally be opposed or

---

[2] The defendants here, more specifically, are the United States, the U.S. Internal Revenue
Service and its Commissioner, and the U.S. Department of Treasury and its Secretary.

controlled," a federal law "for abrogating or preventing the collection of a tax laid by the authority of the State . . . would not be the supreme law of the land, but a usurpation of power not granted by the Constitution."  The Federalist No. 33 (Alexander Hamilton); *see also* Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 7 (1999) (describing ratification-era fears that the Constitution's "wide grant of taxing authority" would "centraliz[e] tyranny").  Soon after ratification, the introduction of the Tenth Amendment created an explicit textual guarantee "reserv[ing] to the States respectively, or to the people," any "powers not delegated to the United States by the Constitution, nor prohibited by it to the States."  U.S. Const. amend. X.

In the nation's early years, the federal government wielded its taxing power with relative modesty, collecting virtually all its revenue from customs duties alone.  *See* Aaron T. Knapp, *The New Jersey Plan and the Structure of the American Union*, 15 Geo. J.L. & Pub. Pol'y 615, 643 (2017).  There were, to be sure, a few early, unpopular efforts to implement limited excise and property taxes, as well as the occasional temporary tax designed to plug wartime revenue gaps, but up through the first half of the nineteenth century the federal government generally steered wide of taxes that reached within the states' borders.[3]  *See id.*; William E. Foster, *Partisan Politics and Income Tax Rates*, 2013 Mich. St. L. Rev. 703, 707–08 & n.27.  Indeed, from the end of the War of 1812 until the Civil War, "[t]here were no federal income taxes, direct taxes, or excise taxes — in short, no internal taxes of any kind."  Anuj C. Desai, *What a History of Tax Withholding Tells Us About the Relationship Between Statutes and Constitutional Law*, 108 Nw. U. L. Rev. 859, 871 (2014).

---

[3] The fact that early Congresses did not tax more aggressively does not mean that they never considered doing so.  One bill proposed during the War of 1812, for example, would have directed the Committee of Ways and Means to "inquire into the expediency" of instituting a federal income tax, although it would have limited the objects of taxation to "such capital or employments as [were] not taxed by any existing laws."  28 Annals of Cong. 1079 (1815).

The financial burdens of the Civil War, though, "necessitated a dramatic shift in federal tax policy," *id.*, and the result was "the first federal income tax in U.S. history," *id.* at 872.  As initially enacted in 1861, that tax imposed a 3% levy on annual income over $800 but provided that, "in estimating [taxable] income, all national, state, or local taxes assessed upon the property, from which the income is derived, shall be first deducted."  Act of Aug. 5, 1861, ch. 45, § 49, 12 Stat. 292, 309.  While the specifics of the tax underwent several modifications over the years it was in effect, the deduction for state and local taxes remained substantially intact. *See* Act of July 1, 1862, ch. 119, § 91, 12 Stat. 432, 473–74; Act of June 30, 1864, ch. 173, § 117, 13 Stat. 223, 281; Act of Mar. 3, 1865, ch. 78, 13 Stat. 469, 749; Act of Mar. 2, 1867, ch. 169, § 13, 14 Stat. 471, 478; Act of July 14, 1870, ch. 255, § 9, 16 Stat. 256, 258.

Shortly after the Civil War, in 1872, the federal income tax was left to lapse, and "the nation returned to reliance on tariffs and excises to fill the federal coffers."  Foster, *Partisan Politics and Income Tax Rates*, 2013 Mich. St. L. Rev. at 710 n.40.  But by 1894, rising popular support for progressive taxation prompted Congress to give the federal income tax another go. *Id.* at 710–11.  The resulting tax, like its predecessors, excluded "all national, State, county, school, and municipal taxes, not including those assessed against local benefits," from taxable income.  Act of Aug. 27, 1894, ch. 349, § 28, 28 Stat. 509, 553.  And, like its predecessors, the tax enacted in 1894 was short lived.  The very next year, in *Pollock v. Farmers' Loan & Tr. Co.*, 157 U.S. 429 (1895), the Supreme Court held that the federal income tax violated the constitutional requirement that any "direct" taxes be apportioned among the states in relation to their relative populations, *id.* at 582–83; *see also* U.S. Const. art. I, § 9, cl. 9 ("No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken.").

*Pollock* drew a backlash and, with it, a push to eliminate the apportionment requirement that had scuppered Congress's 1894 efforts. *See* Erik M. Jensen, Murphy v. Internal Revenue Service*, the Meaning of "Income," and Sky-Is-Falling Tax Commentary*, 60 Case W. Res. L. Rev. 751, 770–71 (2010).  Thus, in 1909, Congress passed a proposed constitutional amendment that would guarantee it the "power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several states, and without regard to any census or enumeration."  U.S. const. amend. XVI.  Of course, the proposed amendment had its detractors. For example, New York's then-Governor, Charles Evans Hughes, opposed ratification out of concern that it would allow the federal government to tax income derived from state or municipal bonds.[4]  *See* Marjorie E. Kornhauser, *The Origins of Capital Gains Taxation: What's Law Got to Do with It?*, 39 Sw. L.J. 869, 918 n.295 (1985).  And state legislators from Virginia and Georgia described their (at times racist) fears that the amendment would permit federal intrusion into state matters.  *See* Robin L. Einhorn, *Look Away Dixieland: The South and the Federal Income Tax*, 108 Nw. U. L. Rev. 773, 792–94 (2014).  But such hesitations were unavailing, and upon the proposed amendment's 1913 ratification, the Sixteenth Amendment became the law of the land.

Congress wasted little time in flexing its newly defined taxing authority.  On October 3, 1913, it enacted the first federal income tax of the twentieth century.  Act of Oct. 3, 1913, ch. 16, § II, 38 Stat. 114, 166–81.  That tax, like its nineteenth-century forebears, deducted from taxable

---

[4] William Borah, a U.S. Senator from Idaho, responded to Governors Hughes' concerns by expressing his view that the Constitution would not permit federal taxation of state and local bond income notwithstanding the proposed amendment because, "however full the grant of power of taxation might be in the Constitution, there must always be subtracted from that power the right of the different [state] sovereignties to perform their functions as such."  45 Cong. Rec. 1696 (1910).  Other federal legislators expressed similar views.  (*See, e.g.*, Dkt. No. 47-20.)

income "all national, State, county, school, and municipal taxes paid within the year, not including those assessed against local benefits." *Id.* § II(B), 38 Stat. at 167. And from then to now, some form of state and local tax deduction (a "SALT deduction"), has been a mainstay of the federal Tax Code. (*See* Dkt. Nos. 54-28 to 54-83.) As the House Committee on Ways and Means explained in 1963, the deduction "represents an important means of accommodation where both the State and local governments on one hand and the Federal Government on the other hand tap th[e] same revenue source." H.R. Rep. No. 88-749, at 48 (1963).

Notwithstanding its baseline durability, the SALT deduction has taken various forms over the years. *See* Gladriel Shobe, *Disaggregating the State and Local Tax Deduction*, 35 Va. Tax Rev. 327, 337–39 (2016) (detailing the deduction's post-1913 history) (hereinafter, "Shobe, *Disaggregating*"). For one thing, the 1944 enactment of a standard deduction — a predetermined sum that taxpayers may elect to deduct from their taxable income in lieu of itemizing their specific deductible expenses — meant that, in practice, the SALT deduction remained relevant for only those taxpayers who chose to itemize their deductions. *See* Individual Income Tax Act of 1944, Pub. L. No. 78-315, § 9, 58 Stat. 231, 236–38. And even beyond making general changes to the federal tax scheme that indirectly influence the role of the SALT deduction, Congress has from time to time amended the deduction directly. In 1964, for example, Congress "enumerated the types of [state and local] taxes that were deductible and disallowed a deduction for any other state and local taxes," thus departing from the earlier rule that "all state and local taxes were deductible unless specifically disallowed." Shobe, *Disaggregating*, 35 Va. Tax Rev. at 338; *see also* Revenue Act of 1964, Pub. L. No. 88-272, § 207, 78 Stat. 19, 40. And in 1986 (in a move that has since been walked back) Congress

eliminated the deduction for state and local sales taxes.[5]  Tax Reform Act of 1986, Pub. L. No. 99-514, § 134, 100 Stat. 2085, 2116; *see also* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 501, 118 Stat. 1418, 1520–21 (partially reinstating the state and local sales tax deduction).

Matters continued thus into the twenty-first century, with the SALT deduction standing as an enduring component of the federal tax scheme, subject to periodic refinement.  As the law stood at the beginning of December 2017, just prior to the enactment of the SALT cap, taxpayers who chose to itemize their deductions could typically deduct from their federally taxable income, among other things, (1) all state and local real and personal property taxes and (2) their choice of all state and local income taxes or all state and local sales taxes.  26 U.S.C. §§ 164(a)(1)–(3), (b)(5) (effective Dec. 18, 2015 to Dec. 21, 2017).

## B.    The SALT Cap

The 2017 Tax Cuts and Jobs Act changed the ballgame.  After its enactment, a taxpayer could, as before, claim a federal tax deduction for (1) state and local real and personal property taxes and (2) a choice of state and local income taxes or state and local sales taxes.  26 U.S.C. §§ 164(a)(1)–(3), (b)(5).  But the newly enacted catch was that these claimed deductions could not total any more than $10,000 for single or jointly filing married taxpayers or any more than $5,000 for a married taxpayer filing separately.  *Id.* § 164(b)(6)(B).

---

[5] The 1986 amendment followed a national debate over whether Congress should repeal the SALT deduction altogether.  *See* Shobe, *Disaggregating*, 35 Va. Tax Rev. at 338–39.  Among those opposing repeal was New York's then-Governor, Mario Cuomo, who described repeal as "an attack . . . on the idea of the Republic" that "would certainly intrude on States['] rights."  *The Impact of Repeal of the Deductions for State and Local Taxes: Hearings Before the Subcomm. on Monetary and Fiscal Policy of the J. Econ. Comm.*, 99th Cong. 87 (1985).

The States represent that the introduction of this ceiling has fundamentally altered the tax landscape.  New York claims, for example, that those of its taxpayers who itemize deductions claimed an average SALT deduction of $21,943 prior to the introduction of the cap.  (Dkt. No. 46 ¶ 33.)  But because the cap now prevents taxpayers from deducting even half that amount, New York predicts that its taxpayers will in many cases see their federal tax bills rise and will, in all, end up paying a total of $121 billion more into the federal coffers between 2018 and 2025 than they would have paid absent the cap.  (Dkt. No. 46 ¶ 50.)  Connecticut, Maryland, and New Jersey have concerns as well.  Among the three of them, they estimate that in 2018 alone their taxpayers paid $7.5 billion more to the federal government than they would have paid without the cap.  (Dkt. No. 46 ¶¶ 51–53.)  Such tax hikes, moreover, are not spread evenly across the nation.  Because the cap's effect on any given taxpayer depends on whether her state and local tax bill exceeds the $10,000 (or $5,000) ceiling, taxpayers in states and localities with higher taxes will, on average, feel a greater financial pinch as a result of the cap than will taxpayers in states and localities with lower taxes.  And taxpayers in the Plaintiff States here fall into the former category.  All in all, the States allege that, nationwide, they have "the highest percentages of taxpayers whose federal tax burden increased under the 2017 Tax Act."  (Dkt. No. 46 ¶ 47.)

Further, the States maintain, the exclusively Republican legislators who voted to enact the SALT cap — and the Republican president who signed it into law — *intended* this differential impact.  According to the States, the cap's "true purpose" was "to coerce a handful of States with relatively high taxpayer-funded public investments — States that are primarily Democratic leaning — to change their tax policies."  (Dkt. No. 1 ("Compl.") ¶ 107.)  If there were doubt on that point, the States believe, one need only listen to the cap's supporters.  For example, former House Speaker Paul Ryan has said that the cap would lead people in high-tax

states to "see their true cost of government."  Mike DeBonis, *To Make Their Tax Plan Work,*
*Republicans Eye a Favorite Blue-State Break*, Wash. Post, Sept. 16, 2017.  And President Trump
has said that the cap would encourage citizens to "make sure that [their] politicians do a good job
of running [their] state."  *President Trump Vows Largest Tax Cut in the History of This Country*,
Fox News, Oct. 11, 2017.  Other members of Congress and the executive branch have expressed
similar views.  *See, e.g.*, *First on CNBC: Transcript: Treasury Secretary Steven Mnuchin Speaks*
*with CNBC's "Squawk Box" Today*, CNBC, Oct. 12, 2017 (Treasury Secretary Steven
Mnuchin's statement that the cap would spare the federal government from "continu[ing] to
subsidize the states"); *Rep. Duncan Hunter Said GOP Tax Bill Could Cost Californians More*
*than Others, but He Still Supports It*, San Diego Union Tribune, Oct. 30, 2017 (Representative
Duncan Hunter's statement that the new tax law would "not [be] as good" for "California, New
Jersey, New York and other states that have horrible governments"); Sahil Kapur, *'Death to*
*Democrats': How the GOP Tax Bill Whacks Liberal Tenets*, Bloomberg, Dec. 5, 2017 (Senator
Ted Cruz's statement that he hoped the SALT cap would make "state and local officials . . . less
eager to jack up the taxes on hard working Americans").

Being among the states thus supposedly targeted, the Plaintiff States here resolved to take
responsive action — and so they found their way to federal court.

## C.   Procedural Background

The States filed this suit on July 17, 2018.  (Dkt. No. 1.)  According to their complaint,
the SALT cap "disregards Congress's hitherto unbroken respect for States' distinct and
inviolable role in our federalist scheme" and "deliberately seeks to compel certain States to
reduce their public spending."  (Compl. ¶ 1.)  In doing so, the complaint maintains, the cap falls
foul of the "structural constraints" that the Constitution, through Article I, section 8 and the
Tenth and Sixteenth Amendments, places "on the federal government's ability to use its tax

power to interfere with the sovereign authority of the States to determine their own taxation and fiscal policies."  (Compl. ¶ 117; *see also id.* ¶¶ 124–140.)  The States thus seek a declaration that the cap is unconstitutional and an injunction that bars the Government from enforcing it. (Compl. at 50.)

On November 2, 2018, the Government moved to dismiss for lack of jurisdiction and for failure to state a valid legal claim.  (Dkt. No. 42.)  The States opposed the motion and filed a cross-motion for summary judgment.  (Dkt. No. 44.)  Briefing was complete as of March 22, 2019 (*see* Dkt. Nos. 43, 45, 53, 57), and the Court held oral argument on the motions on June 18, 2019 (Dkt. No. 61).  The parties have ably presented the case, and the Court is prepared to rule.

## II.    Legal Standards

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) allow a party to move to dismiss a complaint for, respectively, lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(1), 12(b)(6).  When deciding a Rule 12(b)(1) or 12(b)(6) motion, a court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Lubrano v. United States*, 448 F. App'x 159, 159 (2d Cir. 2012) (summary order) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  A case may be dismissed for lack of jurisdiction under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it," *id.* (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)), and a case may be dismissed for failure to state a claim under Rule 12(b)(6) if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face," *id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Federal Rule of Civil Procedure 56(a), meanwhile, requires a court to grant summary judgment in favor of a moving party if that party can demonstrate that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, a fact is "material" if it "might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When assessing a summary judgment motion, "a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Id.*

## III.   Discussion

The Court begins, as it must, by considering whether this case falls within its subject-matter jurisdiction. The Court then turns to the merits.

### A.      Jurisdiction

The Government raises three challenges to this Court's subject-matter jurisdiction. First, it argues that the States lack standing to bring the claims they have asserted. (Dkt. No. 43 at 9–14.) Second, it argues that the Anti-Injunction Act, 26 U.S.C. § 7421(a), strips this Court of jurisdiction. (Dkt. No. 43 at 14–17.) Third, it argues that the case presents a nonjusticiable political question. (Dkt. No. 43 at 17–18.) The Court addresses these arguments in turn.[6]

---

[6] Thomas Scambos has filed an *amicus* brief raising a fourth argument as to why this Court lacks subject-matter jurisdiction over this case. (Dkt. Nos. 32–33.) His argument invokes Article III, section 2 of the U.S. Constitution, which provides in relevant part that, "[i]n all cases . . . in which a state shall be party, the Supreme Court shall have original jurisdiction." U.S. Const. art. III, § 2, cl. 2. Because plaintiffs here are states, Scambos argues, Article III, section 2 confers authority on the Supreme Court — but not the district courts — to take original jurisdiction over this case. (Dkt. No. 32 exh. 1 at 2.) Scambos, though, overlooks that where, as here, "a State is suing parties who are not other States, the original jurisdiction of [the Supreme] Court is not exclusive." *Illinois v. City of Milwaukee*, 406 U.S. 91, 101 (1972); *see also* 28 U.S.C. § 1251(b). The provision he cites therefore poses no impediment to this Court's jurisdiction.

### 1.    Standing

Article III of the U.S. Constitution provides that "[t]he judicial power" of the federal courts "shall extend" only to certain sorts of "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1.  Not every "legal dispute," though, "qualif[ies] as a genuine case or controversy" for constitutional purposes.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).  Rather, "to prevent the judicial process from being used to usurp the powers of the political branches," a plaintiff may invoke the federal courts' jurisdiction only if it shows that it has standing, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), or, in other words, that it has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination," *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

To establish the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), a plaintiff "must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury," *Massachusetts*, 549 U.S. at 517.  Here, any injuries the States suffer as a result of the SALT cap are traceable to the Government's enforcement of the cap and so would be remedied by an injunction that bars enforcement.  The remaining question for standing purposes, then, is whether the States have adequately shown "a concrete and particularized injury that is either actual or imminent."  *Id.*

The Supreme Court has recognized that "States are not normal litigants for the purposes of invoking federal jurisdiction."  *Massachusetts*, 549 U.S. at 518.  Under the *parens patriae* doctrine, for example, an injury to a state's quasi-sovereign interests, such as its interest in the "health and well-being — both physical and economic — of its residents in general," *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000) (quoting *Alfred L. Snapp & Son, Inc. v.*

*Puerto Rico*, 458 U.S. 592, 607 (1982)), may sometimes be sufficient to support the state's standing to sue "on behalf of [its] citizens," *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 119 (2d Cir. 2002).  But because the States have disclaimed any intent to sue in a *parens patriae* capacity here (Dkt. No. 45 at 7 n.6), they must show that at least one of them has suffered "a direct, tangible injury" to its own proprietary or sovereign interests, *Cahill*, 217 F.3d at 97; *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

The States identify three injuries that they contend are sufficiently concrete, particularized, and actual or imminent to support standing.  First, they claim that the SALT cap will "make it more difficult for [them] to maintain their current taxation and fiscal policies" because it "will force [them] to choose between their current level of public investments and higher tax rates."  (Compl. ¶ 15; *see also* Dkt. No. 45 at 6–8.)  Second, they claim that they "will lose specific streams of tax revenue due to the decline in home equity value and lower household spending caused by the new cap on the SALT deduction."  (Dkt. No. 45 at 8.)  Finally, they claim that they have suffered an injury to their "equal sovereignty" simply by virtue of having been "expressly targeted . . . for unequal treatment" vis-à-vis other states by Congress.  (Dkt. No. 45 at 9.)

The Court addresses only the second of these injuries, *i.e.*, the diminished tax revenues the States allege they will suffer due to the SALT cap.  The States claim that "[b]y capping the deductability of property taxes," the cap "makes homeownership more expensive and decreases the value of real estate."  (Compl. ¶ 99.)  New York, for one, estimates that its citizens will see a $63.1 billion loss of home equity due to the cap.  (*Id.*)  As a result, the States allege, homeowners

will see smaller returns when they sell their homes and, even before then, will see a drop in the value of what is, for many, "their most important asset."  (Compl. ¶ 100.)  These economic consequences, New York predicts, will lead to decreased household spending and delayed home sales and will thereby reduce its revenues from sales taxes and real estate transfer taxes.  (Compl. ¶¶ 101–102.)  Maryland and New Jersey anticipate similar results, projecting millions of dollars of lost real estate transfer tax revenue in the coming years.  (Compl. ¶¶ 103–104.)

Expected financial loss can constitute the sort of concrete and particularized injury that is capable of supporting standing.  *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019) (citing a probability of "*some* financial injury" as sufficient to establish standing).  And the states, no less than private citizens, are entitled to invoke that principle in demonstrating their standing to sue.  Most notably, the Supreme Court held in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), that a state's "loss of specific tax revenues" is a "direct injury" capable of supporting standing, *id.* at 448.  In that case, Wyoming challenged an Oklahoma law that had led certain Oklahoma power plants to decrease their use of Wyoming-mined coal.  *Id.* at 440, 445–46.  On cross-motions for summary judgment, the Supreme Court considered evidence that Wyoming's severance tax revenues had dropped since the effective date of the Oklahoma law and held on the basis of this evidence that Wyoming had standing to challenge the law.  *Id.* at 446–48.  In so holding, the Court distinguished earlier cases that had "denied standing to States where the claim was that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues."  *Id.* at 448.  None of these earlier cases, the Court explained, had identified "a direct injury in the form of a loss of *specific* tax revenues" such as the severance tax revenues Wyoming had placed at issue.  *Id.* (emphasis added).

As in *Wyoming*, the States here have cited specific revenues — most persuasively, real estate transfer tax revenues — that will allegedly be diminished absent judicial intervention. The Government attempts to paint this theory of injury as "insufficiently particular," arguing that, "under [the States'] theory, they would have standing to challenge *any* federal tax increase that generally reduced their citizens' spending power and, conceivably, their own tax revenues." (Dkt. No. 53 at 6.) But this ungenerous characterization misses the mark. At least with respect to real estate transfer taxes, the States have staked out an entirely plausible theory of injury with the requisite specificity: by effectively raising state property taxes, the SALT cap reduces the value of a homeowner's property, thereby discouraging home sales and decreasing the revenues the States are able to collect by taxing such sales. Perhaps a full evidentiary record would reveal that the States' theory of injury is not borne out by reality. But for purposes of withstanding the Government's Rule 12(b)(1) motion, the States have alleged an injury that, if proved, would give them a sufficiently concrete stake in the outcome of this suit to establish their standing.[7] *See Lujan*, 504 U.S. at 561 (noting that "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing "[a]t the pleading stage").

Nor is the Court persuaded by the Government's claim that the States' asserted financial injury is "too speculative" or insufficiently imminent for standing purposes. (Dkt. No. 43 at 13.) Certainly, "[a]llegations of *possible* future injury" cannot support standing. *Clapper*, 568 U.S. at 409 (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The

---

[7] The Court acknowledges that the States have moved for summary judgment and that the requirements for establishing standing at the summary judgment stage are more stringent than they are at the pleading stage. *See Lujan*, 504 U.S. at 561. But because the Court ultimately decides that the States' complaint must be dismissed pursuant to Rule 12(b)(6), *see infra* Section III.B, the Court does not reach the States' motion for summary judgment and so need not decide whether the States' evidentiary showing would suffice to establish standing at that stage.

Supreme Court, after all, has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,'" *id.* (quoting *Whitmore*, 495 U.S. at 158), and has rejected theories of injury that "rel[y] on a highly attenuated chain of possibilities," *id.* at 410.  But the Government here has presented the Court with no reason to doubt the "[b]asic economic logic" that supports the States' prediction that the SALT cap will reduce their real estate transfer tax intake.  *Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1198 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989)).  Under the "lenient" standard "for reviewing standing at the pleading stage," the Court concludes that the States' credible claim that the SALT cap will reduce the revenues they glean from real estate transactions by depressing their housing markets does not require the sort of "conjecture" or "unwarranted inferences" that would render a claimed injury too speculative to support standing at the motion-to-dismiss stage.  *Baur v. Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003).

Thus, by plausibly alleging that the SALT cap will decrease their real estate transfer tax revenues and that this injury can be redressed through the declaratory and injunctive relief they seek in this litigation, the States have established their standing for purposes of withstanding the Government's Rule 12(b)(1) motion.  In light of this conclusion, the Court need not decide whether the States' two other alleged injuries — *i.e.*, pressure to change their tax policies and an injury to their equal sovereignty — are viable grounds for establishing standing here.

### 2.      Anti-Injunction Act

The Government next argues that the Anti-Injunction Act ("AIA") bars the States' suit. With exceptions not relevant here, the AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).  In other words, the AIA "withdraw[s] jurisdiction from the state and federal courts to entertain suits

seeking injunctions prohibiting the collection of federal taxes," *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5 (1962), thereby "permit[ting] the United States to assess and collect taxes alleged to be due without judicial intervention, and . . . requir[ing] that the legal right to the disputed sums be determined in a suit for refund," *id.* at 7.  Because the States here seek to enjoin enforcement of the SALT cap (*see* Compl. at 50), the Government argues that the AIA strips this Court of jurisdiction over their claims (Dkt. No. 43 at 14–17).

The Government's argument cannot square with the Supreme Court's opinion in *South Carolina v. Regan*, 465 U.S. 367 (1984).  In *Regan*, the Court considered South Carolina's challenge to the elimination of a federal tax exemption that had formerly excluded interest earned on state-issued bearer bonds from federally taxable income.[8]  *Id.* at 370–71.  The federal government argued in that case that the AIA barred South Carolina's claims, *id.* at 370, but the Court saw things differently, holding that the AIA was "not intended to bar an action where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax," *id*. at 373.  Because South Carolina had no "alternative avenue . . . to litigate its claims on its own behalf," the Court concluded that the state's injunctive suit could go forward.  *Id.* at 381.

As in *Regan*, the parties here have identified no mechanism other than an injunctive suit by which the States might "on [their] own behalf" challenge the legality of the SALT cap.  *Id.* Instead, the Government argues that the States might be able to seek relief by persuading one of their aggrieved taxpayers to challenge the SALT cap in a refund action.  (Dkt. No. 43 at 16–17.)

---

[8] Bearer bonds, one of the two forms in which states have historically issued bonds, are characterized by their "mechanisms used for transferring ownership and making payments." *South Carolina v. Baker*, 485 U.S. 505, 508 (1988).  Specifically, "[o]wnership of a bearer bond . . . is presumed from possession and is transferred by physically handing over the bond," and the holder of a bearer bond can obtain interest payments "by presenting bond coupons to a bank that in turn presents the coupons to the issuer's paying agent." *Id.*  The other traditional type of bond — the registered bond — operates differently.  *See id.*

In the Government's view, *Regan* was a unique case in which there was "no reason why any individual taxpayer would have the incentive to challenge" the law eliminating the exemption for bearer-bond interest because the law was designed to discourage states from issuing bearer bonds in the first place.  (Dkt. No. 53 at 7.)  Because the States' individual taxpayers here, in contrast, will continue to pay state and local taxes regardless of the law affecting the federal deduction, the Government claims that those taxpayers will have every reason to bring post-payment refund actions challenging the law and that *Regan* therefore does not apply.  (Dkt. No. 43 at 15–16.)

The Government's narrow understanding of *Regan* finds no support in the opinion itself. In *Regan*, the Court framed its analysis by noting that its earlier AIA cases dealt with situations in which "the plaintiff had the option of paying [a challenged] tax and bringing a suit for a refund," and that existing case law had thus not decided "whether the Act would apply to an aggrieved *party* who could not bring a suit for a refund."  *Regan*, 465 U.S. at 374 (emphasis added).  And the Court answered that question in the negative, holding in light of the AIA's "purposes and the circumstances of its enactment" that "Congress did not intend the Act to apply to actions brought by aggrieved *parties* for whom it has not provided an alternative remedy."  *Id.* at 378 (emphasis added).  Emphasizing that South Carolina's bondholders — not South Carolina itself — would "be liable for the tax on the interest earned on" state bearer bonds, *id.* at 379, the Court concluded that South Carolina was "unable to utilize any statutory procedure to contest the constitutionality" of the tax law at issue and that the AIA therefore did not bar its suit, *id.* at 380.

In reaching its conclusion, the *Regan* Court never hinted that the AIA would have applied had South Carolina been able to pursue its claims indirectly by encouraging a third party to bring suit.  Rather, *after* concluding that South Carolina's suit could proceed, the Court went on to note that its conclusion was "only *buttresse*[*d*]" by its uncertainty as to whether South Carolina could

18

"obtain judicial review of its claims by issuing bearer bonds and urging a purchaser of those bonds to bring a suit contesting the legality" of the resulting tax. *Id.* (emphasis added). And to whatever extent this uncertainty *did* inform *Regan*'s holding, the Court did not present it as a case-specific aspect of the particular tax at issue. Rather, the only explanation the *Regan* Court gave for its doubt as to whether "[South Carolina] would be able to convince a taxpayer to raise its claims," *id.*, was that the Internal Revenue Service "routinely audits the returns of taxpayers who litigate claims for refunds," *id.* at 380 n.18. It was thus *general* uncertainty over a state's ability to rely on its taxpayers that gave the Court confidence in its clear, categorical holding that "the [AIA] was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims *on its own behalf*." *Id.* at 381 (emphasis added).

That holding applies with full force here. It may well be the case that the States' taxpayers will have incentive to challenge the SALT cap in individual refund suits. But those suits will not afford the States themselves an opportunity to assert the sovereign interests that are threatened by the SALT cap. Just as South Carolina was entitled to seek to protect its own interest in issuing bearer bonds without relying on the arguments of its taxpayers, the States here need not cross their fingers and hope that future refund actions brought by third parties will adequately address their fears that the SALT cap will unlawfully interfere with their own tax policies.

Of course, the analysis would be different if the States sought in this action to assert the rights of their taxpayers — rights that the taxpayers could defend themselves in a refund action. *Regan* does not allow taxpayers to "evade the [AIA] by forming organizations to litigate their tax claims," *id.* at 381 n.19, and courts have relied on that notion to hold that the AIA bars a plaintiff that is not itself subject to a given tax from seeking injunctive relief in the hopes of "preserv[ing]

the position" of a third party that is, *RYO Machine, LLC v. U.S. Dep't of Treasury*, 696 F.3d 467,

472 (6th Cir. 2012).  The Sixth Circuit, for example, has held that the AIA barred a suit brought

by companies that hoped to enjoin an agency rule that threatened their profits by imposing a tax

on their customers.  *Id.*  And the Ninth Circuit has held that the AIA barred an American Indian

tribe from bringing an injunctive suit aimed at protecting a specific third-party tribal corporation

from the application of a federal excise tax.  *Confederated Tribes & Bands of the Yakama Indian*

*Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 811 (9th Cir. 2016).

But, as noted, the States have disclaimed any intent to invoke the rights of their citizens.

(Dkt. No. 45 at 7 n.6.)  Instead, they claim that the SALT cap violates *their own* sovereign rights

by transgressing the constitutional limits on federal power (Compl. ¶ 88) and "depriving them of

their authority to determine their own taxation and fiscal policies without federal interference"

(Compl. ¶ 86).  This claimed injury is hardly "derivative of any injury suffered by" the States'

taxpayers.  *Yakama Indian Nation*, 843 F.3d at 815.  Critically, it would persist even if the States

elected to blunt the SALT cap's effect on their taxpayers altogether by, for example, dramatically

reducing state tax rates.  Just as the AIA in *Regan* posed no obstacle to South Carolina's efforts

to seek the injunction of a federal tax law that, South Carolina claimed, deterred it from pursuing

its preferred fiscal policies — *i.e.*, the issuance of bearer bonds — the AIA poses no

jurisdictional impediment here, where the States seek to enjoin a federal tax law that, they claim,

will cause them to forego *their* preferred fiscal policies — *i.e.*, the continued imposition of

specific tax rates.

Ultimately, then, this Court concludes that the States' efforts to secure an injunction of the SALT cap in this litigation do not fall foul of the AIA's jurisdictional bar.[9]

### 3.     Political Question Doctrine

Finally, the Government argues that the present dispute simply lies beyond the scope of judicial cognizance and so is barred by the political question doctrine.  (Dkt. No. 43 at 17–18.)

The political question doctrine creates a "narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).  The doctrine bars a court from resolving a dispute over which it would otherwise have jurisdiction if the dispute "involves a political question . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"  *Id.* (alteration in original) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  The Government neither does nor plausibly could argue that the Constitution commits responsibility for policing the limits of federal tax authority vis-à-vis the states to the legislative and executive branches alone.  *See, e.g.*, *Baker*, 485 U.S. at 511–15 (resolving a Tenth Amendment challenge to a federal tax).  Accordingly, this Court need only ask whether there exist judicially discoverable and manageable standards for resolving the dispute before it.

To decide whether such standards exist, the Court must first identify the specific issue it is being asked to resolve.  The Court is guided in this analysis by the Supreme Court's decision in *Zivotofsky*.  In that case, an American born in Jerusalem asked to have "Israel" rather than "Jerusalem" listed as the place of birth on his passport.  566 U.S. at 191.  Although a federal

---

[9] In light of this conclusion, the Court need not address the States' argument that states are not the sort of "person[s]," 26 U.S.C. § 7421(a), that are subject to the AIA in the first place (Dkt. No. 45 at 10 n.12).

statute entitled him to have his request granted, the State Department refused to comply, citing

its "longstanding policy of not taking a position on the political status of Jerusalem."  *Id.*

Litigation ensued, and the State Department sought dismissal on political question grounds.  *Id.*

The Supreme Court was unmoved.  *Id.* at 201.  While the Court accepted that framing the case

"in terms of whether the Judiciary may decide the political status of Jerusalem" would raise

justiciability concerns, *id.* at 197, the Court explained that such a framing would

"misunderstand[] the issue presented," *id.* at 195.  The case did not ask the courts "to supplant a

foreign policy decision of the political branches with [their] own unmoored determination of

what United States policy toward Jerusalem should be," but instead asked them only to conduct

the "familiar judicial exercise" of interpreting the federal statute at issue and gauging its

constitutionality.  *Id.* at 196.  Far from "turn[ing] on standards that defy judicial application," this

task demanded the sort of "examination of . . . textual, structural, and historical evidence" that is

well within the judicial purview.  *Id.* at 201 (quoting *Baker*, 369 U.S. at 211).

  So too here.  This is not a case that asks the courts to resolve a matter of opinion.  *See*

*Padavan v. United States*, 82 F.3d 23, 27 (2d Cir. 1996) (concluding that courts lack standards

for adjudicating "the question [of] whether immigration control is a failure").  Nor is it a case

that asks courts to undertake an "unprecedented intervention in the American political process"

that could end up demanding quintessentially political, rather than legal, judgment calls.  *Rucho*

*v. Common Cause*, 139 S. Ct. 2484, 2498 (2019) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 306

(2004) (Kennedy, J., concurring in judgment)).  Nor yet is it a case in which there is simply no

law to apply.  *See 767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Fed. Republic of*

*Yugoslavia*, 218 F.3d 152, 161 (2d Cir. 2000) (finding no legal basis for deciding what successor

liabilities follow upon the dissolution of a nation state).  This case, instead, asks this Court to use

familiar tools of constitutional interpretation to decide whether a specific statute oversteps the bounds of federal authority.  "This is what courts do."  *Zivotofsky*, 566 U.S. at 201; *see, e.g.*, *New York v. United States*, 505 U.S. 144, 182 (1992) (analyzing the "constitutional plan" to resolve a claim that Congress had "exceed[ed] its authority relative to the States").

In arguing that this case demands a standardless inquiry barred by the political question doctrine, the Government simply states, without elaboration, that the States have suggested "no clear, neutral standards or criteria for deciding when a given SALT deduction limit or cap passes constitutional muster."  (Dkt. No. 43 at 17.)  But the parties' briefs, which adroitly engage a considerable body of existing precedent, give the lie to this *ipse dixit*.  Certainly, the fact that the States have had difficulty articulating just when any given SALT cap transgresses constitutional limits may have consequences for the merits of their argument that *this* SALT cap does so.  It hardly deprives this Court, however, of a neutral legal framework for assessing that argument.

In sum, this Court has little trouble concluding that this case is susceptible to judicial resolution and that the political question doctrine therefore poses no jurisdictional impediment.

## B. Merits

Having satisfied itself of its jurisdiction over this case, the Court turns to the merits.  The States claim that the SALT cap "violates the Tenth Amendment and the constitutional guarantees of federalism" (Compl. ¶ 129) and "exceeds Congress's powers under Article I, Section 8 of the United States Constitution" (Compl. ¶ 139) and the Sixteenth Amendment (Compl. ¶ 133).  In essence, despite invoking three distinct constitutional provisions, the States raise a single claim: that the SALT cap exceeds the federal tax power by verging into territory that is constitutionally reserved to the states.  In making this claim, the States pursue two principal lines of argument. First, they argue that the SALT deduction has a special historic status, such that *any* attempt to eliminate or substantially curtail it would upset the constitutional balance of state-federal power.

23

Alternatively, they argue that the particular statute at issue here represents an unlawful effort by Congress to wield its regulatory authority in a way that coerces specifically targeted states in the exercise of their sovereign powers.  The Court considers these arguments in turn.

### 1.    The Constitutional Status of the SALT Deduction

The States first argue that the Constitution contains a limitation on the federal tax power that would bar *any* congressional effort to tax a substantial portion of the sums a taxpayer has paid toward state and local taxes.  (Dkt. No. 45 at 14–26.)  While acknowledging that no such limitation appears in the Constitution's text, the States argue that the limitation can nonetheless be "inferred from the 'essential postulates' of the Constitution's history and structure."  (Dkt. No. 45 at 14 (quoting *Printz v. United States*, 521 U.S. 898, 918 (1997)).)  In particular, the States recount the SALT deduction's "extraordinarily long and consistent history" and urge the Court to conclude that it has been Congress's "constitutionally grounded views about state sovereignty and the limits of federal taxing power" that have driven it to include a "near-total SALT deduction" in every prior version of the federal income tax.  (Dkt. No. 45 at 15.)

The States are correct that the SALT cap is in some ways unprecedented.  As the Court has already explained, the availability of an uncapped deduction for state income and property taxes (albeit not for state sales taxes) has been a mainstay of the federal income tax since that tax's earliest inception.  Certainly, as the Government points out, Congress has over the years altered what sorts of state and local taxes are eligible for deduction and has made changes to the structure of the Tax Code that, as a practical matter, have limited the amount of state and local tax liabilities that certain taxpayers can fruitfully deduct.  (Dkt. No. 43 at 26–28.)  The Government, though, has identified no prior statute that has "*directly* limit[ed] the deduction for state and local income and property taxes" to a specifically identified dollar amount.  (Dkt. No. 45 at 21.)

And the States are further correct that when "there is no constitutional text speaking to [a] precise question," courts may seek an answer in, among other things, "historical understanding and practice." *Printz*, 521 U.S. at 905. So, for example, in *Printz v. United States*, the Supreme Court, when invalidating a federal law that required state and local law enforcement officers to perform background checks on potential handgun purchasers, found it relevant that "compelled enlistment of state executive officers for the administration of federal programs [was], until very recent years . . . , unprecedented." *Id.* at 905. And in *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010), the Supreme Court cited the historical novelty of a statute that placed unprecedented restrictions on the President's ability to remove certain executive-branch officers as a sign of unconstitutionality, *see id.* at 505–06.

Mere "[l]egislative novelty," however, "is not necessarily fatal." *Nat'l Fed. of Indep. Business v. Sebelius* (*NFIB*), 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.). Even if historic practice "tends to negate the existence of [an asserted] congressional power," practice alone is "not conclusive." *Printz*, 521 U.S. at 918. Rather, courts look to historic practice to inform their understanding of the structural limitations that ultimately arise from the Constitution itself. In *Printz*, then, the novelty of the law at issue was instructive only insofar as it clarified how the constitutionally enshrined "division of power between State and Federal Governments" had historically been viewed. *Id.* at 922. And in *Free Enterprise Fund*, the Court considered past legislative practice not for its own sake, but only as an aid in understanding the scope of "[t]he executive power" that the Constitution explicitly vests in the President. *Free Enter. Fund*, 561 U.S. at 492 (alteration in original) (quoting U.S. Const. art. II, § 1, cl. 1).

Instead of looking at the SALT cap's novelty alone, then, this Court must ask whether the fact that Congress has not previously imposed such a cap arises out of a structural limitation built

into the constitutional plan.  And this is where the States run into trouble.  The Supreme Court

has held that Article I, section 8, from which the federal government derives its power to "lay

and collect Taxes," U.S. Const. art. I, § 8, cl. 1, "is exhaustive and embraces every conceivable

power of taxation," *Brushaber v. Union Pac. R.R. Co.*, 240 U.S. 1, 12 (1916), including the

power "to lay and collect income taxes," *id.* at 13.  Accordingly, Congress holds "plenary power

under the Constitution to tax income and to grant exemptions from that tax."  *Lyeth v. Hoey*, 305

U.S. 188, 194 (1938).  That plenary power "knows no restriction except where one is expressed

in or arises from the Constitution."  *United States v. Bennett*, 232 U.S. 299, 306 (1914).

The States have cited no constitutional principle that would bar Congress from exercising

its otherwise plenary power to impose an income tax without a limitless SALT deduction.  In the

main, they rely on the notion that the Tenth Amendment preserves states' "power to tax all

property, business, and persons, within their respective limits," *Thomson v. Union Pac. R.R. Co.*,

76 U.S. 579, 591 (1869), and so bars "improper [federal] interference with the [s]tates' taxing

power" (Dkt. No. 45 at 16).  Even absent an uncapped SALT deduction, though, states remain

free to exercise their tax power however they wish.  To be sure, the SALT cap, like any other

feature of federal law, makes certain state and local policies more attractive than others as a

practical matter.  But the bare fact that an otherwise valid federal law necessarily affects the

decisional landscape within which states must choose how to exercise their own sovereign

authority hardly renders the law an unconstitutional infringement of state power.[10]  *Cf. Garcia v.*

*San Antonio Metro. Transit Auth.*, 469 U.S. 528, 552 (1985) ("State sovereign interests . . . are

---

[10] To be sure, the States argue that the particular SALT cap at issue here represents a
uniquely coercive exercise of federal power, and that the burdens it imposes on state regulatory
authority go beyond the sort of incidental effects that any other federal law might create.  (Dkt.
No. 45 at 26–36.)  The Court addresses that argument below.  *See infra* Section III.B.2.

more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power."); *Goldin v. Baker*, 809 F.2d 187, 191 (2d Cir. 1987) (considering a Tenth Amendment challenge to a federal tax on certain income and rejecting it on the ground that "the power to tax private income has been expressly delegated to Congress" (quoting *Regan*, 465 U.S. at 418 (Stevens, J., concurring in part and dissenting in part))).

The Supreme Court's opinion in *South Carolina v. Baker* dispels any remaining doubt on this point.  In *Baker*, the Court rejected the claim that Congress had overstepped its constitutional authority when it eliminated a longstanding federal tax exemption for interest earned on state-issued bearer bonds.  *Baker*, 485 U.S. at 527.  Despite the "historical fact that Congress ha[d] always exempted state bond interest from taxation by statute, beginning with the very first federal income tax statute," *id.* at 523, the Court rejected the idea that this exemption had been "frozen into the Constitution," *id.* at 522 n.13.  Concluding that nothing in the Constitution itself *mandated* the longstanding exemption that Congress had previously seen fit to offer as a matter of grace, the Court perceived no constitutional flaw in the law that did away with the exemption, *id.* at 527, notwithstanding the dissent's concern that the law could have "devastating effects . . . on state and local governments," *id.* at 533 (O'Connor, J., dissenting).

That case governs here.  As in *Baker*, the parties seeking to impose a limitation on the federal government's plenary tax power in this case have made a strong showing that Congress has historically exempted certain income from federal taxation.  But also as in *Baker*, those parties have failed to identify a persuasive basis for reading such an exemption into the Constitution itself.  If anything, *Baker* presented a better opportunity for recognizing a

constitutionally rooted limitation on the federal tax authority than this case does.  This is true for two reasons.

First, *Baker* addressed past legislative practice that was more consistent than the historic practice upon which the States rely here.  Prior to the law at issue in *Baker*, Congress had never before taxed interest earned on state-issued bonds, making the challenged law a stark historical outlier.  *See Baker*, 485 U.S. at 523.  Here, however, although a direct cap on the deduction for sums paid toward state and local income and property taxes is a legislative novelty, Congress has previously limited the deduction for state and local *sales* taxes, *see* 100 Stat. at 2116, and has in the past, moreover, indirectly limited the SALT deduction altogether for certain taxpayers.  In 1990, for example, Congress enacted the Pease limitation, under which taxpayers with adjusted gross incomes over a certain threshold were required to apply a specified reduction to the total amount they claimed in itemized deductions.[11]  *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11102, 104 Stat. 1388, 1388-406 (codified at 26 U.S.C. § 68).  And the Pease limitation has been upheld as constitutional over objections that it exceeded Congress's lawful tax authority by effectively limiting the SALT deduction.  *Campbell v. United States*, No. 00 Civ. 4746, 2001 WL 1262934, *2–4 (S.D.N.Y. Oct. 22, 2001), *aff'd*, 45 F. App'x 50 (2002).

 Second, the relevant historical record in *Baker* betrayed express legislative doubt as to the constitutionality of limiting the deduction at issue.  As the Court has explained, the issue of whether the Sixteenth Amendment allowed Congress to tax interest earned on state-issued bonds was a source of explicit uncertainty during the ratification debates.  *See supra* Section I.A & n.4.  The States point to no comparable evidence that shows that the SALT deduction has historically

---

[11] The Tax Cuts and Jobs Act has suspended the Pease limitation for any taxable year beginning after December 31, 2017, and before January 1, 2026.  *See* Tax Cuts and Jobs Act, Pub. L. No. 115-97, § 11046, 131 Stat. at 2088 (codified at 26 U.S.C. § 68(f)).

been seen as constitutionally required.  Legislators, of course, have accepted the uncontroversial proposition that Congress may not directly interfere with the states' exercise of their sovereign tax powers.  *See* 45 Cong. Rec. 1696 (1910) (noting one Senator's view that "there must always be subtracted from" the federal tax power "the right of the different [state] sovereignties to perform their functions as such").  But, as set out above, a SALT cap does not necessarily work such interference.  And while the States highlight legislative statements that reference the SALT deduction in connection with states' rights, *see supra* note 5, these sparse, ambiguous references to federalist principles fail to demonstrate a widely held, longstanding view that, in including an uncapped SALT deduction in every past federal income tax, Congress has been responding to a constitutional imperative rather than making an accommodating policy choice.  Indeed, one of the Founding-era sources the States have cited took the view that if dual state-federal taxation under the new Constitution led to the "improper accumulation of taxes on the same object," the result "would be a mutual inconvenience, not arising from a superiority or defect of power on either side, but from an *injudicious* exercise of power by one or the other."  The Federalist No. 33 (Alexander Hamilton) (emphasis added).  It then expressed a "hope[]" that "*mutual interest*," rather than legal mandate, "would dictate a concert in this respect."  *Id.* (emphasis added).

The Court recognizes that the SALT cap is in many ways a novelty.  But the States have failed to persuade the Court that this novelty alone establishes that the SALT cap exceeds Congress's broad tax power under Article I, section 8 and the Sixteenth Amendment.

### 2.    Coercion

Unable to establish that a dollar cap on the SALT deduction is unlawful *per se*, the States next pursue a narrower argument that takes aim at the specific cap enacted here.  Put briefly, the States argue that the purpose and effect of *this* SALT cap is to coerce certain targeted states into

bringing their tax policies in line with the federal government's preferences. (Dkt. No. 45 at 26–36.) And this sort of targeted coercion, the States maintain, violates the Constitution. (*Id.*)

The States' coercion argument rests on the principle that the Tenth Amendment restricts Congress's ability to "direct or otherwise motivate the States to regulate in a particular field or a particular way." *New York*, 505 U.S. at 161. Most fundamentally, "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)). And just as Congress may not "directly . . . compel the States" to implement a federal program, *id.* at 166, it exceeds the scope of its constitutional authority if it "indirectly coerces a State to adopt a federal regulatory system as its own," *NFIB*, 567 U.S. at 578 (plurality opinion).

The States contend that this principle applies here. Although they have not identified any specific federal policy that the SALT cap is designed to coerce them into adopting, they allege that the cap constitutes an effort to disincentive them, in general terms, from imposing high tax rates. (Dkt. No. 45 at 26–29.) Worse yet, they go on, this coercive effect is no mere incident of an otherwise innocent piece of legislation. To the contrary, they argue, Congress *intended* that the SALT cap would effectively compel certain disfavored, high-taxing states to alter their tax policies. (Dkt. No. 45 at 29–33.) Thus, the States conclude, the SALT cap not only works an unlawful coercive effect in violation of the Tenth Amendment, but it does so in a disparate manner that violates the constitutional principle of equal sovereignty among the states. (*Id.*)

As an initial matter, this Court declines to speculate on Congress's motives in passing the SALT cap. Even assuming, favorably to the States, that Congress enacted the cap in the hopes of prompting states to lower their taxes, the Supreme Court's opinion in *South Dakota v. Dole*, 483

U.S. 203 (1987), makes clear that an otherwise valid federal law does not offend the Constitution simply because it seeks to affect state policies.  In *Dole*, the Court rejected a claim that Congress had exceeded its constitutional authority by directing the Secretary of Transportation to withhold certain federal highway funds from any state that authorized anyone younger than twenty-one to drink alcohol.  *See id.* at 205–06.  Even assuming that Congress had no power to "regulate drinking ages directly," the Court held, Congress nevertheless had the constitutional authority to "act[] indirectly under its spending power to encourage uniformity in the States' drinking ages." *Id.* at 206.  The Court's reasoning was straightforward.  Beginning with the established principle that the Constitution gives Congress broad power to "authorize expenditure of public moneys for public purposes," *id.* at 207 (quoting *United States v. Butler*, 297 U.S. 1, 65 (1936)), the Court saw no constitutional problem with Congress's choice to use that power to give "relatively mild encouragement to the States to enact higher minimum drinking ages than they would otherwise choose," *id.* at 211.  This was so, the Court reasoned, because even if the challenged law favored certain state-level policy choices over others, the ultimate decision of where to set the drinking age "remain[ed] the prerogative of the States not merely in theory but in fact."  *Id.* at 211–12.

The same reasoning applies here.  The federal taxing power, like the spending power, "gives the Federal Government considerable influence even in areas where it cannot directly regulate."  *NFIB*, 567 U.S. at 537.  Just as Congress may impose conditions on federal spending in order to encourage federally preferred state-level policies, it may also influence the states by "enact[ing] a tax on an activity that it cannot authorize, forbid, or otherwise control."  *Id.*  Thus, in the tax context, no less than in the spending context, a court will typically not "[i]nquir[e] into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it."  *Sonzinsky v. United States*, 300 U.S. 506, 513–14 (1937); *cf. United States v. Kahriger*,

345 U.S. 22, 27 (1953) (upholding a federal tax despite "legislative history indicating a congressional motive to suppress" intrastate gambling activity (footnote omitted)), *overruled in part on other grounds by Marchetti v. United States*, 390 U.S. 39, 54 (1968).  So even if, as the States contend, Congress enacted the SALT cap in order to exert downward pressure on state and local tax rates, such a motive poses no constitutional problem as long as the states remain free "not merely in theory but in fact" to set their own tax policies.[12]  *Dole*, 483 U.S. at 211–12.

Nor have the States shown that legislative intent would be relevant even if, as they claim, Congress intended for the SALT cap's adverse effects to fall disproportionately on certain states. Article I, section 8 permits Congress to enact a tax that does not "fall[] equally or proportionately on each State," as long as the tax "operates with the same force and effect in every place where the subject of it is found." *United States v. Ptasynski*, 462 U.S. 74, 82 (1983) (quoting *Ptasynski v. United States*, 550 F. Supp. 549, 553 (D. Wyo. 1982)).  Here, the SALT cap applies equally to all state and local taxes across the nation, such that the disparate nature of its effects would not ordinarily raise constitutional concerns.  The States, of course, contend that the cap violates an independent constitutional principle announced by the Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013) — namely, "the principle that all States enjoy equal sovereignty," *id.* at 535.  *Shelby County*, though, is inapposite.  In that case, the Court invalidated part of a statutory scheme that required some (but not all) states "to obtain federal permission before enacting any law related to voting," *id.* at 535, a requirement that the Court viewed as an "extraordinary departure from the traditional course of relations between the States and the

---

[12] The Government, of course, disputes that the States have produced sufficient evidence to establish that Congress harbored any particular motive in enacting the SALT cap.  (Dkt. No. 43 at 35–38.)  Because the Court concludes that the States' arguments fail on the merits even if Congress *was* motivated by a desire to influence state and local tax policy, the Court need not decide whether the States' evidence of legislative intent is sufficient to create a factual dispute.

Federal Government," *id.* at 545 (quoting *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 500–01 (1992)).  That scheme bears no resemblance to the SALT cap, which applies to *every* state's taxpayers and does not require *any* state to "beseech the Federal Government for permission" to exercise its sovereign powers.  *Id.* at 544.  Put simply, nothing in *Shelby County* suggests that the equal sovereignty principle bars Congress from using its tax powers to incentivize state-level policy changes simply because it knows that some states will feel those incentives more forcefully than others.[13]  *See Florida v. Mellon*, 273 U.S. 12, 17 (1927) ("Congress cannot accommodate its legislation to the conflicting or dissimilar laws of the several states, nor control the diverse conditions to be found in the various states, which necessarily work unlike results from the enforcement of the same tax.").

To assess the States' coercion claim, then, the Court must look to the SALT cap's effects rather than to the aims Congress might have had in enacting it.  Specifically, the Court considers whether the States have sufficiently alleged that the SALT cap goes beyond the "relatively mild encouragement" that the Constitution permits, *Dole*, 483 U.S. at 211, and constitutes an unlawful

---

[13] Even further afield are *Massachusetts v. United States Department of Health & Human Services*, 682 F.3d 1 (1st Cir. 2012), and *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013), upon which the States rely for the proposition that, "[i]n federalism cases, courts have probed deeply into Congress's motives for enacting legislation" (Dkt. No. 57 at 15).  *Massachusetts* and *Windsor* involved equal protection challenges to an unprecedented federal law that defined marriage as exclusively heterosexual and thereby "intrude[d] extensively into a realm that ha[d] from the start of the nation been primarily confided to state regulation — domestic relations and the definition and incidents of lawful marriage."  *Massachusetts*, 682 F.3d at 12; *see also Windsor*, 699 F.3d at 186 (characterizing the law as "an unprecedented breach of longstanding deference to federalism").  But it is well established that the question of legislative purpose is central to the equal protection analysis, *see, e.g.*, *Washington v. Davis*, 426 U.S. 229, 240–41 (1976), whereas, as the Court has already explained, Congress commits no constitutional violation merely because it uses its tax powers with the intent of encouraging state-level policy changes.  And, unlike the law at issue in *Massachusetts* and *Windsor*, the SALT cap falls well within an area of traditional federal regulation, *i.e.*, the area of "tax[ing] income and . . . grant[ing] exemptions from that tax."  *Lyeth*, 305 U.S. at 194.

"gun to the head," *NFIB*, 567 U.S. at 581 (plurality opinion), by effectively coercing them into changing their tax laws.  In arguing that the cap will indeed have an impermissible coercive effect, the States point to a number of facts that they characterize as undisputed.  First, they claim that their taxpayers will pay "billions of dollars in additional federal income taxes because of the cap on the SALT deduction, relative to what they would have paid if the 2017 Tax Act had been enacted without the cap."  (Dkt. No. 46 ¶ 49; *see also id.* ¶¶ 50–54.)  Second, the States claim that the SALT cap will "make[] homeownership in the Plaintiff States more expensive and decrease[] the value of real estate in the Plaintiff States by billions of dollars" (Dkt. No. 46 ¶ 57; *see also id.* ¶¶ 58, 63, 65), with New York in particular predicting that this drop in property values will cause lower household spending, reduced in-state sales, and significant in-state job losses (Dkt. No. 46 ¶¶ 59–61).  Finally, the States anticipate that the SALT cap will cause them to lose millions of dollars in real estate transfer tax revenue.[14]  (Dkt. No. 46 ¶¶ 62, 64, 66.)

Ultimately, though, the Court cannot conclude that these claimed harms, even if real, are sufficient to establish that the SALT cap is coercive.  Two considerations lead to this result.

First, the States' estimates of how much the SALT cap increases their taxpayers' federal tax bill are based on a flawed assumption.  In making these estimates, the States have compared their taxpayers' situation under the Tax Cuts and Jobs Act as it has been enacted — SALT cap and all — to their taxpayers' situation as it would have been had Congress passed the Act without the SALT cap.  (*See* Dkt. No. 46 ¶¶ 49–54.)  There is no reason to believe, though, that the Tax Cuts and Jobs Act would have looked anything like the enacted version had Congress

---

[14] Claiming an additional purported harm, the States further point to evidence that the SALT cap places a burden on them and their taxpayers that is disproportionate to the burden it places on other states and their taxpayers.  (Dkt. No. 46 ¶¶ 47–48, 55–56.)  But the fact that the SALT cap might burden the Plaintiff States more than it burdens other states does not speak to the issue of whether the cap's impact on the Plaintiff States is so grave as to render it coercive.

not been able to cap the SALT deduction in order to counterbalance other of the Act's provisions that *lower* tax burdens, including for taxpayers in the Plaintiff States.  The States, of course, respond that "[a] court considering the constitutionality of a particular statutory provision necessarily looks to that provision's effect — not the effects of the entire enactment that contained it."  (Dkt. No. 57 at 9–10.)  But that general proposition carries little water here.  The gravamen of the States' coercion claim, after all, is that the SALT cap's effects will be so severe that the States will be compelled to change the fiscal policies that were in effect at the time of the cap's enactment.  It would make no sense for the Court, in assessing that claim, to disregard contemporaneous developments that may have blunted the cap's supposed ill effects by giving the States' taxpayers offsetting gains.[15]

Second, even if the Court does follow the States in isolating the effects of the SALT cap from all other effects of the statute in which the cap is embedded, the States have not plausibly alleged that the cap's effects are so harmful that Congress has engaged in "economic dragooning that leaves the States with no real option but to acquiesce" in the federal government's preferred state and local tax policies.  *NFIB*, 567 U.S. at 582.  In essence, the States allege that the SALT cap will burden their taxpayers so heavily that the States will be compelled to adopt ameliorative policies in response.  But the States have failed to show that the financial burden their taxpayers will experience as a result of the SALT cap is any more severe than the sort of burden that might accompany any other statewide economic disappointment.  And, having failed to make such a showing, the States are unable to take the necessary further step of plausibly suggesting that the

---

[15] The States also point out that their estimates of the SALT cap's effects on property values and real estate transfer tax revenues *do* account for all changes the Tax Cuts and Jobs Act has made to the federal Tax Code.  (Dkt. No. 61 at 52:8–17.)  But the States never argue that these lesser effects, standing alone, create an unconstitutional degree of coercive pressure.

SALT cap puts them to the forced choice of lowering tax rates or facing budgetary catastrophe. Indeed, at argument, counsel for the States as much as conceded that the cap's "budgetary implications are difficult to predict and pinpoint." (Dkt. No. 61 at 33:4–5.)

Comparing the situation here to the situation the Supreme Court confronted in *National Federation of Independent Business v. Sebelius* underscores the frailty of the States' coercion theory. In *NFIB*, the Supreme Court considered a federal law that threatened to withhold all Medicaid funding from any state that refused to expand its existing Medicaid program in specified ways. *See* 567 U.S. at 575–76 (plurality opinion). Noting that "Medicaid spending account[ed] for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs," and that "States ha[d] developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid," *id.* at 581, the Court held that the law represented an unconstitutional federal effort to coerce the states into adopting the federally desired expansion, *id.* at 585. But whereas the law at issue in *NFIB* put a state to the choice of either administering its Medicaid program in the precise way Congress directed or else suffering a "threatened loss of over 10 percent of [its] overall budget," *id.* at 582, the SALT cap simply requires the States to either exercise their sovereign powers — howsoever they wish — to avert or assuage the cap's effects or else suffer the uncertain budgetary effects of doing nothing.[16] If being put to such an open-ended choice is coercion, it will be the rare piece of federal legislation that comports with the Tenth Amendment.

---

[16] The States maintain that the increased federal tax burden their taxpayers will face as a result of the SALT cap is "similar in magnitude" to the amount of federal funds the law at issue in *NFIB* placed in jeopardy. (Dkt. No. 45 at 27.) Even if true, this point holds little weight. For one thing, the *absolute* value of the costs a challenged law threatens to impose means little without knowing the value of those costs *relative* to a state's overall budget. *Cf. NFIB*, 567 U.S. at 582 n.12 (plurality opinion) ("'Your money or your life' is a coercive proposition, whether

In the end, Congress enacted the SALT cap pursuant to its broad tax powers under Article I, section 8 and the Sixteenth Amendment.  The cap, like any federal tax provision, will affect some taxpayers more than others and, by extension, will affect some states more than others. But the cap, again like every other feature of the federal Tax Code, is a part of the landscape of federal law within which states make their decisions as to how they will exercise their own sovereign tax powers.  Because the States have failed to plausibly allege that the cap, more so than any other major federal initiative, meaningfully constrains this decision-making process, this Court has no basis for concluding that the SALT cap is unconstitutionally coercive.

## IV.   Conclusion

For the foregoing reasons, the Government's motion to dismiss is GRANTED and the States' cross-motion for summary judgment is DENIED.

The Clerk of Court is directed to close the motions at Docket Numbers 42 and 44 and to close this case.

SO ORDERED.

Dated: September 30, 2019
       New York, New York

J. PAUL OETKEN
United States District Judge

---

you have a single dollar in your pocket or $500.").  And for another thing, even if the States' *taxpayers* here might in the aggregate face an increased federal tax burden equivalent to the amount of Medicaid funding at risk in *NFIB*, nothing in the present record indicates that the States *themselves* are facing an economic threat equivalent to the threat the states faced in *NFIB*.